# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.,

*Plaintiff,*

v.

DOROTHY FINK, Acting Secretary of Health and Human Services, et al.,

*Defendants.*

Case No. 1:24-cv-3188-RC

## DECLARATION OF MEETALI DESAI IN SUPPORT OF 340B HEALTH, UMASS MEMORIAL MEDICAL CENTER, AND GENESIS HEALTHCARE SYSTEM'S MOTION TO INTERVENE

I, Meetali Desai, state as follows under the penalty of perjury:

1. I am the Director of Pharmacy Business Services at UMass Memorial Medical Center (UMass), a Proposed Intervenor in this action.

2. I have been the Director of Pharmacy Business Services for two years. Before that, I was the Manager of 340B and Pharmacy Business Office.

3. The information set forth in this affidavit is based upon my personal knowledge.

### UMass and the Community Services It Provides

4. UMass is among the nation's most distinguished academic health care systems and strives to improve the health of diverse communities throughout Central New England through clinical care, service, teaching, and research. UMass is a wholly controlled subsidiary of UMass

Memorial Health, which is a non-profit health system designed to fulfill important public health missions, including providing health services to indigent patients in Central Massachusetts and providing highly specialized clinical care. Pursuant to this mandate, UMass provides more care to indigent and underserved patients than any other provider in Central Massachusetts, accounting for over 70% of the region's Medicaid inpatient care.

5. UMass is a "covered entity," as defined in section 340B of the Public Health Service Act, 42 U.S.C. § 256b(a)(4)(A), by virtue of its qualification as a "disproportionate share" hospital that treats a large percentage of indigent patients.

6. UMass is a member of 340B Health, which is also a Proposed Intervenor in this case.

7. UMass relies heavily on savings gained through the 340B Program to meet the healthcare needs of underserved patients in its community. For example, and as further described below, UMass relies on those savings to provide services that support vulnerable populations, such as financial assistance for medications, community benefit programs, the Ronald McDonald Care Mobile Clinic, mobile addiction programs, and medical respite beds. Through these services, in FY'23 alone, UMass has served over 14,631 individuals and provided 669 prescriptions at no cost to qualifying patients.

8. Through a program that provides financial assistance for medications, UMass offers free prescription medications to uninsured patients and dedicates resources to connect underinsured individuals with financial support options, such as copay assistance programs, grants, and charitable foundations.

9. 340B also supports UMass' Child Protection Program, which is the only comprehensive program in the region that addresses clinical issues associated with child abuse, neglect, and placement in substitute care.

10. In addition, UMass offers community benefit programs, which target ethnically diverse, low-income patients who are medically underserved. Those programs focus on addressing social determinants of health, reducing racial and ethnic health disparities and substance abuse, and improving mental health, violence prevention programs, access-to-care services, and pediatric asthma interventions. For example, UMass provides medical services at Hector Reyes House, a residential substance abuse treatment program for Latino men. In addition to offering on-site medical care and cognitive behavioral therapy, which reduces relapses and improves transitions to independent living, the program offers job training and workforce skill development. UMass also participates in a city-wide task force that addresses high rates of pediatric asthma and related emergency department visits through evidence-based intervention programs. In those programs, culturally competent community health workers provide home visits to ensure that medication is correctly administered and to address home triggers.

11. Additionally, UMass' Ronald McDonald Care Mobile Clinic provides free health care and dental services to medically underserved populations in ten low-income neighborhoods. The Clinic provides more than 4,500 annual visits and partners with twenty-eight local public schools.

12. UMass also provides mobile addiction services through its Road to Care Mobile Addiction Team, which provides health services to individuals with behavioral health and substance use disorders at sites frequented by the homeless population. Those services include health screenings, primary care, substance use disorder treatment, screenings for sexually transmitted infections, referrals to social support services, and laboratory and medication services. The program aims to reduce morbidity and mortality and break down healthcare

barriers, such as a lack of transportation and trust in the healthcare system. In 2023, the program had 3,699 clinical encounters and served nearly 869 patients, a 76% increase from the previous year, reflecting the increase in demand for the program.

13. In partnership with South Middlesex Opportunity Council, UMass provides post-acute medical care and social support to individuals experiencing homelessness who have been discharged from the hospital and still require medical attention.

