# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHNSON & JOHNSON HEALTH CARE
SYSTEMS INC.,

*Plaintiff,*

v.

DOROTHY FINK, in her official capacity,
and U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

and

DIANA ESPINOSA, in her official capacity,
and HEALTH RESOURCES AND SERVICE
ADMINISTRATION,

*Defendants*

Case No. 1:24-cv-03188

## MOTION FOR LEAVE BY AMICI CURIAE,
## CF UNITED AND ADAP ADVOCACY,
## TO FILE AN AMICUS BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

William A. Sarraille (D.C. Bar No. 431872)
SPECIAL COUNSEL TO AMICI CURIAE
11322 BEACH MILL ROAD
Great Falls, VA 22066
Telephone: (202) 390-5679
williamsarraille@icloud.com

*Counsel for CF United and ADAP Advocacy*

Dated: February 10, 2025

Amici Curiae, CF United ("CF United") and ADAP Advocacy Association, Inc. ("ADAP Advocacy"), both patient advocacy groups, move this Court, by and through counsel, for leave to file an amicus brief in support of Plaintiff's Motion for Summary Judgment. Plaintiff's motion raises a series of critically important patient issues. As patient advocates, Amici Curiae are deeply concerned that the 340B program is broken and failing patients. 340B, as it explodes in size and generates billions of dollars for covered entities, particularly 340B hospitals, shows no corresponding benefit to uninsured and underinsured patients in the form of charity care assistance, including lower out-of-pocket costs at the pharmacy counter. Indeed, as the program is burgeoning, charity care ratios for 340B hospitals have *fallen*.

Although Plaintiff spends some of its briefing regarding the rebate model on the patient perspective, Amici Curiae believe that the amicus brief that they have prepared will significantly deepen the Court's understanding of the importance of the rebate model to patients and why that model is so desperately needed. Ultimately, because manufacturers, like Plaintiff, and the government have their own perspectives on the 340B program, a distinctly patient-focused perspective is needed to fully address the important issues raised here. That distinct perspective is reflected in Amici Curiae's understanding of the origins of 340B program; the purpose of its expansion under the Affordable Care Act; the disappointing effect of that expansion on charity care, including at the pharmacy counter; the potential impact of a rebate model on the resulting and patient critical affordability issues; and why, from a patient perspective, the text, structure, and purpose of the 340B statute demonstrate that rebates are specifically authorized by statute.

CF United is a grassroots advocacy organization led by rare disease patients and caregivers. As an independent patient voice, it is dedicated to creating affordable access to life-saving medications. Through advocacy, education, and community engagement, it amplifies

patient voices to drive meaningful policy change and protect the rights of those living with rare diseases and complex medical conditions. Sadly, cystic fibrosis patients typically spend significant spans of time in hospitals, sometimes for weeks at a time. Although those admissions often occur at 340B hospitals, all too many cystic fibrosis patients are not offered charity care, either with the costs associated with their hospital stays or on the outpatient 340B drugs they depend for their health and well-being thereafter. Indeed, many patients are never even informed by those 340B hospitals that there is such a thing as "charity care".  The consequence of this is that most patients, despite the dramatically lower pricing offered under the 340B program, do not share in that pricing at all.

ADAP Advocacy's mission is to promote and enhance the AIDS Drug Assistance Programs (ADAPs) and improve access to care for persons living with HIV/AIDS.  ADAP Advocacy works with a range of stakeholders to foster greater community collaboration for the benefit of patients.  It strongly supports the 340B program as a potential means to make health care for patients more affordable by supplying 340B covered entities with subsidies that can (and should) be used to support a reasonable level of charity care to the uninsured and underinsured, including at the pharmacy counter. Unfortunately, despite the explosive growth of the 340B program, which now generates approximately $58 billion in profits to covered entities, on an annual basis, many 340B covered entities, particularly 340B hospitals, provide an abysmally low level of charity care.[1]

---

[1] Because of the differences between 340B hospitals and some other covered entities, like clinics serving HIV and AIDS patients, Amici Curiae appreciate that, in deploying rebate mechanisms, manufacturers, like Plaintiff, have taken such steps as carving out some 340B clinic types, limiting the number of drugs involved, designing rapid payment turn-arounds, and/or considering even faster payments where a covered entity commits to share 340B pricing with patients.

Importantly, as reflected in the proposed amicus, ADAP Advocacy has prepared a "340B Map" that shows, for various facilities, how the program has grown, the level of chief executive compensation (which often has increased, quite dramatically), and the level of charity care (which fails, rather consistently, to correspond in any meaningful way to the explosive program expansion). ADAP Advocacy believes that this data will be useful for the Court to consider in addressing the issues framed by this case.

No party's counsel authored this brief in whole or in part, and no party, its counsel, or any other person—other than Amici Curiae or its counsel—contributed money intended to fund preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Plaintiff has consented to the filing of this amicus brief, and the government takes no position.

In debating the 340B program, the Health Care Resources and Services Administration and others often fail to consider the perspective and needs of the patient. We urge this Court, in addressing the important issues presented here, to consider that perspective and those needs. Amici submit the proposed amicus brief in support of Plaintiff's Motion for Summary Judgment, *see* Attachment A, because the rebate model is a vehicle to bring transparency to the program, it will benefit patients, and it is clearly permitted by the plain language, structure, and purpose of the statute.

A form of order is provided for the Court's consideration as Attachment B.

Respectively submitted,

/s/ _____
William A. Sarraille (D.C. Bar No. 431872)
SPECIAL COUNSEL TO AMICI CURIAE
11322 BEACH MILL ROAD
Great Falls, VA 22066
Telephone: (202) 390-5679
williamsarraille@icloud.com

Dated: February 10, 2025          *Special Counsel for CF United and ADAP Advocacy*

# ATTACHMENT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> *Plaintiff*, <br><br> v. <br><br> DOROTHY FINK, in her official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> and <br><br> DIANA ESPINOSA, in her official capacity, and HEALTH RESOURCES AND SERVICE ADMINISTRATION, <br><br> *Defendants* | Case No. 1:24-cv-03188 |

## BRIEF OF CF UNITED AND ADAP ADVOCACY AS
## *AMICI CURIAE* IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

William A. Sarraille (D.C. Bar No. 431872)
SPECIAL COUNSEL TO AMICI CURIAE
11322 BEACH MILL ROAD
Great Falls, VA 22066
Telephone: (202) 390-5679
williamsarraille@icloud.com

*Special Counsel for CF United and ADAP Advocacy*

Dated: February 10, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

CORPORATE DISCLOSURE STATEMENT ...................................................................... v

IDENTITY AND INTEREST OF *AMICI CURIAE* ....................................................... 1

SUMMARY OF ARGUMENT .............................................................................................4

BACKGROUND ....................................................................................................................5

    A.  The Origins of 340B ........................................................................................... 5

    B.  The 340B Program and the Affordable Care Act ............................................... 7

    C.  As 340B Profits Burgeoned, Charity Care Ratios Fell ...................................... 8

    D.  340B Growth Drivers .........................................................................................11

    E.  Plaintiff's Proposed Model .............................................................................. 14

ARGUMENT ........................................................................................................................15

