Jonathan E. Levitt (D.C. Bar #219207)
**FRIER & LEVITT, LLC**
84 Bloomfield Ave
Pine Brook, NJ 07058
(973) 618-1660
jlevitt@frierlevitt.com

*Attorneys for Amicus Curiae*
*Community Oncology Alliance, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> Plaintiff, <br><br> v. <br><br> DOROTHY FINK, in her official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> and <br><br> DIANA ESPINOSA, in her official capacity, and HEALTH RESOURCES AND SERVICES ADMINISTRATION, <br><br> Defendants. | Case No. 1:24-cv-3188 <br><br> **BRIEF OF COMMUNITY ONCOLOGY ALLIANCE, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF** |

**Table of Contents**

STATEMENT OF IDENTITY AND INTEREST OF THE *AMICUS* ...................................... 1

SUMMARY OF ARGUMENT ........................................................................................... 4

FACTUAL SUMMARY ................................................................................................... 7

    A.   The 340B Program was Created to Benefit America's Most Vulnerable Patients and the 340B Providers that Serve Them ........................................................................................... 7

    B.   The Pharmacy Benefit Manager Landscape ................................................................ 9

    C.   The Exponential Growth of Contract Pharmacies Has Driven Further Reliance on PBMs  11

    D.   The High Cost of Paying off Vertical Integration and the Resulting Harm to Low-Income Patients and Independent Community Practices ........................................................................ 14

    E.   340B Third Party Administrators ("TPAs") ............................................................... 16

ARGUMENTS .............................................................................................................. 17

I.   The Lack of Regulation Regarding the Exponential Growth of Contract Pharmacies Has Allowed PBMs to Profit Off of 340B ....................................................................................... 17

    A.   PBM Owned or Affiliated Contract Pharmacies Retain Billions of 340B Drug Discounts ... 18

    B.   PBMs Use Outsized Market Share to Reap Huge Profits Through 340B ............................. 19

       i.   PBMs Exclude CE-Owned Contract Pharmacies from Their Networks, Including Specialty Networks ........................................................................................................ 19

       ii.   PBMs Mandate 340B Providers Use a PBM Owned or Affiliated TPA ............................ 19

II. The Profit Opportunities Presented by 340B and 340B Contract Pharmacies Have Incentivized PBMs to Drive Out Unaffiliated Providers to the Detriment of Patients ........ 20

III. PBMs Exploit the Lack of Transparent Data about 340B Claims to Obtain Illegal Double Discounts on Already-Discounted 340B Drugs ........................................................ 21

IV. The Rebate Model Improves Upon the Status Quo Through Greater Transparency .... 22

CONCLUSION ............................................................................................................. 24

## TABLE OF AUTHORITIES

**Statutes**

Veterans Health Care Act of 1992, 42 U.S.C. § 256b ................................................................ 7
Veterans Health Care Act of 1992, 42 U.S.C. § 256b(a)(1) ...................................................... 7
Veterans Health Care Act of 1992, 42 U.S.C. § 256b(a)(4) ...................................................... 7

**Other Authorities**

61 Fed. Reg. at 43,549 ............................................................................................................... 8
HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract*
    *Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996) .................................................. 7, 8
The Medicaid Drug Rebate Amendments of 1992, 102 H. Rpt. 384 ......................................... 7

**Rules**

75 Fed. Reg. 10,272-01 .............................................................................................................. 8
Fed. R. App. P. 29(a)(4) ............................................................................................................. 1
Fed. R. App. P. 29(a)(4)(E) ........................................................................................................ 1
Local Civil Rule 7(o)(5) ............................................................................................................. 1

**Regulations**

42 CFR § 10.3 ............................................................................................................................. 2

## STATEMENT OF IDENTITY AND INTEREST OF THE *AMICUS*

Pursuant to Local Civil Rule 7(o)(5) and Fed. R. App. P. 29(a)(4),[1] amicus Community Oncology Alliance, Inc. ("COA") submits this brief in support of Plaintiff Johnson & Johnson Health Care Systems Inc. ("Johnson & Johnson"). Amicus COA is a non-profit organization dedicated to representing and advocating for community oncology practices and, most importantly, the cancer patients they serve. For over twenty years, COA has built a national grassroots network of independent (physician run; not hospital owned) community oncology practices to provide the highest quality, most affordable cancer care close to home.

Community oncology practices play a major role in ensuring patients' access to quality, affordable, and accessible cancer care. Indeed, a majority of cancer patients in the United States receive treatment in independent community oncology practices.

A growing component of cancer treatment is utilizing the increasing availability of oral drugs—in effect, "chemotherapy in a pill"—to treat cancer patients. As more cancer treatment shifts from infusable chemotherapy to oral medications, community oncology practices provide individualized cancer care through a medical integrated dispensing ("MID") model, which integrates oral cancer drug dispensing with a patient's overall cancer treatment plan. Community oncology practices operate in-office pharmacies or drug dispensing facilities—depending on what state pharmacy regulations allow—through which oral cancer drugs are dispensed directly to patients. The MID model promotes improved outcomes and better quality of life for cancer patients because it permits providers to closely monitor a patient's condition, manage side effects of oral

---

[1] Local Civ. Rule 7(o)(5) requires that an *amicus* brief comply with the requirements of Fed. R. App. P. 29(a)(4). Consistent with Fed. R. App. P. 29(a)(4)(E), COA states that no party or its counsel authored this brief in whole or in part. COA further states that no person or party contributed money intended to fund the filing of this brief. COA states that it has no parent company and that no publicly held company has a 10% or greater ownership interest in COA.

oncolytic drugs, and adjust the patient's treatment regimen in real time. Additionally, the MID model reduces patients' out-of-pocket costs and eliminates waste.

Due to the increasing availablilty of oral cancer drugs, community oncology practices have to routinely interact and deal with pharmacy benefit managers ("PBMs") that, among other tasks, process and adjudicate insurance claims for oral drugs. With the three largest PBMs— CVS/Caremark ("Caremark"), Cigna/Express Scripts ("ESI"), and UnitedHealth/OptumRx (OptumRx)—controlling 80 percent of the prescription drug market, these corporate entities have enormous leverage with all pharmacy providers, including not only community oncology practices but also independent pharmacies. In addition to the market power of the PBMs, these entities have consolidated with the largest insurance companies. Furthermore, the largest PBMs own, or are affiliated with large retail pharmacy chains, specialty pharmacies, and mail order pharmacies. These combined entities are some of the largest corporations in the country and are juggernauts in the health care industry.