14. UMass also operates the St. Paul Consortium Mental and Behavioral Health Equity Initiative, which provides mental health counseling and clinical observation to adolescents. In 2023, the initiative reached more than 800 students in four schools from PreK to 12th grade, and there are currently more than fifty students receiving ongoing counseling.

**The Impact of the Proposed Rebate Model on UMass**

15. I have had the opportunity to review Johnson & Johnson's (J&J's) proposed rebate model and to evaluate its potential impact on UMass' current operations. J&J's proposed rebate model threatens to drastically cut the 340B savings UMass uses to fund the community services described above.

16. At the outset, UMass will be forced to divert significant funds—it estimates nearly $400,000 annually—from its normal operations to comply with J&J's proposed rebate model.

17. In late 2020, a handful of drug manufacturers adopted a program under which 340B hospitals such as UMass could only use pharmacies outside their hospitals to sell 340B drugs if they provided the drug manufacturer with hospital claims data. By 2023, several other drug manufacturers had imposed similar claims data requirements. Because the financial consequences of not participating in this program would have been devastating, UMass participated, which required it to hire new staff. Based on that experience, UMass projects that it

will need to hire and train a new full-time employee to participate in J&J's proposed rebate program, who will be tasked solely with submitting claims, reconciling payments, disputing denied rebates, preparing monthly financial reports, and updating current databases and dashboards that currently account for 340B funds.

18. Additional funds would also be required to cover legal fees incurred for compliance consultations.

19. UMass also expects that it will have to overcome significant hurdles to maintain compliance with J&J's proposed rebate model, many of which are beyond its control and could lead to delays in receiving rebates or even result in UMass not getting rebates to which they would otherwise be entitled. Specifically, J&J requires 340B hospitals to submit claims within 45 days of dispensing the two drugs affected by the proposed rebate model. However, according to J&J's policy, rebate payments will only be made once the number of "validated dispensed units" matches the number of units in the purchased package size. For example, if UMass buys a drug package with 100 units on January 1, 2026, dispenses 25 units on January 2, 2026, but does not dispense the remaining 75 units until March 1, 2026 (due to lack of patient need), under J&J's policy, UMass will not receive a rebate payment before March 1, 2026. UMass presently does not know whether the initial 25 units the hospital dispensed on January 2 and for which the data was timely submitted would be validated, as those units would be more than 45 days old by the time the full package size of 100 units is reached on March 1. If the 25 units were not validated by J&J, UMass does not know whether J&J would require it to dispense 25 more units to reach the full package size (thus creating further delay) or whether J&J would make a partial rebate payment for the 75 units dispensed on March 1, potentially leaving UMass with a financial loss for the 25 units.

20. UMass also expects that it would be required to expend funds challenging disputed claims through the federal Administrative Dispute Resolution (ADR) process. UMass has prior experience filing claims through the ADR process and based on that experience, expects to spend, at minimum, $200,000.00 per ADR filing (which may include multiple, similar claims), inclusive of the appeals, in legal fees and expenses.

21. Diverting funds to comply with J&J's proposed rebate model will significantly undercut UMass's ability to fund the health services and programs that its community has come to rely on.

22. Additionally, UMass is extremely concerned that J&J will not fully comply with its duties under the proposed rebate model and will improperly deny rebate claims. UMass estimates that it would need to spend an additional $24 million per year to purchase STELARA and XARELTO at full price upfront. If that significant additional upfront cost is not promptly – or ever – reimbursed through a rebate UMass will suffer serious financial harm.

23. Based on prior experience with the growth of contract pharmacy regulations, UMass has every expectation that the number of drug manufacturers imposing rebate models will continue to grow if J&J is allowed to proceed with its proposed rebate model. In fact, Sanofi-Aventis U.S. LLC, Eli Lilly and Company, Novartis Pharmaceuticals Corporation, and Bristol Myers Squibb have already announced their intention to implement rebate programs. Should many drug manufacturers impose a rebate model, the cost of having to purchase 340B drugs at their full price instead of their discounted price would create such a financial loss that UMass would have to make significant cuts to its community programs described above to stay afloat. Even if all drug manufacturing companies eventually provided rebates for all 340B drugs

purchased (an outcome UMass does not expect), waiting to receive those rebates after purchasing drugs at significantly higher prices would cause the hospital significant financial harm.

On this 29th day of January, 2025, I declare under penalty of perjury that the foregoing is true and correct.

_____
Meetali Desai
Director, Pharmacy Business Services
UMass Memorial Medical Center