    I.     A REBATE MODEL IS A BADLY NEEDED MEANS TO ENABLE PATIENTS
          TO UNDERSTAND IF THEY ARE SHARING IN 340B PRICING ............................15

    II.    PLAINTIFF'S MODEL IS A BONA FIDE OFFER COMPLETELY
          CONSISTENT WITH THE STATUTE…………………………………….................16

    III.   THE PLAIN LANGUAGE OF THE STATUTE SPECIFICALLY AUTHORIZES
          REBATES, AND HRSA IS WITHOUT ANY AUTHORITY TO PRECLUDE
          THEM ..................................................................................................................18

    A.  The Plain Language of the Statute Clearly Demonstrates that Rebates Are
       Specifically Authorized, without any "Pre-Approval" by the Secretary .......................... 19

    B.  The Structure of the Statute Is Formed by the Distinction between the "Ceiling
       Price" and the "Amount Required to Be Paid" ............................................... 20

    C.  It Would Be Arbitrary and Capricious for the Secretary to Disregard Rebates
       Actually Paid to Covered Entities…………………………………………………… ........22

CONCLUSION ....................................................................................................................24

CERTIFICATE OF COMPLIANCE ....................................................................................25

CERTIFICATE OF SERVICE .............................................................................................26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Jimenez v. Quarterman*,
 555 U.S. 113 (2009) ........................................................................... 18

*Novartis Pharms Corp. v. Johnson*,
 102 F. 4th 452 (D.C. Circ. 2024) ................................................... 2, 14, 16-18, 23

*Sanofi Aventis U.S. LLC v. HHS*,
 58 F. 4th 696 (3d Circ. 2023) ............................................................ 2

*United States v, Granderson*,
 511 U.S. 39 (1994) ............................................................................ 22

**Statutes and Regulations**

42 U.S.C. § 1396r-8(c)(1)(C) ............................................................... 4

42 U.S.C. § 256b ........................................................................... 19-24

62 Fed. Reg. 45,823 (Aug. 29, 1997) ................................................. 20

The Affordable Care Act, Pub. L. No. 111-148 (2010) ....................... 7

**Rules**

Fed. R. App. P. 29(a)(4)(E) ................................................................. 1

**Other Authorities**

340B Insider, Cloudmed, *Legal Considerations and Compliance for 340B Program Optimization* (last visited Feb. 7, 2025) ............................................ 3

ADAP Advocacy, 340B Map (last visited Feb. 7, 2025) ..................... 10

Aimed Alliance, "Study Finds 340B Hospitals Significantly Markup Infusion Drugs" ................ 9

AIR340B, *340B – A Missed Opportunity to Address Those That Are Medically Underserved: 2023 Update*. (2023) ............................................ 12

AIR340B, *Charity Care at 340B Hospitals Is on a Downward Trend* (Oct. 2023) ...................... 8

D. Bell, "Rebates at the Point of Sale", *The Actuary* (May 2020) ................. 17

Eleanor Blalock, BRG, *Measuring the Relative Size of the 340B Program; 2020 Update* (June 2022) ....................................................................................................9

Bristol Myers Squibb v. Fink, et al., 1:24-cv-03337, Complaint (D.D.C.) ....................................16

Commonwealth Fund, "The State of Health Insurance Coverage in the U.S." (2024) (last visited Feb. 7, 2025) ........................................................................................13

R. Conti *et al.*, *The 340B Drug Discount Program: Hospitals Generate Profits By Expanding to Reach More Affluent Communities*, 33 Health Affs. 1786 (2014)....................12

Adam J. Fein, *The 340B Program Climbed to $44 Billion in 2021 – With Hospitals Grabbing Most of the Money*, Drug Channels (Aug. 15, 2022) ....................................................8

Adam Fein, *The 340B Program Reached $66 Billion in 2023 – Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024)...........9

Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023)........................2

Adam Fein, *Hospitals Are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions*, Drug Channels (Oct. 2, 2024) ............................................12

Nicholas C. Fisher, *The 340B Program: A Federal Program In Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. Health Care L. & Pol'y 25 (2019) ..........................................................................................................4, 5

Ellen Graber, "How a Company Makes Millions Off a Hospital Program Meant to Help Patients", *New York Times* (Jan. 15, 2025) ....................................................................10, 11

Hearing Before the Subcommittee on Oversight and Investigations, "Examining How Covered Entities Utilize the 340B Drug Pricing Program" (Oct. 11, 2017) ............................7

H.R. Rep. No. 102-384, pt. 2 (1983) ....................................................................................4, 6, 19

HRSA, *2022 340B Covered Entity Purchases* (last visited Feb. 7, 2025) ....................................14

HRSA, *2023 340B Covered Entity Purchases* (last visited Feb. 7, 2025) ....................................9

Kaiser Family Foundation, "Distribution of the Total Population by Federal Poverty Level" (last visited Feb. 7, 2025) ..............................................................................................13

Nicole Longo, *340B Program Remains Second Largest Federal Drug Program, Yet Little Solid Evidence of Benefits to Patients*, PhRMA (June 30, 2022)................................................2

R. Martin *et al.*, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023* (May 10, 2024) ......................................................................................................................... 9

R. Martin *et al.*, IQVIA, *Are Discounts In the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?* (last visited Feb. 7, 2025) .......................... 12

R. Martin *et al.*, IQVIA, *Unintended Consequences: How the Affordable Care Act Helped Grow the 340B Program* (Aug. 30, 2024) .................................................................. 12

Minnesota Department of Health, 340B Covered Entity Report (Nov. 15, 2024) ........................ 17

Pioneer Institute, Hospital Charity Care (last visited Feb. 7, 2025) ......................................... 8, 13

Pioneer Institute, Hospital Charity Care, Massachusetts (2022) (last visited Feb. 7, 2025) ......... 10

Pioneer Institute, Hospital Charity Care, New Mexico (2022) (last visited Feb. 7, 2025) ........... 11

J. Robinson *et al,* "Hospital Prices for Physician-Administered Drugs for Patients with Private Insurance", N Eng J Med 2024;390:338-345 (Jan. 24, 2024) ...................................... 9

S. Thomas *et al.*, Health Studies Research, "The Unintended Consequences of the 340B Safety Net Drug Discount Program", 2020 Mar.1; 55(2):153-156 ........................................... 7

U.S. Department of Health and Human Services, "About the Affordable Care Act" ................... 7

U.S. Department of Health and Human Services, HealthCare.Gov, "Federal Poverty Limit" (last visited Feb. 7, 2025) ............................................................................................ 13

S. Wright*,* "Memorandum Report: Contract Pharmacy Arrangements in the 340B Program", OEI-05-13-00431, U.S. Department of Health and Human Services, Office of the Inspector General (Feb. 4, 2014) ................................................................................ 7-8

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, CF United and ADAP Advocacy state that they have no parent companies or subsidiaries, are not publicly held corporations, and that no part of their ownership is held by any publicly held corporation.