The 340B Drug Pricing Program ("340B"), the subject of Johnson & Johnson's complaint, is a federal program that provides hospitals and other designated grantees, including community health centers ("340B providers"),[2] with substantial discounts on drugs from pharmaceutical companies as a requirement of their participatipation in Medicaid. The original congressional intent of creating 340B in 1992 was to, in essence, help under 100 safety net hospitals provide financial assistance to patients in need. However, the program has grown substantially such that it accounted for $124 billion of prescription drugs (priced at wholesale acquisition cost) in 2023 and is now the second largest federal drug program.[3]

---

[2] As used in this brief, "340B provider" corresponds with the term "covered entity" as defined in 42 C.F.R. § 10.3.
[3] Rory Martin and Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023*, https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2024/iqvia-update-on-size-of-340b-program-report-2024.pdf (last accessed Feb. 6, 2025).

PBMs participate in 340B by having their wholly-owned or otherwise affiliated pharmacies, including mail-order and specialty pharmacies, designated as 340B "contract pharmacies." An analysis by Avalere Health found that sixty-nine percent of 340B contract pharmacies were associated with a PBM through vertical integration (53 percent) or contractual arrangement (16 percent).[4] Certainly, when Congress created 340B it never intended that for-profit corporations would, in effect, divert 340B drug discounts from patients in need to themselves.

Especially given the significant intrusion of PBMs into 340B, complicated by the fact that there is no definition of a 340B eligible patient, there is a massive opportunity for not only hospitals but also for PBMs to capture 340B drug discounts intended for patients in need. There needs to be tracking of where 340B discounts are going because now the program is a veritable black hole that is extremely easy to abuse by for-profit entities.

COA is compelled to submit this amicus brief to inform the Court how the 340B program has mutated from a well-intentioned safety-net benefit to a proverbial cash machine for hospitals and now, for PBMs. Not only are patients in need not getting discounts to help pay for expensive drugs, but also the mutation of 340B is putting tremendous pressures on community oncology practices. These include 340B hospitals cutting off patient referrals to community oncology providers in order to pressure practices to merge into hospitals in order to capture more 340B discounts, as well as PBMs mandating that cancer patients use their wholly-owned 340B contract pharmacies so that PBMs can optimize their 340B profits. The former threatens the viability of community oncology practices to be able to treat their patients; the latter destroys the MID model that integrates drug dispensing with the patient's cancer treatment plan. This crowding out of community oncology practices also impacts patient care. Cancer patients who are treated in

---

[4] Avalere, *PBM, Mail-Order, and Specialty Pharmacy Involvement in 340B*, https://avalere.com/insights/pbm-mail-order-and-specialty-pharmacy-involvement-in-340b (last accessed Feb. 10, 2025).

hospitals pay more out-of-pocket costs. Patients forced to use PBM mail-order pharmacies face treatment delays, coverage denials, as well as higher costs.

The root of the problems described above is the lack of transparency in the 340B program. COA reads nothing in statute that requires pharmaceutical manufacturers to use front-end 340B drug discounts, rather than post-purchase rebates based on transparent data (referred by Johnson & Johnson as the "rebate model"). COA implores this Court to recognize that hospitals and PBMs have essentially created a for-profit sub-market facilitated by an almost total lack of transparency surrounding 340B. This is precisely the reason those actors are fighting the use of rebates so intensely. COA believes that a reasoned shift from front-end, non-transparent discounts to post-purchase, data-driven rebates will cast the searchlight inward on 340B and its abuses and better guarantee that the program is serving patients, not large for-profit corporations. The underlying issue in this litigation is drug profits versus patient well-being. That is why COA is filing this amicus brief and respectfully asks the Court to allow pharmaceutical manufacturers to adopt the 340B "rebate model."

## SUMMARY OF ARGUMENT

Congress established 340B in 1992 with the goal of making health care affordable and accessible at certain designated safety-net providers serving uninsured, low-income, or otherwise vulnerable patients. Congress created 340B because voluntary discounts provided to safety-net providers were eliminated when in 1990 Congress required that manufacturers provide their "best price" for drugs to Medicaid as a mandatory part of participation in Medicaid..

The transmogrification of 340B, especially through contract pharmacy arrangements with 340B covered entities, has in turn invited PBMs to capture and plunder the program as an extremely profitable source of drug discounts. Instead of providing accessible and affordable

4

health care for the nation's most vulnerable patients, as it once did, 340B has progressively been distorted into a gold mine for some of America's largest public companies.

Over the last two decades, extreme consolidation and vertical integration—combined with flawed government guidance and lax oversight—have allowed the largest insurers and PBMs, through their owned or affiliated ("vertically integrated") contract pharmacies, to increasingly dominate (and reap substantial profits from) the 340B program. PBMs then retain the profits they generate through the 340B program, which are not passed on to patients. Making matters worse, the enormous revenue these for-profit entities retain through 340B incentivizes and empowers PBMs to further consolidate their control over, and to monopolize, the broader pharmacy market, which increases prices and drives independent pharmacies out of business.

The number of vertically integrated contract pharmacies participating in 340B, and the number of arrangements these for-profit pharmacies have with 340B providers have grown exponentially. In conjunction with the rise of PBM-affiliated contract pharmacies, the complexity of administering 340B drugs has led most 340B providers and contract pharmacies to rely on dedicated 340B third-party administrators ("TPAs") to retroactively determine which claims are 340B-eligible and to coordinate the replenishment of inventory using drugs purchased under the 340B program. Moreover, PBMs have positioned themselves, particularly over the last five to ten years, as the owners of contract pharmacies, while some of the largest TPAs are also owned or affiliated with the PBMs.

The PBMs do not just profit from 340B through their dispensing and TPA activities, but also profit from their role as traditional PBMs, managing pharmacy benefits on behalf of plan sponsors, such as health insurance companies, unions, self-funded employers and government programs, and from negotiating rebates from pharmaceutical manufacturers. In this role, the PBMs

retain further profits from 340B by concealing data from manufacturers that would indicate which claims had been dispensed using inventory purchased under 340B, thereby enabling PBMs to obtain rebates on the 340B claims, which are otherwise supposed to be exempt from such rebates per manufacturers' contracts with PBMs. Thus, pharmaceutical manufacturers frequently pay "duplicate discounts" on 340B drugs that were sold to 340B providers at a steep discount. At the same time, PBMs will also conceal from their plan sponsor clients the fact that they received drug manufacturer rebates on 340B claims, instead indicating that 340B claims are exempt from minimum rebate guarantees.