## IDENTITY AND INTEREST OF *AMICI CURIAE*[2]

CF United ("CF United") and ADAP Advocacy Association, Inc. ("ADAP Advocacy") are not-for-profit patient advocacy groups. CF United is a grassroots advocacy organization led by rare disease patients and caregivers. As an independent patient voice, it is dedicated to ensuring continued, affordable access to life-saving medications. Through advocacy, education, and community engagement, it amplifies patient voices to drive meaningful policy change and protect the rights of those living with rare diseases and complex medical conditions. ADAP Advocacy's mission is to promote and enhance the AIDS Drug Assistance Programs (ADAPs) and improve access to care for persons living with HIV/AIDS. ADAP Advocacy works with a range of stakeholders to foster greater community collaboration for the benefit of patients.

Both organizations strongly support the 340B program as a potential means to make health care for the patients that they serve more affordable. Under the program, 340B covered entities receive billions in subsidies that should enable them, in turn, to support a reasonable level of charity care to the uninsured and underinsured, including at the pharmacy counter. Unfortunately, despite the explosive growth of the 340B program, which now generates approximately $58 billion in profits to covered entities annually, many 340B covered entities provide an abysmally low level of charity care, including to patients in need at the pharmacy counter. Sadly, too many covered entities, particularly 340B disproportionate share hospitals, have aggressively committed themselves to abusing the 340B program by maximizing their profits while reducing their charity care ratios. Amici Curiae serve those patients, hear from them about their struggles to access

---

[2] No party's counsel authored this brief in whole or in part, and no party, its counsel, or any other person—other than Amici Curiae or its counsel—contributed money intended to fund preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). Plaintiff has consented to this brief and the Federal Defendants take no position.

charity care at these covered entities, and try to help those patients not lose access to the drug therapies on which their health depends as a consequence.

Amici Curiae are committed to ensuring that pharmaceutical patients in need, including chronic and rare disease patients, receive a direct benefit[3] from the massive subsidies provided by the program, as intended by Congress. Despite the billions that are made available to 340B covered entities,[4] there is disappointedly little evidence that those billions actually benefit pharmaceutical patients in the form of charity care, including assistance at the pharmacy counter. Indeed, there is substantial evidence that billions in subsidies are diverted to third parties, like large, for-profit retail pharmacy chains and "administrators," many of whom are affiliated with massive entities called pharmacy benefit managers that control much of health care.[5]

Amici Curiae write in support of Plaintiff Johnson & Johnson Health Care Systems, Inc.'s ("Plaintiff") motion for summary judgment because they believe that the rebate model is the only way to change this unacceptable situation. The 340B program, mired in opaqueness for years, must be made transparent. The rebate model would do exactly that.

---

[3] *See* Nicole Longo, *340B Program Remains Second Largest Federal Drug Program, Yet Little Solid Evidence of Benefits to Patients*, PhRMA (June 30, 2022), https://phrma.org/Blog/340b-program-remains-second-largest-federal-drug-program-yet-little-solid-evidence-of-benefits-to-patient.

[4] Covered entities have "a financial incentive to catalog as many prescriptions as possible as eligible for [a 340B] discount", *Novartis Pharms. Corp. v Johnson,* 102 F.4th 452, 457-58 (D.C. Cir. 2024), because they generate "revenue from serving insured patients" by "turn[ing] a profit" when "the insurance companies reimburse them at full price for drugs that they bought at the 340B discount", *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 699 (3d Cir. 2023).

[5] Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023), https://bit.ly/3ZH23yG (discussing the "dominate[]" positions of such sprawling for-profit pharmacy chains and PBMs, as CVS Health, Walgreens, Cigna, Express Scripts, UnitedHealth Group,  OptumRx, and Walmart).

The rebate model can provide the platforms and the data to understand, clearly and without obfuscation or manipulation, what the connection is (or isn't) between a 340B covered entity and the person that receives the drug[6] and whether bona fide 340B patients in need receive assistance at the pharmacy counter.  To justify the billions in subsidies generated off of the drug therapies of 340B patients, many of whom pay substantial sums out of their own pockets to help fund those massive subsidies, 340B must operate as a means to enable patients in need to secure the benefit of drug discounts at the pharmacy counter.

In opposing the transparency that the program and patients so desperately need, the Health Services and Resources Administration ("HRSA"), sadly, has put the interests of 340B entities that do not share their discounts with their patients above the needs of vulnerable patients.[7] Further, HRSA's position that it and only it can "approve" a transparent model for the operation of the 340B program is completely inconsistent with the text, structure, and purpose of the statute. HRSA is seeking an unworthy end through unlawful means.

Amici Curiae, with their patient advocacy focus and mission, seek to assist the Court by providing additional information on the 340B statute, its history, and how the 340B program is

---

[6] Even some 340B advocates acknowledge excesses in the manner that some covered entities "claim" a patient for purposes of 340B purchases—and the profits that can be generated by doing so.  *See* 340B Insider, Cloudmed, *Legal Considerations and Compliance for 340B Program Optimization*, https://www.cloudmed.com/resource/340b-insider-december-2022/ (various covered entities take the extreme position that "everybody we have ever treated at any point is our patient") (last visited Feb. 7, 2025).

[7] Amici Curiae feel compelled, as patient advocates, to comment on HRSA's threat to remove Plaintiff from the 340B program.  This would effectively cut off drug therapy coverage for hundreds of thousands of Medicare and Medicaid patients dependent for their health and well-being on any of Plaintiff's many medications.  Though Amici Curiae take no pleasure in saying this, that threat, with its disturbing implications for vulnerable patients with rare and chronic diseases, was a recklessly anti-patient act. Amici Curiae are deeply concerned about this threat, which is so obviously detrimental to the interests of patients.

failing patients.  In debating the 340B program, HRSA and others often fail to consider the perspective and needs of the patient.  We urge this Court, in addressing the important issue presented here, to consider that perspective and those needs.  Amici submit this brief in support of Plaintiff because the rebate model is a vehicle to bring transparency to the program and is clearly permitted by the plain language, structure, and purpose of the statute.

## SUMMARY OF ARGUMENT

Designed to help the uninsured and the underinsured by focusing on providers devoted to their "direct care",[8] the 340B program, now more than thirty years in, has utterly lost its way.  Even as the 340B program dramatically expanded, in particular over the course of the last fifteen years, all too many covered entities have cut their charity care ratios, adversely affecting the very patients who are struggling to afford their medications at the pharmacy counter.[9]  Despite the fact that it is their prescriptions that generate, collectively, billions in subsidies to covered entities, patients are left to pay out-of-pocket amounts for their drugs that they cannot afford. All too often patients who qualify for charity care are not offered that assistance. Typically, patients of covered entities paying out-of-pocket for the medications on which their health depends are not even told that they are not sharing—at all—in the steeply reduced prices that their providers receive.

Amici Curiae urge this Court to grant Plaintiff's Motion for Summary Judgment for the following reasons. *First*, patients are in desperate need for the transparency that only the rebate model can provide into what, to this point, has been a hopelessly opaque program.  This Court should grant Plaintiff's motion because rebate models can benefit all stakeholders, including

---

[8] *See* House Report 102-384, Pt. 2, at 10-12 (1983); *see also* 106 Stat. at 4962 (codified at 42 U.S.C. § 1396r-8(c)(1)(C)).