These PBM tactics inevitably place upward pressures on drug prices because pharmaceutical manufacturers increase their drug prices to compensate for PBM rebates and improper double discounts. Additionally, PBMs have no incentive to negotiate lower drug prices as their profits from the 340B program, especially from their 340B contract pharmacies, are linked to the price of the drugs. Therefore, patients end up paying higher out-of-pocket costs for drugs.

Today's 340B program has diverged significantly from the one Congress originally legislated, especially driven by the explosion of contract pharmacies and the entry of PBMs into 340B. Providing up-front discounts when 340B was first implemented was appropriate because the program was small and uncomplicated. However, with the explosion of contract pharmacies, and the increasing foothold of PBMs capturing 340B discounts, the program has become a complicated, veritable black hole that has mutated from its original congressional intent and implementation. Up-front discounts are virtually unaccountable as to whether the discounts are actually helping patients in need and how much of the discounts are retained by 340B providers and PBMs. By utilizing 340B rebates, rather than discounts, pharmaceutical manufacturers will be better able to ensure that 340B savings are being directed to patients. Therefore, allowing

rebates to be used, which are clearly anticipated by and permissible under the statutory framework,[5] would at least provide much needed transparency and oversight for a program that is out of control and diverting funds that should be helping patients.

For all of the above reasons, discussed below, COA files this amicus brief.

## FACTUAL SUMMARY

### A. The 340B Program was Created to Benefit America's Most Vulnerable Patients and the 340B Providers that Serve Them

Congress designed 340B to assist safety-net providers serving poor, uninsured or otherwise vulnerable populations. *See* Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602 (codified as amended at 42 U.S.C. § 256(b). Under 340B, drug manufacturers—as a requirement to participate in Medicaid—are required to charge hospitals and other 340B providers no more than a significantly discounted "ceiling price" on certain outpatient prescription drugs purchased by these entities for their patients. 42 U.S.C. § 256b(a)(1), (4). 340B's purpose is "to enable covered entities to stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2 at 12 (1992). A fundamental aim of 340B is supporting the 340B providers' ability to "provide direct clinical care to large numbers of uninsured Americans" regardless of their ability to pay. *See id.* Indeed, the Health Resources and Services Administration ("HRSA"), the agency charged with administering 340B, has opined that 340B is designed so that 340B providers would "pass all or significant part of the discount to their patients." HRSA, *Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services*, 61 Fed. Reg. 43,551 (Aug. 23, 1996). Thus, the clear purpose of 340B is that uninsured, poor, and otherwise vulnerable patients

---

[5] *See, e.g.*, The Medicaid Drug Rebate Amendments of 1992, 102 H. Rpt. 384 ("In giving these 'covered entities' access to price reductions the Committee intends to enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services.").

would benefit by receiving discounted drugs or charity care. Congress did not intend 340B discounts to become a financial windfall for PBMs or hospitals.

Under 340B, eligible 340B providers can acquire drugs from manufacturers at extreme discounts from the usual price. In turn, *and in theory*, 340B providers can "pass on" those savings to their patients through lower costs for medications, or, as contemplated by 340B itself, 340B providers can seek reimbursement for 340B drugs in the normal course and use those greater profit margins to subsidize other unfunded areas of their operations (note, most 340B providers are mandated by law or regulation to take on a disproportionate amount of uninsured or indigent patients). Because certain 340B providers, such as small community health centers, may not have in-house pharmacies, HRSA issued sub-regulatory guidance in 1996 permitting 340B providers to "contract" with outside pharmacies (i.e., contract pharmacies), and to allow 340B inventory to be dispensed through such contract pharmacies. *See* 61 Fed. Reg. at 43,549.

Initially, HRSA restricted 340B providers to contracting with only a single contract pharmacy. *Id.* at 43,551. In 2010, however, HRSA dramatically shifted the 340B contract pharmacy landscape by permitting 340B providers to maintain an unlimited number of contract pharmacy relationships. *See* 75 Fed. Reg. 10,272-01 (Mar. 5, 2010). In the wake of this HRSA guidance, for-profit pharmacies, especially those owned or affiliated with PBMs, have seized on the opportunity to capitalize on substantial 340B drug discounts. The 2010 guidance opened the door for the largest and most sophisticated for-profit PBMs to realize substantial profits from a federal drug pricing program designed to aid non-profit 340B providers caring for the most resource-strapped and vulnerable patients.

### B.  The Pharmacy Benefit Manager Landscape

PBMs are fiscal intermediaries that administer and manage drug benefits on behalf of health insurance plans. But, as discussed below, the distinction between PBMs and health plans are blurred. PBMs are primarily responsible for processing and paying prescription drug claims submitted by providers on behalf of covered beneficiaries. The largest PBMs unilaterally dictate the provider's reimbursement for dispensing or administering the drug and the health plan will, in turn, reimburse the PBM for the amount paid to the provider. PBMs also provide a host of related services associated with the administration of pharmacy benefits including formulary design and management, rebate negotiation, and maintaining a network of providers.

The largest PBMs are owned or affiliated with the nation's largest health insurance companies. These PBMs also own or are affiliated with retail, mail-order and/or specialty pharmacies. As a result, a small number of huge, vertically integrated corporations wield near-limitless power and influence in the prescription drug market and the adjudication of 340B eligible claims. Today, three PBMs control nearly 80 percent of the prescription drug market: Caremark, ESI, and OptumRx.[6] Each of these PBMs also share common ownership with a major insurer and specialty and/or mail-order pharmacy. Caremark is owned by CVS Health, which also owns health insurers Aetna[7] and SilverScript[8] and CVS retail, mail order and specialty pharmacies.[9]  Health

---

[6] Adam Fein ("Fein"), Drug Channels ("DC"),  *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies—And What's Ahead,* (Apr. 9, 2024)  https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html.

[7] https://www.aetnacvshealth.com/(last visited Feb. 6, 2025).

[8] SilverScript,  https://www.silverscript.com/, (last visited Feb. 6, 2025).