[9] *See* Nicholas C. Fisher, *The 340B Program: A Federal Program in Desperate Need of Revision After Two-and-a-Half Decades of Uncertainty*, 22 J. Health Care L. & Pol'y 25, 30 (2019).

patients, by providing each stakeholder group with the information necessary to ensure that the program is being operated in a fashion that serves each stakeholders' legitimate interests. For patients, rebate models offer a means, finally, to understand when 340B concessions are being shared with them and when, even though it is their therapy that is generating profits for the covered entity, the patient is receiving no benefit at the pharmacy counter.

*Second*, the *Novartis*, 102 F.4th at 462-63, bona fide offer test is clearly satisfied here. Plaintiff's proposed rebate model, limited to disproportionate share hospitals, only involving two drugs, and requiring payment between "seven and ten days" (faster than normally required for other rebate customers and faster even than the expedited payment window that the Secretary has established under the Inflation Reduction Act, *see, infra*, at 14) is far from the "onerous" conditions necessary to establish that an offer is not bona fide.

*Third*, the text, structure, and purpose of the 340B statute demonstrates that rebates are specifically authorized as a means to effectuate the 340B price, and HRSA has absolutely no authority to prevent the use of those rebates—or the transparency they would bring to the program. HRSA's contention that it has a "pre-approval" power is atextual and ahistoric, arbitrary and capricious, and leads, inevitably, to absurd results.

## BACKGROUND

### A. The Origins of 340B

The 340B program was created by Congress in 1992 to address an "unintended consequence" resulting from the enactment of the Medicaid Drug Rebate Program in 1990.[10] Previously, manufacturers provided substantial price concessions, voluntarily, that directly

---

[10] *See* Nicholas C. Fisher, 22 J. Health Care L. & Pol'y at 30.

benefited patients at the pharmacy counter.[11] But, because Congress did not anticipate that the creation of the Medicaid program would compel manufacturers to abandon those voluntary concessions, Congress inadvertently forced the prices of drugs to vulnerable patients to be raised, precipitously higher, which adversely affected patients at the pharmacy counter.

Some 340B advocates claim, rather cynically, that Congress, in correcting this Medicaid issue, only intended the program to benefit covered entities.  That is untrue. The loss of the voluntary discounts quite clearly and directly affected uninsured and underinsured patients dependent on drug therapies, who were forced to pay more out of their pockets as a consequence. The contention that the development of the 340B program was only about the covered entities and not about the prices vulnerable patients were required to pay out of pocket is manifestly wrong— and a perversion of the program and its origins.

When Congress enacted the 340B program, it referenced federally-funded clinics and public hospitals precisely because they "*serve* large numbers of *low-income and uninsured patients*."[12]  Similarly, Congress spoke explicitly to the fact that, in permitting covered entities to access discounts, it was motivated to do so because those entities "provide *direct clinical care* to large numbers of *uninsured* Americans."[13] Indeed, the single line from the legislative history that 340B advocates cite as reflecting Congress' original intent says the same thing, when fully quoted. Though Congress referenced "stretching … resources", it did so specifically in a context that

---

[11] *See id.* at 29.

[12] House Report, at 10–12 (1992) (emphasis added).

[13] *See* House Report at 12 (emphasis added).

stressed the underlying purpose of "better *serv[ing] underinsured and underinsured patients*".[14]
Those vulnerable patients are most directly impacted at the pharmacy counter and that specific
context was the one most directly affected by the Medicaid rebate program's unintended effect of
decreasingly the cost of pharmaceuticals used by vulnerable patients.

In other words, Congress did not see a distinction between the covered entities and the
needy patients they were expected to serve; one (the entities) were referred to because the needs
of the other (the patient) were embedded in the first; they were viewed as two sides of the same
coin.

### B.  The 340B Program and the Affordable Care Act

In 2010, when the Affordable Care Act[15] ('the ACA") was enacted, Congress also
expanded the 340B program. Those two steps were meant to work hand in glove to bring
affordable health care to patients in need,[16] including patients dependent on drug therapies who
need assistance at the pharmacy counter.[17] At that time, 340B covered entities made less than $6
billion in purchases under the program.[18]

---

[14] *See* Hearing Before the Subcommittee on Oversight and Investigations, "Examining How
Covered Entities Utilize the 340B Drug Pricing Program" (Oct. 11, 2017) (emphasis added).

[15] Public Law 111-148 (2010).

[16] U.S. Department of Health and Human Services, "About the Affordable Care Act",
https://www.hhs.gov/healthcare/about-the-aca/index.html (ACA designed to "[m]ake affordable
health insurance available to more people").

[17] S. Thomas, *et al.,* Health Services Research, "The Unintended Consequences of the 340B
Safety Net Drug Discount Program", 2020 Mar. 1;55(2):153-156,
https://pmc.ncbi.nlm.nih.gov/articles/PMC7080379/ (the "340B Drug Pricing Program was
created", among other purposes, "to increase access to outpatient medications for low-income
and uninsured patients).

[18] S. Wright, "Memorandum Report: Contract Pharmacy Arrangements in the 340B Program",
OEI -05-13-00431, U.S. Department of Health and Human Services, Office of the Inspector

Then, as now, a small fraction of the covered entities, 340B disproportionate hospitals, were the recipients of almost 80% of the subsidies generated by the program.[19]  Despite their often massive size, resources, and 340B subsidies, most disproportionate share hospitals had charity care rates that failed to even meet the national average.[20] The picture was not any better for all 340B hospital types, whose charity care ratios was  a disappointingly low 2.60%.[21]

For those who advocated for the ACA, including patient advocates, the hope and expectation was that, with the expansion of the program, covered entities, particularly 340B hospitals, would significantly expand their commitment to patients in need, including those at the pharmacy counter.  That was a central part of Congress' plan to bring more affordable health care to the uninsured and the underinsured.

**C.  As 340B Profits Burgeoned, Charity Care Ratios Fall**

Fast forward to now, fifteen years after the ACA was enacted, and the intervening years tell a very sad tale of a program that has exploded, without any demonstration of any corresponding benefit in the level of charity care the uninsured and underinsured receive.

There can be no legitimate dispute that the 340B program's growth has been dramatic.  By HRSA's own calculation, the program now involves $66 billion in heavily discounted purchases

---

General (Feb. 4, 2014) (finding a bit more than $7 billion in 340B sales in 2013, after the program had begun to expand following the passage of the ACA).

[19] *See* Adam J. Fein, *The 340B Program Climbed to $44 Billion in 2021—With Hospitals Grabbing Most of the Money*, Drug Channels (Aug. 15, 2022), https://www.drugchannels.net/2022/08/the-340b-program-climbed-to-44-billion.html.

[20] AIR340B, *Charity Care at 340B Hospitals is on a Downward Trend* 2, 6 (Oct. 2023), https://bit.ly/4eicWep.