[9]  CVSHealth,  Neighborhood  Pharmacy,  https://www.cvshealth.com/services/pharmacy/neighborhood-pharmacy.html  (last  visited  Feb.  6,  2025);  CVSHealth,  Specialty  Pharmacy, https://www.cvshealth.com/services/pharmacy/specialty-pharmacy.html (last visited Feb. 6, 2025).

insurer Cigna owns ESI,[10] which operates its own mail-order pharmacy,[11] and Accredo Health, Inc., which operates Accredo Specialty Pharmacy.[12] Insurance company UnitedHealth Group owns OptumRx,[13] which owns OptumRx Specialty Pharmacy.[14]

These integrated corporations, especially over the last five to ten years, have grown to own a significant majority of 340B contract pharmacy relationships.[15] The top five corporations controlling 340B contract pharmacy relationships—CVS Health, Walgreens, Cigna, UnitedHealth Group and Walmart—now control 73% of all contract pharmacy relationships.[16] Each of these entities also operate or are affiliated with a PBM.[17] The three largest PBMs (Caremark, ESI and OptumRx), controlling 80% of the total prescription drug market, account for 44% of all contract pharmacy relationships through their owned or affiliated contract pharmacies.[18] More than 80% of Walgreens retail pharmacy locations and two-thirds of CVS locations are contract pharmacies.[19] In fact, CVS Health is the largest contract pharmacy participant in the 340B Program, with an estimated 72,200 contract pharmacy relationships, out of 220,000 nationally.[20]

---

[10]    Bruce Japsen, *Cigna-Express Scripts Merger's A Done Deal*, Forbes, Dec. 19, 2018, https://www.forbes.com/sites/brucejapsen/2018/12/19/cigna-express-scripts-merger-a-done-deal-by-thursday/#261d98a55688).

[11] Express Scripts, https://www.express-scripts.com/rx (last accessed Feb. 6, 2025).

[12] Accredo by Evernorth, https://www.accredo.com/ (last accessed Feb. 6, 2025).

[13] Optum - About Us, https://www.optum.com/en/about-us.html (last accessed Feb 6, 2025).

[14]    Optum, Specialty Pharmacy, https://www.optum.com/en/pharmacy-services/specialty-pharmacy.html /, (last accessed Feb. 6, 2025).

[15] Fein, DC, *Hospitals Are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*, https://www.drugchannels.net/2024/06/hospitals-are-relying-more-on-pbms-to.html (last accessed Feb. 6, 2025).

[16]   Adam Fein & Doug Long, *The Specialty Pharmacy Industry Update and Outlook*, May 3, 2022, https://drugch.nl/asembia22; *see also* GAO 2018, at 20-21 (noting approximately 75% of 340B Contract Pharmacies are chain pharmacies, notwithstanding that chain pharmacies represent scarcely half of all pharmacies nationwide).

[17] *See* https://ncpa.org/sites/default/files/2024-05/VerticalBusiness_2024_040324.pdf (last accessed Feb. 10, 2025)..

[18] Eleanor Blalock, BRG, *For Profit Pharmacy Participation in the 340B Program: 2024 Update*, Jan. 2025, https://media.thinkbrg.com/wp-content/uploads/2025/01/23154627/340B_For-Profit-Pharmacy-Participation-2024-Update_V1.pdf (last accessed Feb. 7, 2025).

[19]    Fein, DC, *Exclusive: 340B Continues Its Unbridled Takeover of Pharmacies and PBMs*, https://www.drugchannels.net/2021/06/exclusive-340b-continues-its-unbridled.html

[20] Fein, DC, *Hospitals Are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*, https://www.drugchannels.net/2024/06/hospitals-are-relying-more-on-pbms-to.html (last accessed Feb. 6, 2025).

In addition to their retail pharmacies, Caremark, ESI and OptumRx collectively own 500 mail order, specialty, and infusion pharmacies that act as contract pharmacies.[21] Demonstrating the outsized control the PBMs have over the overall 340B contract pharmacy market, these 500 contract pharmacies have a combined 35,000 contractual arrangements with 340B providers.[22] These 500 mail, specialty, and infusion pharmacies owned by or affiliated with the three largest PBMs account for only 1.5% of all 340B contract pharmacy *locations*, but 21% of the total number of 340B contract pharmacy *relationships*.[23] And their control over these channels continues to rapidly increase.

### C. The Exponential Growth of Contract Pharmacies Has Caused Further Reliance on PBMs

As a result of HRSA's 2010 guidance, both the number of contract pharmacies participating in 340B and the number of arrangements these contract pharmacies maintain with 340B providers grew exponentially. In January 2010, less than 1,300 unique locations participated as contract pharmacies.[24] However, as of June 1, 2024, there were 32,883 unique locations for contract pharmacies participating in 340B—half of the entire U.S. pharmacy industry—accounting for 220,000 contractual relationships with 340B providers.[25] Between April 2010 and April 2020, the number of contract pharmacy arrangements with 340B providers grew by 4,228%,[26] with each

---

[21] Fein, DC, *Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still Booming Contract Pharmacy Market*, https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html
[22] *Id.*
[23] *Id.*
[24] Fein, DC, *Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still-Booming 340B Pharmacy Market*, https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html
[25] Fein, DC, *Hospitals are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*; https://www.iqvia.com/locations/united-states/blogs/2022/04/340b-program-continues-to-grow-while-contract-pharmacy-restrictions-take-effect
[26] Vandervelde at 4; *see also* AIR340B ("AIR340B"), *The Impact and Growth in 340B Contract Pharmacy Arrangements – Six Years Later*, at 1, https://340breport.com/wp-content/uploads/2024/05/AIR340B_340B-Contract-Pharmacies.pdf (last accessed Feb. 6, 2025).

340B hospital utilizing 22 different contract pharmacies on average, and federal grantees utilizing 11 different contract pharmacies.[27]

This expansion has coincided with an *increasing* reliance on PBMs. In 2024, hospitals had approximately 116,000 total relationships with contract pharmacies, with the largest five companies accounting for approximately 79% of that total figure.[28] Those companies—CVS Health, Walgreens, Walmart, Express Scripts (Cigna) and OptumRx (UnitedHealth)[29]—include or are affiliated with the largest PBMs. Between just 2020 and 2024, the three largest PBMs dramatically increased the number of PBM-owned or affiliated contract pharmacy locations—in the case of CVS/Caremark from approximately 9,400 to 38,700, in the case of ESI/Cigna from approximately 5,700 to 13,500, and in the case of OptumRx/UnitedHealth from approximately 3,200 to 10,300.[30]

Ironically, efforts by drug manufacturers to limit the number of contract pharmacies or require 340B providers to use a single dedicated contract pharmacy may have contributed to the growing dominance of PBM-affiliated contract pharmacy chains in 340B. By way of background, in 2020, several pharmaceutical manufacturers announced restrictions on 340B providers that generally aimed to limit the distribution of 340B drugs by 340B providers to a single contract pharmacy.[31] In response to these manufacturer limitations, 340B providers and contract pharmacies have reportedly implemented "alternative distribution models" that involve 340B

---

[27] Vandervelde, at 7.