[21] Pioneer Institute, Hospital Charity Care, available at https://pioneerinstitute.org/340babuse/hospital-charity-care/ (last visited Feb. 7, 2025) (2011 figures).

on an annual basis.[22] That is at least 11 times the size of the estimate program in 2010. Those heavily discounted drugs now have a list price value of $124 billion, [23] a figure that likely understates, quite significantly, the true reimbursement value of the drugs.[24]  In other words, the 340B program provides now on the order of $58 billion[25] (or more) in yearly subsidies.

Cruelly, even as vulnerable patients' need for drug therapies permitted covered entities, particularly 340B hospitals, to increase their 340B profits by billions and billions of dollars, those 340B hospitals not only failed to increase their percentage commitments to charity care, they dramatically *decreased* their charity care ratios.  Even as the 340B program expanded and expanded and expanded, providing billions more in subsidies, 340B hospitals' charity care ratios

---

[22] Adam Fein, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024), https://bit.ly/4fhCnwP.

[23] R. Martin, et al., IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023* (May 10, 2024), available at https://www.iqvia.com/locations/united-states/library/white-papers/the-340b-drug-discount-program-grew-to-$124b-in-2023 (last visited Feb. 7, 2025).

[24] That is the case, in no small measure, because 340B hospitals mark up their drugs enormously in selling to commercial, employer, and Medicare payors. *See* Aimed Alliance, "Study Finds 340B Hospitals Significantly Markup Infusion Drugs", available at https://aimedalliance.org/study-finds-340b-hospitals-significantly-markup-infusion-drugs/ (last visited Feb. 7, 2025) ("Specifically, markups for some commonly administered infusion drugs were 6.59 higher at 340B hospitals than at independent doctor practices, and 4.34 times higher than at non-340B hospitals."); *see also* J. Robinson, *et al.,* "Hospital Prices for Physician-Administered Drugs for Patients with Private Insurance", N Engl J Med 2024;390:338-345, DOI: 10.1056/NEJMsa2306609 (January 24, 2024) (cited in the Aimed Alliance article).

[25] *Compare id.* (list value of 340B purchases equaling $124 billion), *with* HRSA, *2023 340B Covered Entity Purchases* ($66 billion in acquisition costs in 2023, creating a "spread" estimate of $58 billion), available at https://www.hrsa.gov/opa/updates/2023-340b-covered-entity-purchases (last visited Feb. 7, 2025); *see also* Eleanor Blalock, BRG, *Measuring the Relative Size of the 340B Program; 2020 Update*, at 7 (June 2022), https://media.thinkbrg.com/wp-content/uploads/2022/06/30124832/BRG-340B-Measuring-Relative-Size-2022.pdf. (analyzing the delta in list to acquisition price for 2020).

plummeted. By 2022, the last year for which those charity care data are available, 340B hospital charity care had fallen from 2.60%, in 2011, to 2.15%. That is almost a 20% drop, even as 340B program purchases increased by 1,000%.[26] Those increased purchases brought massive new opportunities to profit on the "spread" between the low acquisition prices and the reimbursement value of those drugs, but with no corresponding increase in charity care, including at the pharmacy counter.

One of the Amici Curiae here, ADAP Advocacy, has produced a "340B Map" that drills down on this disturbing problem.[27] The map shows, for a wide cross-section of covered entities, including a number of 340B hospitals, growth in 340B revenues and, in many cases, a simultaneous fall in charity care ratios. Johns Hopkins University Hospital, for example, has seen a 329% increase in its 340B revenues, taking its total revenues over a billion dollars, while its charity care ratio has fallen by 21% in the same period. Sutter Valley Hospitals, one of the largest hospital systems in the country, has seen a 259% increase in 340B revenues, part of its total revenues that now exceed $16 billion annually, while its charity care ratio has fallen by 72%. Sutter's chief executive officer compensation has increased 1,133%.

The *New York Times* recently reported on a patient example that, rather shockingly, illustrates the problem.[28] Virginia King, a metastatic breast cancer patient, sought drug therapy

---

[26] Many hospitals have charity care ratios way below even these low averages, however. UMass Medical Center, for instance, according to Pioneer Institute, had a charity care ratio of just 0.95% in 2022. *See* Pioneer Institute, Hospital Charity Care, Massachusetts (2022), available at https://pioneerinstitute.org/340babuse/hospital-charity-care/ (last visited Feb. 7, 2025).

[27] ADAP Advocacy, 340B Map, available at https://340bmap.org/mapster-wp-map/340b-map/ (last visited Feb. 7, 2025).

[28] Ellen Graber, "How a Company Makes Millions Off a Hospital Program Meant to Help Patients", *New York Times* (Jan. 15, 2025).

from Christus St. Vincent, a 340B hospital.  The manufacturer list price for the drug, before the 340B discount to the hospital, was $2,700.[29]  The hospital billed Mrs. King's insurer $22,700, 8.4 times the list price of the drug, even without considering the 340B discount.[30]  Although Mrs. King's insurer paid $10,000 on the claim, almost 4 times the list price of the drug, Christus St. Vincent billed her, in addition, for $2,500, itself almost the entire list price of the drug. It did so without offering her any charity care.[31]  To add insult to injury, Christus St. Vincent subsequently sent her to collections.  When Mrs. King switched to a non-340B provider with *no* 340B subsidies, her patient "responsibility was nothing".  Christus St. Vincent defended itself by claiming, in part, that the 340B program "helped the hospital provide charity care", but a review of its charity care reveals that its ratio was just 1.95%, below even the embarrassingly low national average.[32]

The history of the 340B program is, unfortunately, a story of a well-intentioned program that has lost its way. Clearly designed to bring affordable health care to patients in need, including by virtue of its expansion at the time of the enactment of the ACA, the 340B program has grown at a break-neck pace without any corresponding benefit to patients in charity care, including assistance at the pharmacy counter.

### D.  340B Growth Drivers

What drove the dramatic expansion of the program?  Contract pharmacies were certainly a significant part of that story.  340B contract pharmacy relationships have increased exponentially

---

[29] *Id.*

[30] *See id.*

[31] *Id.*

[32] Pioneer Institute, Hospital Charity Care, New Mexico (2022), available at https://pioneerinstitute.org/340babuse/hospital-charity-care/ (last visited Feb. 7, 2025).

from roughly 1,300 in 2010 to more than 33,000,[33] an increase of 2,200%. Disappointedly, many of those contract pharmacies are located in affluent neighborhoods.[34] Of the more than 33,000 340B contract pharmacy relationships used by covered entities, only 35% are located within a medically underserved location.[35] The all too clear message is that too many 340B covered entities care much more about creating new opportunities to make more money from the program than to address access issues for the needy who so often live in pharmacy desserts.

Worse yet, contract pharmacy arrangements do a very poor job of providing needy patients meaningful access to affordable drugs, underscoring why the Amici Curiae are so concerned that patients are not sharing adequately in the dramatically reduced prices at which covered entities are able to purchase drugs under the program.[36]  Despite the massive growth in the 340B program, only 1.4% of contract pharmacy patients can be shown to have received any assistance at the contract pharmacy counter.[37]  That is even below the abysmally low 340B hospital charity care

---

[33] Adam Fein, *Hospitals Are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions*, Drug Channels (Oct 2, 2024), available at https://www.drugchannels.net/2024/10/hospitals-are-relying-more-on-pbms-to.html (last visited Feb. 7, 2025).