[28] Fein, DC, *Hospitals are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis*; Rory Martin, IQVIA, 340B Program Continues to Grow While Contract Pharmacy Restrictions Take Effect, https://www.iqvia.com/locations/united-states/blogs/2022/04/340b-program-continues-to-grow-while-contract-pharmacy-restrictions-take-effect

[29] *Id.*

[30] *Id.*

[31] Congressional Research Service, *Litigation Continues Over Use of Contract Pharmacies in 340B Drug Discount Program*, May 23, 2024, https://crsreports.congress.gov/product/pdf/LSB/LSB11163#:~:text=In%20summer%202020%2C%20some%20drug,distribution%20to%20one%20contract%20pharmacy. (last accessed Feb. 7, 2025).

replenishment drug being initially delivered to a 340B provider pharmacy, then being subsequently transferred to the contract pharmacy for dispensing.[32] Larger for-profit chain pharmacies, including PBM-affiliated pharmacies, are obviously more amenable to these types of distribution models since they have greater nationwide reach through their numerous retail locations as well as their mail-order and specialty pharmacies. *It should also be noted that contract pharmacies may be violating State Board of Pharmacy rules that prohibit pharmacies from effectively relabeling drugs that were dispensed at a different location.*

The mutation of 340B places an enormous amount of the national drug spend in the hands of for-profit PBMs. Approximately 14% of all pharmaceutical sales in the United States, or $124 billion, are accounted for under 340B.[33] 340B has grown three times faster than the non-340B drug market between 2018 and 2023.[34] Between 2022 and 2023, 340B expenditures increased more than 23%—a rate of increase that has been largely consistent over the past several years.[35] In terms of magnitude, 340B has exceeded the size of Medicare Part D, which spent approximately $116 billion on drug expenditures in 2023.[36] The primary component driving 340B's tremendous expansion is not a rise in the number of 340B eligible patients or increased need for charity care, but rather the expansive use of contract pharmacies, the vast majority of which are PBM-owned or affiliated.

---

[32] Quarles, *Amidst Ongoing Manufacturer Restrictions, 340B Covered Entities and Contract Pharmacies Get Creative*, Sept. 18, 2023, https://www.quarles.com/newsroom/publications/amidst-ongoing-manufacturer-restrictions-340b-covered-entities-and-contract-pharmacies-get-creative (last accessed Feb. 7, 2025).

[33] Rory Martin and Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023*, https://www.iqvia.com/-/media/iqvia/pdfs/us/white-paper/2024/iqvia-update-on-size-of-340b-program-report-2024.pdf (last accessed Feb. 6, 2025).

[34] *Id.*

[35] Fein, DC, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, https://www.drugchannels.net/2024/10/the-340b-program-reached-66-billion-in.html (last accessed Feb. 6, 2025); *see also* Fein, DC, *Exclusive: The 340B Program Soared to $38 Billion in 2020 – Up 27% vs 2019*, https://www.drugchannels.net/2021/06/exclusive-340b-program-soared-to-38.html (last accessed Feb. 6, 2025).

[36] Congressional Budget Office, Medicare Baseline Projections, https://www.cbo.gov/system/files/2024-06/51302-2024-06-medicare.pdf (last accessed Feb. 6, 2025).

**D. The High Cost of Paying off Vertical Integration and the Resulting Harm to Low-Income Patients and Independent Community Practices**

The dramatic increase—and the essentially unchecked expansion of PBMs to dominate the 340B contract pharmacy market—has been met with some disturbing milestones. A May 2024 report by the North Carolina State Treasurer found that despite the marked expansion of contract pharmacies, jumping from six within North Carolina in 2010 to 1,059 in 2022, primarily involved an expansion into **wealthier** neighborhoods, serving communities that were 41.5% more affluent than in 2012.[37] Further, between 2010 and 2020, the distance between hospital 340B providers and their contract pharmacies has increased dramatically, from an average of 34 miles to an average of 334 miles.[38]  In some instances, a contract pharmacy can be thousands of miles away from the 340B provider.[39] Today, 28% of 340B revenue is generated by the use of contract pharmacies.[40] These 30,000+ contract pharmacies share in the 340B discounts from manufacturers; however, there is no requirement that contract pharmacies use those discounts to help patients.[41]

The significant growth of 340B contract pharmacy arrangements, especially for PBM-owned or affiliated contract pharmacies, is attributable to the substantial profit potential of 340B and insufficient contract pharmacy oversight by HRSA. Based on the terms of their contracts with 340B providers, contract pharmacies retain a substantial portion, generally 25-35%, of total 340B discounts.[42] Typically, 340B providers pay the contract pharmacy a flat fee for each eligible

---

[37] State Treasurer of North Carolina, *Overcharged: State Employees, Cancer Drugs, and the 340B Drug Pricing Program;* https://www.shpnc.org/documents/overcharged-state-employees-cancer-drugs-and-340b-drug-price-program/download?attachment
[38] Vandervelde, at 4.
[39] *Id.*
[40] Ed Silverman, STAT, *Two dozen states side with HHS in its raucous dispute with pharma over a drug discount program,* (May 16, 2022), https://www.statnews.com/pharmalot/2022/05/16/hhs-340b-hospitals-prescription-drugs/?utm_campaign=pharmalittle&utm_medium=email&_hsmi=21%E2%80%A6
[41] GAO, GAO-18-840, *Drug Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement*, (June 2018), at 31, https://bit.ly/3vKXcxg ("GAO 2018") (noting that 57% of surveyed hospital-CEs provided *no 340B discounts* to patients receiving their prescriptions at Contract Pharmacies).
[42] Fein, DC, *Exclusive: Five Pharmacy Chains and PBMs Dominate 2022's Still-Booming Contract Pharmacy Market*, https://www.drugchannels.net/2022/07/exclusive-five-pharmacies-and-pbms.html (last accessed Feb. 6, 2025); *see*

prescription dispensed, which generally ranges from $6-$15, but can be upwards of $1,750 per prescription.[43] Additionally, some 340B providers "also agree[] to pay [contract] pharmacies a percentage of the revenue generated by each [340B] prescription," which can be as much as 20%.[44] With these favorable reimbursements, the average profit margin for contract pharmacies on 340B claims for brand name drugs is an astounding 72%, compared with just 22% for non-340B brand name drug claims.[45] Put another way, a contract pharmacy's profit margin is approximately three times greater for 340B brand name claims than for non-340B.