[34] R. Conti, *et al.*, *The 340B Drug Discount Program: Hospitals Generate Profits By Expanding To Reach More Affluent Communities*, 33 Health Affs. 1786 (2014), https://bit.ly/3ZFC9uP

[35] AIR340B, *340B – A Missed Opportunity To Address Those That Are Medically Underserved: 2023 Update* (2023), https://bit.ly/4eDzyG1 (65% of covered entities themselves not located in medical underserved areas).

[36] R. Martin et al., IQVIA, *Unintended Consequences: How the Affordable Care Act Helped Grow the 340B Program* (Aug. 30, 2024), available at https://bit.ly/3XFDWh8.

[37] R. Martin, *et al.,*IQVIA,  *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?*, available at https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/are-discounts-in-the-340b-drug-discount-program-being-shared-with-patients-at-contract-pharmacies.pdf (last visited Feb. 7, 2025).

rate of 2.15% in 2022.[38] But to put this rate of assistance into even greater relief, more than 40% of the U.S. population are uninsured, underinsured, or experience a gap in coverage each year.[39] A 1.4% level of assistance at the pharmacy counter seems indefensible in light of the billions and billions generated by the 340B program and this level of need.

It is true that non-hospital 340B covered entities that receive grants from HRSA have a limited obligation to provide assistance to some patients, including in connection with pharmaceutical items and services. Specifically, these entities, which account for no more than 20% of the program, are obligated under those grants to provide "sliding scale" assistance to patients at 200% of the federal poverty limit or below.[40] That, coupled with the low rate of identified assistance at contract pharmacies, goes a long way towards showing why so many patients continue to struggle with coinsurance and other out of pocket costs for their drug therapy.

The 340B program is broken, and the root cause is a lack of transparency about what persons 340B entities are claiming as their patients and whether they are receiving charity care at the pharmacy counter. These are issues that a rebate model can address.  All of this is not to say

---

[38] Pioneer Institute, Hospital Charity Care, available at
https://pioneerinstitute.org/340babuse/hospital-charity-care/ (last visited Feb. 7, 2025).

[39] Commonwealth Fund, "The State of Health Insurance Coverage in the U.S." (2024) ("9 percent of adults were uninsured, 12 percent had a gap in coverage over the past year, and 23 percent were underinsured, meaning they had coverage for a full year that didn't provide them with affordable access to health care"), available at
.https://www.commonwealthfund.org/publications/surveys/2024/nov/state-health-insurance-coverage-us-2024-biennial-survey# (last visited Feb. 7, 2025).

[40] U.S. Department of Health and Human Services, HealthCare.Gov, "Federal Poverty Limit", available at https://www.healthcare.gov/glossary/federal-poverty-level-fpl/ (last visited Feb. 8, 2025).  Only 28% of the US population was ineligible to receive any assistance under this standard. Kaiser Family Foundation, "Distribution of the Total Population by Fed3eral Poverty Level", available at  https://www.kff.org/other/state-indicator/population-up-to-200-fpl/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Feb. 7, 2025).

that there aren't many covered entities that do, in fact, provide meaningful charity care and assistance to the vulnerable at the pharmacy counter. But those covered entities that do the right thing are themselves harmed by the lack of transparency that mars the program at present and protects those that fail to do right by patients.

### E. Plaintiff's Proposed Model

As patient advocates, Amici Curiae appreciate that Plaintiff's plan is to move forward in a targeted manner. It has carved out all covered entities except 340B disproportionate hospitals,[41] distinguishing between those entities that secure much of the program's subsidies, but only account for a small faction (about 10%) of participating entities, and all other covered entity types.[42] It also, Amici Curiae note, has limited its program to two drugs, both of which are subject to the Inflation Reduction Act ("the IRA") mandated pricing, where there needs to be a functional means to ensure that 340B duplicate discounts do not complicate an already disturbing level of duplicates and defeat IRA implementation. Importantly, under a rebate model, HRSA would retain its enforcement mechanisms and could appropriately pursue rebate systems should they be structured to effectively provide no "offer" of 340B pricing on any *bona fide* basis, as the courts have already held.[43]

---

[41] Because of the differences between 340B hospitals and some other covered entities, like clinics serving HIV and AIDS patients, Amici Curiae appreciate that, in deploying rebate mechanisms, manufacturers, like Plaintiff, have taken such steps as carving out some 340B clinic types, limiting the number of drugs involved, designing rapid payment turn-arounds, and/or considering even faster payments where a covered entity commits to share 340B pricing with patients.

[42] HRSA, *2022 340B Covered Entity Purchases*, available at https://bit.ly/3Y1GQ17.

[43] *See Novartis,*102 F.4th at 455.

## ARGUMENT

### I.    A REBATE MODEL IS A BADLY NEEDED MEANS TO ENABLE PATIENTS TO UNDERSTAND IF THEY ARE SHARING IN 340B PRICING.

In a program that has lost its way, the rebate model is a mechanism to ensure fair and equitable transparency in all directions, including for patients who seem to be losing access to charity care, both at the pharmacy counter and elsewhere, even as the program expands and expands, bringing additional billions to both covered entities and to "middlemen" who are absolutely not the intended beneficiaries of the program.

A rebate model can, and should, give covered entities transparency into manufacturer concessions, ensuring that covered entities know that they are, in fact, receiving the price they should. It should, similarly, allow manufacturers a means of having confidence, when they make the 340B price available, that they are not paying duplicate discounts or being targeted by diversion schemes. For the states, the rebate model can be a means to guard against improper Medicaid payments, conserving badly needed Medicaid resources meant to provide medical care to the indigent and disabled.

Finally, a rebate model can, and should, allow patients to understand whether they are receiving any part of the benefit of 340B pricing at the pharmacy counter. That is possible because, as Plaintiff says in its Complaint, at ¶ 44, the rebate model allows for the identification of "340B eligible patients in real time", which is the necessary predicate for informing patients about whether or not they receive a benefit at the pharmacy counter. Promisingly, another manufacturer plaintiff in one of the other pending cases has even discussed with HRSA providing rebates "even

faster" than "seven to ten days" if a covered entity "share[s] the 340B price directly with the patient".[44]

Working in collaboration with all stakeholders, we can allow patients to share meaningfully in 340B discounts, but still allow covered entities to receive very substantial subsidies beyond that patient sharing. But the rebate model is the *sine qua non* of that effort, given the very poor performance of many covered entities to date.

## II.    PLAINTIFF'S MODEL IS A BONA FIDE OFFER COMPLETELY CONSISTENT WITH THE STATUTE.

In *Novartis*, 102 F.4th at 455, HRSA asserted an authority (the ability to forestall any contract pharmacy limitations) based on a statutory power it does not have. The US. Court of Appeals for the District of Columbia Circuit struck down HRSA's "atextual and ahistorical position" because the manufacturer offers there were "bona fide". *See id.* That holding is controlling here, where HRSA's "pre-approval" authority is yet another "atextual and ahistorical" deviation from the statute designed to override another "bona fide" offer.