The exponential growth of contract pharmacies, on its own, would not be an issue if it resulted in increased access and affordability of care to patients of 340B providers. But financial help for patients is "*negatively correlated"* with growth of 340B contract pharmacies.[46] The "growth of contracts with 340B hospitals [is] uncorrelated with uninsured rates, poverty rates, or areas of medical underservice."[47] In direct contradiction to the spirit of 340B—serving poor neighborhoods and patients—following HRSA's reversal of its one-contract-pharmacy policy, "the percent of 340B pharmacies in the *lowest* income neighborhoods *declined by 5.6%*".[48] Conversely, "the percentage of 340B pharmacies in the *highest* income neighborhoods *increased by 5.0%*".[49] Contract pharmacy growth has therefore been concentrated in affluent neighborhoods, with

---

*also* Minnesota Department of Health. *340B Covered Entity Report: Report to the Legislature*, https://www.health.state.mn.us/data/340b/docs/2024report.pdf (last accessed Feb. 6, 2025).
[43] GAO 2018, at 26.
[44] *Id.*
[45] Vandervelde, at 4.
[46] *Id.* (emphasis added); *see also* Bruce Levinson, *Measuring the Effectiveness of the 340B Program*, at 4, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3284078
[47] Sayeh Nikpay et al., *Association of 340B Contract Pharmacy Growth With County-Level Characteristics*, American Journal of Managed Care, https://www.ajmc.com/view/association-of-340b-contract-pharmacy-growth-with-county-level-characteristics.
[48] Dr. John K. Lin, et al., *Assessment of US Pharmacies Contracted With Health Care Institutions Under the 340B Drug Pricing Program by Neighborhood Socioeconomic Status*, JAMA, (June 17, 2022), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2793530
[49] *Id.* (suggesting that economic opportunity cannot justify the disparity in the decline of 340B Contract Pharmacies in poor neighborhood because "the percentage of non-340B pharmacies in the same neighborhood *increased* by 1.3%").

predominately fully insured patients.[50] HRSA's 2010 Guidance has allowed for-profit contract pharmacies to expand their reach and charge fully insured patients steep markups compared to the 340B discounts received and pocket the difference.[51] In reality, for-profit 340B contract pharmacies are not seeking to deliver charity care or serve disadvantaged populations; they are simply trying to maximize their profits.

Another collateral consequence of the rapid expansion of contract pharmacy relationships with 340B providers is that independent medical practices and pharmacies, including independent community oncology practices, are being crowded out of the market.[52] This phenomenon is likely attributable to the PBMs' exclusionary tactics against independent and unaffiliated providers and imposition of oppressive and unreasonable terms of participation in the PBMs' pharmacy networks. Other factors may also be at play, including hospital consolidation and acquisition of independent community practices by 340B providers,[53] which is associated with rising drug expenditures.[54]

### E.  340B TPAs

The process of determining whether a particular claim is 340B eligible is complex, and responsibility for compliance lies with the 340B provider.[55] Among other duties, 340B providers must ensure that prescriptions are eligible, savings are properly tracked and calculated (e.g., without duplication), and that 340B inventories are properly replenished.[56] To meet these

---

[50] Ted Okon, STAT, *Hospitals and for-profit PBMs are diverting billions in 340B savings from patients in need*, (July 7, 2022), https://www.statnews.com/2022/07/07/for-profit-pbms-diverting-billions-340b-savings/

[51] *Id.*

[52] *See, e.g.,* . Nikpay, Sayeh S., et al., *Hospital-Physician Consolidation Accelerated in the Past Decade in Cardiology, Oncology,* Health Affairs. July 2018. https://www.healthaffairs.org/doi/10.1377/hlthaff.2017.1520.

[53] Chuan Sun, Shanyue Zeng, Rory Martin, IQVIA, *The Cost of the 340B Program to States* (2025).

[54] Levin, Jonathan S., et al., *Impact of hospital-physician vertical integration on physician-administered drug spending and utilization*, Health Economics. 2024. https://pubmed.ncbi.nlm.nih.gov/39533535.

[55] 42 U.S.C. § 256(b)(5)(D); 75 Fed. Reg. 10272, 10277.

[56] *See* Sayeh Nikpay and Lucas Halvorson, *Growing Administrative Complexity in the 340B Program and the Rise of Third-Party Administrators*, Oct. 18, 2023, https://doi.org/10.1093/haschl/qxad052 (last accessed Feb. 6, 2025).

responsibilities, 340B providers typically hire TPAs that provide claims processing and management services and retroactively determine which claims are 340B eligible.[57] The largest TPAs are also vertically integrated: CVS Health owns Wellpartner.[58] Cigna owns Verity Solutions.[59] Walgreens owns 340B Complete and Shields Health Solutions.[60]

In exchange for their services, TPAs charge an administrative fee that is ultimately paid out of 340B savings. Although the methods used to compensate TPAs vary, a study by the Government Accountability Office revealed that a significant number of TPAs charge fees as a "[p]ercentage of the difference between the 340B price and the reimbursement received for the drug."[61] In other words, some TPAs are skimming a portion of the 340B savings that were intended for patients via 340B providers. And, where both the contract pharmacy and TPA are owned or affiliated with the same PBM, a substantial portion of 340B savings is effectively being funneled to the same corporate entity rather than to their intended beneficiaries—the 340B providers and their patients.

## ARGUMENTS

### I.    The Lack of Regulation Regarding the Exponential Growth of Contract Pharmacies Has Allowed PBMs to Profit from 340B

"The enormous growth in 340B contract pharmacy arrangements seems to boil down to a *single* factor: *outsized profit margins*."[62]  A lack of regulation over the growth and use of PBM-owned and affiliated contract pharmacies has allowed for-profit corporations to exploit 340B and divert the financial benefits intended for patients in need and the 340B providers that serve them.[63]

---

[57]  OIG Report, *Contract Pharmacy Arrangements in the 340B Program*, (Feb. 4, 2014), at 5, https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf
[58]  Vandervelde, at 4; *see also* AIR340B, at 8.
[59]  *Id.*
[60]  *Id.*
[61]  GAO 2018, at 34.
[62]  Vandervelde at 4 (emphasis added).
[63]  PhRMA, PR Newswire, *New Analysis Shows Contract Pharmacies Financially Gain From 340B Program With No Clear Benefit to Patients*, https://www.prnewswire.com/news-releases/new-analysis-shows-contract-pharmacies-financially-gain-from-340b-program-with-no-clear-benefit-to-patients-301148590.html.