It is a high bar for HRSA to demonstrate that an offer is not bona fide. That standard is met where a manufacturer asserts "conditions … onerous enough to effectively increase the contract 'price'" so as to set it "above the statutory ceiling". *Id.* at 46. That is clearly not the case here.

Whether Plaintiff effectuates the correct price by a "rebate or discount", Plaintiff's model, as presented, quite clearly effectuates the correct price, and there are no "unreasonable conditions" present. *Id.* The proposed rebate model only applies to disproportionate hospitals,

---

[44] Complaint, Bristol Myers Squibb v. Fink, et al., 1:24-cv-03337 (D.D.C.), at ¶ 57.

16

typically large, massively resourced, and sophisticated players. Further, it applies to only two of Plaintiff's many drugs.

It contemplates a payment within ten days, maybe as quickly as seven. The "carrying costs" for any drug over so short a period would be a sliver of the lucrative financial opportunity these large covered entities have under the program. As the Minnesota 340B Report shows, 340B revenue above covered entity acquisition costs is at least 42%. *See* Minnesota Department of Health, 340B Covered Entity Report (Nov. 15, 2024).

In addition, we agree with Plaintiff that the data that would be requested under the rebate model is not burdensome because that information is "already collected by 340B entities in the normal course of business". Complaint*, at 3, 9-10. 98. Indeed, covered entities cannot lawfully participate in the 340B program without collecting the data at issue, which they routinely send to their "own third party administrators" to develop a basis for "cataloging" patients in order to capture the reimbursement spread. *See Novartis*, 102 F.4th at 457-58. Those "administrators", which include affiliates of some of the largest and most sophisticated entities in health care, are able to efficiently transmit all the necessary data to manufacturers.

On these facts, it would be the height of "arbitrary and capricious" conduct for the Secretary to refuse to recognize bona fide rebate offers actually "paid" within just "seven to ten days" of the triggering "purchase". This is particularly true because that speed in the payment of rebates is much faster than the 30 to 90 days that usually applies for rebates paid to other customers.[45] Thus, HRSA rather absurdly rejects *preferential* treatment for covered entities *vis-à-vis* other rebate customers.

_____

[45] D. Bell, "Rebates at the Point of Sale", *The Actuary* (May 2020), available at https://www.theactuarymagazine.org/rebates-at-the-point-of-sale/ (last visited Feb. 7, 2025).

In this regard, Plaintiff is right to hammer away at the point that it is setting a faster standard than the Centers for Medicare and Medicaid Services, a sister agency to HRSA, set even in the unusually expedited Medicare negotiated price context under the IRA (14 days). HRSA's refusal to recognize payments made "within seven to ten days" simply cannot be squared with either *Novartis*' "bona fide offer" test or with the recently (government) formulated IRA standard.[46]

Accordingly, this court should grant Plaintiff's Motion for Summary Judgment, as the rebate model is a bona fide offer, the only thing that the statute requires.

### III.    THE PLAIN LANGUAGE OF THE STATUTE SPECIFICALLY AUTHORIZES REBATES, AND HRSA IS WITHOUT ANY AUTHORITY TO PRECLUDE THEM.

The plain language of the statute demonstrates that (1) rebates are specifically authorized and that the Secretary has no rebate "pre-approval" authority, (2) the Secretary's reading of the "as provided by the Secretary" language is completely at odds with the structure of the statute, and (3) the Secretary's interpretation is arbitrary and capricious and would result, inevitably, in absurd, counter-textual outcomes.  We take each of these points in turn, appreciating that we must begin the statutory analysis "with the plain language of the statute.'" *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009).

---

[46] *Novartis*, 102 F.4th at 455.

**A.    The Plain Language of the Statute Clearly Demonstrates that Rebates Are Specifically Authorized, without any "Pre-Approval" by the Secretary.**

Starting, as we must, with the text, it is important to stress two interrelated, critically important threshold points: (1) what the plain language of the statute says and (2) what it does not say.[47]

First, the plain language states that, in determining "the amount required to be paid", it is necessary for the Secretary to "tak[e] into account *any rebate* or discount".  42 U.S.C. § 256b(a)(1) (emphasis added). The plain language of the statute, thus, states that there are two parts to assessing what a manufacturer has actually "paid": "rebates", on the one hand, and "discounts" on the other.  *Id*.  That clear textual signal that both "rebates" and "discounts" are specifically (and equally) authorized is reinforced by the broad framing of the word "any" that precedes both.  Further, beyond that, the statute refers *first* to "rebate" and only second to "discount", indicating, if anything, that the "rebate" mechanism was the one *primarily* invoked by Congress.[48]

Beyond what the statute says, it is equally important to observe that it quite emphatically does not say, as the Secretary seems to suggest, that a rebate must be "approved" before it is deployed.  The word "approve"—or any variation of it—is wholly absent from the statute here.

---

[47] After making these initial points, we will return, with the context established, to the ", as provided by the Secretary" language.

[48] Although it is unnecessary to consider legislative history here, because the plain language of the statute demonstrates that the Secretary's position must be rejected, the legislative history contemplates "reductions (*whether through a discount, rebate, or other mechanism*) to these 'covered entities' on covered outpatient drugs." H.R. Rep. No. at 12 (emphasis added).

*See id.* The Secretary, in pressing for a "pre-approval" power, is quite literally attempting to insert a word into the statute that is not there, while simultaneously trying to eliminate words that are clearly there ("any rebate"). The Secretary's reading, as a consequence, is doubly wrong.

If Congress had intended to create an "approval" power, it would have clearly said so. It could, quite easily have said, for instance, that "discounts are permissible, but rebates may only be used if the Secretary approves such rebate". But that is not what Congress said. Significantly, the Secretary never asserted such a "pre-approval" power for more than three decades.[49] That's not surprising—because no such power exists.

> ### B. The Structure of the Statute Is Formed by the Distinction between the "Ceiling Price" and the "Amount Required to Be Paid".

To understand what the phrase "as provided by the Secretary" means (and does not mean), it is important to focus on the structure of the statute, which addresses two different things: (1) the calculation of the "ceiling price" and (2), separately, the "account[ing]" for the "amount required to be paid". 42 U.S.C. § 256b(a)(1)-(2).

There is, first, as a temporal matter under the statute, the task of calculating the "ceiling price", the target that must be hit in order for the statutory requirement to be satisfied. The statute speaks to this part of the equation by stating that the "ceiling price", the target, is "equal to the average manufacturer price", a defined term under the Medicaid rebate program, "in the preceding calendar quarter, reduced by the rebate percentage", which is "described in paragraph

---

[49] The ADAP model and the replenishment model are both "retrospective" systems, like the rebate model. But HRSA has never conditioned those models on a "pre-approval". *See, e.g.,* 62 Fed. Reg. 45,823 (Aug. 29, 1997) (discussing ADAPs). Indeed, it has never conditioned the use of any "discount" on a pre-approval.