In turn, this means that the exponential growth of contract pharmacies has not translated into increased financial assistance for patients in need. Instead, it has served to create a new, lucrative source of profits for large corporations.

### A. PBM Owned or Affiliated Contract Pharmacies Retain Billions of 340B Drug Discounts

In 2023, CVS Health contract pharmacies retained $1.08 billion of 340B drug discounts; Walgreens contract pharmacies retained $1.04 billion; ESI contract pharmacies retained $663 million; and OptumRx contract pharmacies retained $337 million.[64] Collectively, in 2023, Walgreens, Caremark, ESI and OptumRx retained $3.12 billion in 340B discounts. These corporations are likely retaining these discounts as very close to pure profit, considering the 340B provider supplies 340B drugs at essentially no cost to the contract pharmacy. In effect, the largest contract pharmacies (PBM owned or affiliated) are using 340B to fund their for-profit operations, rather than to benefit 340B providers and the underserved patients and communities they serve.

### B. PBMs Use Outsized Market Share to Reap Huge Profits Through 340B

#### i. PBMs Exclude Certain 340B Provider-Owned Contract Pharmacies from Their Networks, Including Specialty Networks

Many 340B providers have now opened their own in-house pharmacies. These 340B providers naturally prefer to send patients to their own in-house pharmacy, rather than a contract pharmacy that could be hundreds or even—in the case of a mail order pharmacy—thousands of miles away. However, PBMs have moved toward practices termed "discriminatory reimbursement" of contract pharmacies owned by 340B providers, or outright exclusion from their networks.[65] The top PBMs—using their enormous, outsized market leverage—also make

---

[64] Nephron Research, *340B Pharmacy Tailwind/Manufacturer Headwind Poised to Reverse in 2H 2023*, https://nephronresearch.com/340b-pharmacy-tailwind-manufacturer-headwind-poised-to-reverse-in-2h-2023/ (last accessed Feb. 7, 2025).
[65] Jeffrey Lewis et al, *PBMs and the 340B Program*, https://340breport.com/wp-content/uploads/2021/06/PBMs-and-340B-White-Paper-June-29-2021.pdf.

aggressive offers to become contract pharmacies for the excluded 340B providers and steer their patients to a PBM owned or affiliated contract pharmacy, in order to maximize their 340B profits.

### ii. PBMs Mandate 340B Providers Use a PBM Owned or Affiliated TPA

Although use of contract pharmacies increases the potential distribution range for discounted drugs, it also greatly increases the complexity of determining 340B eligibility. To accurately determine which prescriptions are 340B eligible, many 340B providers, who are responsible for 340B compliance, contract with TPAs to retroactively reconcile which of the 340B provider claims are 340B-qualified.[66]

As discussed previously, many of the largest 340B contract pharmacies are vertically integrated with TPAs. Consistent with their virtual stranglehold on the contract pharmacy market, and motive to divert every 340B discount to themselves, some vertically integrated TPAs require 340B providers to contract with and use PBM-owned contract pharmacies. For example, beginning in 2018, CVS Health required 340B providers seeking to enter into a 340B contract pharmacy arrangement with CVS to also utilize CVS Health's wholly owned TPA, Wellpartner, for 340B claim reconciliation.[67] 340B providers were presented with a choice: either use the PBM's TPA or not contract with CVS's vast network of contract pharmacies. CVS's Wellpartner now serves as the *exclusive* TPA for any CVS contract pharmacy arrangement—accounting for 32% of all contract pharmacies.[68] Compounding this situation, Wellpartner charges 340B providers a percentage of each claim they reconcile. CVS has leveraged its market power and vertically integrated business model to siphon a significant portion of 340B revenue for CVS' own benefit.

---

[66] 75 Fed. Reg. 10272, 10274-10278 (Mar. 5, 2010).
[67] *See RxStrategies, Inc. v. CVS Pharmacy, Inc.*, 390 F. Supp.3d 1341, 1347 (M.D.Fl. 2019) ("CVS now requires any covered entity that wants to fill 340B Program prescriptions at a CVS pharmacy to use Wellpartner as its program administrator. If the covered entity does not want to use Wellpartner as its 340B program administrator, it cannot utilize CVS as a contract pharmacy for the 340B program.").
[68] Fein, DC, *Hospitals Are Relying More on PBMs to Manage Manufacturers' 340B Contract Pharmacy Restrictions: DCI's 2024 Market Analysis.*

## II.    The Profit Opportunities Presented by 340B and 340B Contract Pharmacies Have Incentivized PBMs to Drive Out Unaffiliated Providers to the Detriment of Patients

The substantial profit opportunities for PBM contract pharmacies have further spurred PBM attempts to divert patient volume to their own affiliated contract pharmacies and drive unaffiliated contract pharmacies out of the market. PBMs have engaged in exclusionary tactics against unaffiliated providers participating in 340B; and for those unaffiliated providers able to obtain admission to these restrictive networks, PBMs actively seek to divert as much patient volume to their owned or affiliated contract pharmacies.

For example, PBMs employ restrictive networks and overly burdensome admission requirements. In the specialty and mail order markets, PBMs have created both exclusive and near-exclusive networks whereby all PBM affiliated pharmacies are able to participate, but virtually no other pharmacy is permitted access.[69] Indeed, some PBM networks are effectively closed to any pharmacy unaffiliated with PBMs.[70] As discussed above, specialty and mail order prescriptions account for a significant portion of 340B claims revenue. This has become dominated by PBMs, which have made their specialty network application and approval process intentionally onerous, blocking admission to pharmacies failing to meet the PBMs' self-created and unachievable admission criteria.[71] For example, when PBMs deny unaffiliated pharmacy applications, they often require them to wait a year or more before they can reapply. PBMs also require applying

---

[69] Fein, Dc, *The Top 15 Specialty Pharmacies of 2018: PBMs Keep Winning*, (Apr. 9, 2019), https://www.drugchannels.net/2019/04/the-top-15-specialty-pharmacies-of-2018.html*; see also* Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers and Taxpayers*, (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf.