(2)". *Id.* The targeted "ceiling price" is calculated, as a temporal matter, first and "furnish[ed]" to the Secretary in "reports". *Id.*

Second, after a ceiling price is calculated, reported, and the stakeholders have chosen the means they think best—"rebate or discount"—to effectuate that ceiling price, there must be an "accounting" of the "amounts … paid", as the drug flows through various entities in the distribution chain until it reaches the covered entity. *Id*. In other words, "any rebate or discount" that is paid must be subject to evaluation to determine that those "amounts" actually were "paid" such that the "ceiling price" target was satisfied. *Id*.

An example will illustrate. In our example, the 340B ceiling price, as calculated and reported to the Secretary for a drug, is $100. The manufacturer initially sells the drug at a $200 list price to a distributor, the first entity in the distribution chain. The drug maker offers $15 at that time to the distributor, thinking that $10 will be passed on to the subsequent purchaser, as a base discount, whether the purchaser is a 340B entity or not. Thereafter, in a case where the product is, in fact, purchased by a covered entity, the manufacturer extends a further $90 "rebate" to that entity, payable, like in Plaintiff's model, "within seven to ten days" of the covered entity's triggering "purchase".

Contrary to the manufacturer's intent, however, the distributor charges the covered entity $195, passing only $5 of the initial $15 to the covered entity, not $10. Thus, the covered entity has, unknown to the manufacturer, been charged a net price of $105 ($200-$5-$90), not the "ceiling price" of $100.

This is where the "as provided by the Secretary" language applies. If the covered entity complains to the agency that it did not actually receive the "amount required to be paid", the

21

Secretary may determine that "amount" by "taking into account any rebate or discount" actually paid. *Id*. The Secretary "provide[s]" for "any rebate or discount" *actually* transferred to the covered entity, but she will not "provide[]" for any amount that is *not* actually passed to the covered entity. *Id*.

The language that the Secretary misreads to supposedly entitle her to read the word "rebate" entirely out of the statute only, in fact, addresses this potential "account[ing]" issue. It is no accident that the entire parenthetical "(taking into account any rebate or discount, as provided by the Secretary)" modifies the phrase "the amount required to be paid". *Id*. The "provided" language is about the "amount" of a "rebate or discount" for payment evaluation purposes, not the question whether either a "rebate or discount" may be used as a mechanism. *See id*.

Said another way, the statute directs the Secretary to "provide" for "any rebate or discount" in "account[ing]" for the "amounts" actually "paid".   It gives the Secretary no power at all to foreclose rebates as an acceptable *means* of ensuring that the correct "amount" is "paid", no more than it could "pre-approval" discounts into oblivion.  The statute specifically authorizes stakeholders to select "any rebate or discount", without interference. But, if the "rebate or discount" does not actually make it to the covered entity, the statute permits the Secretary to address that "amount" question.

## C.    It Would be Arbitrary and Capricious for the Secretary to Disregard Rebates Actually Paid to Covered Entities.

Courts must seek a "sensible construction [of a statute] that avoids . . . an absurd conclusion." *United States v. Granderson*, 511 U.S. 39, 56 (1994) (internal quotations and citation omitted); the Secretary effectively urges this court to disregard that basic tenet of statutory interpretation in arguing that she can simply disregard "rebates" categorically when

"offered" by a manufacturer. The Secretary's position is arbitrary and capricious for at least three reasons.

*First*, as *Novartis*, 102 F.4th at 455, made clear, all that a manufacturer is required to do under the statute is to make a "bona fide offer" at the ceiling price. If funds actually offered to a covered entity in the form of a rebate are categorically ignored by the Secretary, the Secretary has exceeded her authority by requiring not just a "bona fide offer", but by demanding an offer in a form dictated by the Secretary. That the Secretary cannot do, as she would be fundamentally rewriting the nature and scope of the statutory "offer" obligation. The *Novartis* decision was crystal clear that in the absence of truly "onerous" conditions a bona fide offer was completely sufficient to satisfy the statutory obligation. *Id.*, at 462.

*Second*, refusing, particularly on a categorical basis, to recognize "any rebate" would be fundamentally inconsistent with the Secretary's obligation to "provide" for "any rebate" that is, in fact, "paid" to the covered entity. 42 U.S.C. § 256b. In such a case, the Secretary would have stretched the words "taking into account", "paid", "any rebates or discounts", and the obligation to "provide[]" for them beyond the text or the structure or the purpose of the statute. The Secretary at that point would be refusing to apply basic math to a set of transactions and then saying that the absurd result that follows is what Congress intended.

*Third*, pretending that rebates actually paid do not contribute to the "amount required to be paid" would lead to an absurd outcome that is specifically *not* authorized by statute. The statute is clear on its face that a manufacturer, though required to make an "offer" at the ceiling price, is in no way obligated to allow covered entities to purchase at any price *below* that figure. *See* 42 U.S.C. § 256b(a)(1). But if the Secretary can disregard rebates actually provided to

23

covered entities, that is exactly what would follow.  Returning to our example from above, if the $90 rebate actually paid can be disregarded simply because it is in the form of a "rebate", the Secretary could force an entirely duplicate $90 payment, and a manufacturer, contrary to the clear intent of the law, would be forced to pay a subceiling price that far exceeds the statutory obligation.

The Secretary's interpretation of the statute is triply arbitrary and capricious and leads, inevitably, to absurd results.

## <u>CONCLUSION</u>

For these reasons, Plaintiff's motion for summary judgment should be granted.  The time to permit transparency in the 340B program has come.  It is not possible, without a transparent system, to separate those that put the patient first, from those that do not.  Patients need a rebate model now, and HRSA has no authority to stop this badly needed step forward.

Dated:  February 10, 2025                              Respectfully submitted,


                                                           /s/
                                                          _____

                                                          William A. Sarraille (D.C. Bar No. 431872)
                                                          SPECIAL COUNSEL TO AMICI CURIAE
                                                          Telephone: (202) 390-5679
                                                          williamsarraille@icloud.com

                                                          *Counsel for CF United and ADAP Advocacy*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the requirements of Local Rule 7 and

Federal Rule of Appellate Procedure 29(a)(4), because it does not exceed 25 pages and uses 12-

point Times New Roman font.


Dated:  February 10, 2025                    /s/_____
                                             William A. Sarraille

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be served this 10th day of February, 2025, electronically through the Court's CM/ECF system on all registered counsel.

/s/_____
William A. Sarraille

# ATTACHMENT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., *Plaintiff*, v. DOROTHY FINK, in her official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, and DIANA ESPINOSA, in her official capacity, and HEALTH RESOURCES AND SERVICE ADMINISTRATION, *Defendants* | Case No. 1:24-cv-03188 |

**PROPROSED FORM OF ORDER**

Having considered the Motion for Leave to File an Amicus Brief, as submitted by Amici Curiae, CF United and ADAP Advocacy, and any opposition thereto, as well as the applicable law and the relevant record, the Court now grants said motion and directs the Clerk to enter that Brief onto the docket.

It is SO ORDERED.

Signed this ___ day of February, 2025

_____
United States District Court Judge