[70] *Id.*

[71] Jeffrey Lewis et al, PBMs and the 340B Program, https://340breport.com/wp-content/uploads/2021/06/PBMs-and-340B-White-Paper-June-29-2021.pdf.; Frier Levitt, *Pharmacy Benefit Manager Exposé: How PBMs Adversely Impact Cancer Care While Profiting at the Expense of Patients, Providers, Employers and Taxpayers*, (Feb. 2022), https://communityoncology.org/wp-content/uploads/2022/02/COA_FL_PBM_Expose_2-2022.pdf

pharmacies to demonstrate a broad level of expertise in dispensing a wide range of specialty medications in numerous therapeutic classes.[72]

PBMs have created a sham application and admission process that, in all practicality, only allows their affiliated pharmacies to participate. This is driven in large part by PBMs' quest to optimize 340B profits at the expense of vulnerable, low-income patients in need.

### III.    PBMs Exploit the Lack of Transparent Data about 340B Claims to Obtain Illegal Double Discounts on Already-Discounted 340B Drugs

The lack of transparent data-sharing between 340B providers, contract pharmacies, and pharmaceutical manufacturers as to which claims are 340B-eligible or which drugs dispensed to patients were obtained at the 340B-discounted price, creates opportunities for "rebate aggregators" or "group purchasing organizations" ("GPOs") to profit at the expense of manufacturers. Each of the big three PBMs (Caremark, ESI, and OptumRx) have established separate rebate aggregators or GPOs, which are affiliated entities that provide rebate contracting services on behalf of the PBMs and the PBMs' clients. Rebate aggregators and GPOs include Ascent Health Services (affiliated with ESI and Prime, and also serving Humana Pharmacy Solutions), Zinc Health Services (affiliated with Caremark), and Emisar Pharma Services (affiliated with OptumRx). They are essentially extra middlemen between drug manufacturers and PBMs, and allow the latter to dramatically obscure the flow of prescription drug money, in turn opaquely taking a contingent fee cut of rebates negotiated.[73]

---

[72] *Id.*
[73] *See* Federal Trade Commission, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies*, July 2024, https://www.ftc.gov/system/files/ftc_gov/pdf/pharmacy-benefit-managers-staff-report.pdf (last accessed Feb. 7, 2025).

Pharmaceutical manufacturers' rebate contracts generally exempt 340B claims.[74] However, PBMs and their affiliated rebate aggregators earn fees on the rebates paid by pharmaceutical manufacturers, specifically, as a portion of drug cost eligible for rebates.[75] In turn, PBMs have a direct financial incentive to conceal which claims are 340B to pharmaceutical manufacturers, which may result in the payment of duplicate manufacturer rebates on already-discounted 340B drugs. At the same time, when facing healthcare plans and plan sponsors to which the rebates are owed, the PBMs are likely asserting that the same drug claims are in fact 340B and thus exempt from rebate guarantees to the plans.[76] This is a win-win situation for the PBMs and their affiliated intermediaries: they earn lucrative fees on the duplicative rebates paid by pharmaceutical manufacturers, but those rebates are also not being passed along to plans, which may ultimately increase insurance premiums and out-of-pocket costs paid by consumers.[77]

## IV.     The Rebate Model Improves Upon the Status Quo Through Greater Transparency

To recap, the 340B has mutated from a non-profit patient and community benefit into a massive financial boon for the largest for-profit PBMs and their affiliates. Although there is no single "fix" to address the problems identified in this *amicus* brief, COA supports Johnson & Johnson's adoption of the rebate model because it will immediately inject transparency into a system that is currently operating as a black box. Contract pharmacies do not know when a customer is a patient of a 340B provider or if they are 340B-eligible. The pharmaceutical manufacturer also does not know when a 340B drug has been dispensed, or which claims being

---

[74] Medicaid plans are also statutorily precluded from claiming duplicate Medicaid drug rebates on 340B claims. *See* 42 U.S.C. § 256b(a)(5)(A)(i).

[75] *Id*. at 22.

[76] *See*  National Alliance of Healthcare Purchaser Coalitions, *A Playbook for Employers: Addressing Pharmacy Benefit Management               Misalignment*,               https://www.nationalalliancehealth.org/wp-content/uploads/NationalAlliance_PBM_PB_2023_A.pdf at 15 (last accessed Feb. 7, 2025).

[77]  Luke Greenwalt, IQVIA, *Uncover the Invisible Impacts of 340B Discounts*, Dec. 20, 2021, https://www.iqvia.com/locations/united-states/blogs/2021/12/uncover-the-invisible-impacts-of-340b-discounts   (last accessed Feb. 7, 2025).

included in a PBM's request for rebates were purchased under the 340B program, rendering them ineligible for rebates. Due to the lack of transparency, all the entities in this chain, including 340B providers, rely heavily on contract pharmacies and TPAs to accurately execute the requirements and obligations of 340B—even when contract pharmacies and TPAs are for-profit entities whose goal is not necessarily to ensure full compliance with all 340B Program rules and regulations. The product replenishment model, as it is implemented today, enables PBMs to exploit 340B because there is no accountability for profit-seeking middlemen who have no interest in upholding the original congressional intent of 340B to directly or indirectly help patients in need. It is disconcerting that HRSA clearly does not understand that the current model of 340B is a far cry from Congress's original intent in creating 340B.

The rebate model proposed by Johnson & Johnson would improve the *status quo* on at least three fronts. First, no 340B discounts would be realized by the 340B providers until they demonstrate, through readily-available data that the claims are 340B-eligible claims, which also will demand less reliance on TPAs. Second, 340B providers will be able to better track how much of the 340B savings are being diverted and retained by intermediaries, such as TPAs and PBM contract pharmacies. Third, by clearly identifying to the pharmaceutical manufacturer which claims are 340B, duplicate discounts (either on 340B rebates or Medicaid rebates) will be eliminated, relieving the upward pressures on drug prices caused by manufacturers compensating for giving double discounts in excess of 100% of the drug price.  Although the rebate model is unlikely to be a panacea for the PBMs' mass profiteering from 340B, it will be an important first step in alleviating some of the conditions that allow PBMs to profit from the program.

**CONCLUSION**

Given the unregulated and unchecked growth of for-profit contract pharmacies, TPAs, and

PBMs participating in 340B, and the mounting evidence that these entities are exploiting the lack

of transparency in 340B claims data to retain substantial portions of 340B drug discounts, *amicus*

Community Oncology Alliance, Inc. supports Plaintiff's Motion for Summary Judgment.

Dated: February 17, 2025                    Respectfully submitted,

                                            **FRIER LEVITT, LLC**

                                            */s/Jonathan E. Levitt*
                                            Jonathan E. Levitt, Esq. (D.C. Bar# 219207)
                                            84 Bloomfield Avenue
                                            Pine Brook, NJ 07058
                                            Tel: (973) 618-1660
                                            *jlevitt@frierlevitt.com*