# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC., <br><br> *Plaintiff*, <br><br> v. <br><br> ROBERT F. KENNEDY Jr., *et al.,* <br><br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> §    Case No. 1:24-cv-3188-RC <br> § <br> § <br> § <br> § |

**BRIEF OF 340B HEALTH, UMASS MEMORIAL MEDICAL CENTER, AND GENESIS HEALTHCARE SYSTEM'S
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

I.    Statutory Background .............................................................................................. 3

II.   The 340B Program Delivers Benefits to Low-Income Patients and Communities.............. 5

III.  The Product Replenishment Model ............................................................................ 8

IV.   J&J's Rebate Proposal .......................................................................................... 10

LEGAL STANDARD ..................................................................................................... 14

ARGUMENT ................................................................................................................ 14

I.    340B Requires Up-Front Price Reductions, Not Post-Purchase Refunds. ...................... 14

    A.  The Plain Statutory Language Requires Up-Front Price Reductions. ........................... 14

    B.  Rebates are Inconsistent with the Structure of the 340B Statute as a Whole. ............... 20

    C.  J&J's Reading Blesses Absurd Results that Threaten to Undermine the 340B Statute Altogether. ........................................................................................ 23

    D.  J&J's Attempts to Obfuscate the Statutory Text Fail. ............................................... 25

    E.  J&J's Justifications for the Rebate Models Lack Merit. ............................................. 28

II.   Requiring Manufacturers to Offer Pre-Purchase Price Reductions as Mandated by the 340B Statute Does Not Violate the APA............................................................... 31

    A.  J&J's APA Arguments Fail with its Incorrect Reading of the 340B Statute................... 31

    B.  Even if a Rebate Model were Permissible, HRSA's Actions were not Arbitrary or Capricious. ................................................................................... 32

    C.  If the Court Determines that HRSA Acted in an Arbitrary and Capricious Manner, the Proper Remedy is to Send the Issue Back to HRSA Without Vacating HRSA's Policy Letters. .......................................................................... 34

CONCLUSION .............................................................................................................. 35

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Portland Retail Druggists Ass'n*,
   425 U.S. 1 (1976 Federal Trade Commission, University of Michigan Advisory
   Opinion (Apr. 9, 2010) .......................................................................................... 10

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
   429 F.3d 1136 (D.C. Cir. 2005) .............................................................................. 35

*Am. Hosp. Ass'n v. Becerra*,
   596 U.S. 724 (2022) ................................................................................................ 25

*Am. Radio Relay League, Inc. v. F.C.C.*,
   524 F.3d 227 (D.C. Cir. 2008) .............................................................................. 32

*Astra USA, Inc. v. Santa Clara County*,
   563 U.S. 110 (2011) ........................................................................................ 3, 18, 22

*Boechler, P.C. v. Comm'r of Internal Revenue*,
   596 U.S. 199 (2022) ................................................................................................ 19

*Davis v. Michigan Dept. of Treasury*,
   489 U.S. 803 (1989) ................................................................................................ 20

*Donnelly v. F.A.A.*,
   411 F.3d 267 (D.C. Cir. 2005) .............................................................................. 17

*Eagle Pharms., Inc. v. Azar*,
   952 F.3d 323 (D.C. Cir. 2020) .............................................................................. 26

*F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................................ 32, 33

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................................ 34

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................................................ 19

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982) ................................................................................................ 23

*Henry v. Sec'y of Treasury*,
   266 F. Supp. 3d 80 (D.D.C. 2017) ........................................................................ 14

*King v. Burwell*,
   576 U.S. 473 (2015) ................................................................................................ 20

*Liu v. Sec. & Exch. Comm'n,*
  591 U.S. 71 (2020) ............................................................................................... 17

*Mackey v. Lanier Collection Agency & Service, Inc.,*
  486 U.S. 825 (1988) ............................................................................................. 18

*Mapes v. Reed,*
  487 F. Supp. 3d 20 (D.D.C. 2020) ....................................................................... 22

*Marshall Cnty. Health Care Auth. v. Shalala,*
  988 F.2d 1221 (D.C. Cir. 1993) ........................................................................... 14

*Massachusetts v. E.P.A.,*
  549 U.S. 497 (2007) ............................................................................................. 31

*McDonough v. Mabus,*
  907 F. Supp. 2d 33 (D.D.C. 2012) ....................................................................... 32

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ........................................................................... 32

*Moss by Mutakabbir v. Smith,*
  794 F. Supp. 11 (D.D.C. 1992) ............................................................................ 22

*Nat'l Ass'n for Advancement of Colored People v. DeVos,*
  485 F. Supp. 3d 136 (D.D.C. 2020) ..................................................................... 14

*Novartis Pharms. Corp. v. Johnson,*
  102 F.4th 452 (D.C. Cir. 2024) ........................................................... 5, 7, 18, 27

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
  587 U.S. 601 (2019) ............................................................................................. 17

*Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.,*
  43 F. Supp. 3d 28 (D.D.C. 2014) ......................................................................... 25

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.,*
  313 F. Supp. 3d 62 (D.D.C. 2018) ....................................................................... 14

*Rancho Vista del Mar v. United States,*
  640 F. Supp. 3d 112 (D.D.C. 2022) ..................................................................... 31

*Roberts v. Sea-Land Servs., Inc.,*
  566 U.S. 93 (2012) ............................................................................................... 20

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.,*
  58 F.4th 696 (3d Cir. 2023) ............................................................ 5, 7, 14, 18, 27

*St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*,
    85 F. Supp. 3d 197 (D.D.C. 2015) ........................................ 34

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ........................................ 34

*United States v. Jicarilla Apache Nation*,
    564 U.S. 162 (2011) ........................................ 18

*United W. Bank v. Off. of Comptroller of Currency*,
    928 F. Supp. 2d 70 (D.D.C. 2013) ........................................ 32

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016) ........................................ 28

*Util. Air Regul. Grp. v. E.P.A.*,
    573 U.S. 302 (2014) ........................................ 22

**STATUTES**

5 U.S.C. § 706 ........................................ 34

42 U.S.C. § 256b .................................... 1, 2, 3, 4, 5, 13, 14, 15, 17, 18, 19, 20, 21, 28

42 U.S.C. § 1396r-8 ........................................ 4, 15, 24

**OTHER AUTHORITIES**

137 Cong. Rec. E3,138-02 (daily ed. Sept. 24, (1991) ........................................ 3

*340B Drug Pricing Program: Fact vs. Fiction*,
    Am. Hosp. Ass'n (Mar. 2021) ........................................ 6

340B Health Comment Letter to CMS relating to Medicare Drug Price Negotiation
    Program (MDPNP) Draft Guidance, July 2, 2024 ........................................ 31

Allen Dobson et al.,
    *340B DSH Hospitals Serve Higher Share of Patients with Low Incomes*,
    Dobson DaVanzo Health Economics Consulting (Sept. 26, 2022) ........................................ 6, 7

*Clarification on the Use of Medicaid Exclusion File*,
    HRSA (Dec. 12, 2014) ........................................ 29

*Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals*,
    340B Health, (July 2023) (last accessed Feb. 27, 2025) ........................................ 11

*FAQs*,
    HRSA (last visited Mar. 18, 2025) ........................................ 8

H.R. Rep. No. 102-384(I) (1991), 1991 WL 255976 ....................................................... 3

H.R. Rep. No. 102-384(II) (1992), 1992 WL 239341 ...................................................... 3

*HRSA Program Integrity, FY 22 Audit Results*,
 HRSA (Oct. 28, 2024)............................................................................................... 29

KNG Health Consulting,
 *340B Hospitals Increased Contributions to Uncompensated and Unreimbursed
 Care During the Pandemic* (February 2025), 340B Health ......................................... 7

Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA,
 to Perry E. Knight, Vice President, Law – Strategic Customer Group,
 Johnson & Johnson (Aug. 14, 2024)...................................................................... 10, 11

Letter from Perry E. Knight, Vice President, Law – Strategic Customer Group,
 Johnson & Johnson, to Rear Admiral Krista M. Pedley, Director, Office of
 Special Health Initiatives, HRSA, et al. (July 31, 2024) ............................................ 10

Letter from Scott White, Chief Operations Officer, North America Innovative Medicine,
 Johnson & Johnson, to Carole Johnson, Administrator, HRSA (Sept. 30, 2024).................... 13

*Preliminary Results of 340B Health Survey: Impact of Rebates on 340B Hospitals*,
 340B Health (Mar. 18, 2025) .................................................................................. 12

Public Law 111-1148, 124 Stat. 119(a) ........................................................................ 5

Report to Congressional Committees, GAO-11-836,
 *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight
 Needs Improvement*, GAO (Sept. 2011) ..................................................................... 6

Report to Congressional Committees, GAO-21-107,
 *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight
 Needs Improvement*, GAO (Dec. 2020)..................................................................... 13

*Setting the Record Straight on 340B: Fact vs. Fiction*,
 Am. Hosp. Ass'n, (Jan. 2025)..................................................................................... 7

Steven Heath et al.,
 *340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant
 Financial Stress*, (Dobson DaVanzo Health Economics Consulting (2022)) ...................... 6, 7

U.S. Gov't Accountability Off., GAO-20-212,
 *340B Drug Discount Program: Oversight of the Intersection with the Medicaid
 Drug Rebate Program Needs Improvement* (Jan. 27, 2020)....................................... 30

*UPDATED: Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021*,
 340B Health (Jan. 13, 2023) (last accessed Feb. 27, 2025)....................................... 11

**REGULATIONS**

42 C.F.R. § 10.10 ................................................................................................................ 16

340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties
    Regulation, 82 Fed. Reg. 1210 (Jan. 5, 2017) ......................................................... 16

Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate
    Option, 63 Fed. Reg. 35,239 (June 29, 1998)............................................................ 4

Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19,
    61 Fed. Reg. 65,406 (Dec. 12, 1996)....................................................................... 13

Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option,
    62 Fed. Reg. 45,823 (Aug. 29, 1997) ........................................................................ 4

Notice Regarding the Section 340B Drug Pricing Program – Program Guidance
    Clarification, 65 Fed. Reg. 13,983 (March 15, 2000)................................................. 5

## INTRODUCTION

This case presents a narrow question of statutory interpretation. Despite Plaintiff Johnson & Johnson Health Care Systems Inc.'s (J&J's) best effort to distract the Court with irrelevant and unfounded allegations about the 340B Drug Discount Program (340B Program), this case boils down to reading and giving meaning to the full text of the statute that established the 340B Program, 42 U.S.C. § 256b. In line with the 340B Program's venerable goals, Congress required, as set forth in the statute's text, that drug manufacturers provide up-front reductions in the price of covered drugs at the time those drugs are sold to certain public and not-for-profit hospitals, community health centers, and other federally funded clinics that provide care to low-income and other vulnerable patients (340B Providers, described in the statute as "covered entities"). That command resolves this case.

Under the 340B Program, drug manufacturers, including J&J, must provide up-front discounts on certain covered drugs to 340B Providers. 340B Providers use the cost savings from these discounts to provide, among other benefits, health services and community programs to support low-income and vulnerable populations, exactly as Congress intended when it created the program.

J&J disagrees with how the 340B Program works and makes unsubstantiated claims about non-compliance. But rather than take those complaints up with Congress or use the compliance and audit mechanisms available to it under the 340B statute, J&J seeks to rewrite the statutory language. Based on its flawed interpretation, J&J wishes to impose a rebate model fundamentally at odds with the 340B statute and the way the 340B Program has functioned since its inception in 1992. This rebate model would require that a specific category of hospitals eligible to participate in 340B (340B Hospitals) purchase certain 340B eligible drugs at their (often shockingly high) full

price, collect and submit patient data, and then wait to receive a rebate. That process removes a core component of the 340B Program: prompt access to up-front 340B discounts.

Delaying access to up-front discounts means that 340B Hospitals would have to spend significantly more to maintain their drug inventory and effectively float J&J the difference between the full price of the 340B drug and the 340B discount price. This would reduce the funds that 340B Hospitals have available to serve their low-income, rural, and underserved patients, an outcome that undermines the very goals of the 340B Program. A rebate model would also give J&J nearly unchecked discretion over which prescriptions will receive the 340B rebate and which will not.[1] That discretion creates a completely new statutory regime whereby drug manufacturers, which have every incentive to limit the 340B Program, determine the implementation and compliance rules of the 340B Program. The 340B statute plainly bars this scheme.

The relevant statutory text, 42 U.S.C. § 256b(a)(1), contains only two sentences. J&J reaches its conclusion that the statute permits it to impose a rebate model by misunderstanding the first sentence and by failing to give meaning to the second sentence, which Congress added in 2010. Read together and in the context of the entire statute as required by proper statutory interpretation principles, the two sentences in 42 U.S.C. § 256b(a)(1) make clear that up-front price reductions are required. At bottom, J&J urges an improper interpretation of the statute because it does not like—and has never liked—the 340B Program, which reduces J&J's substantial profits by reducing the cost of essential drugs paid for by 340B Providers.

J&J's Complaint is the latest of drug manufacturers' attempts to undermine the 340B Program. But Congress made the exact policy choices that J&J criticizes throughout its briefing

---

[1]    J&J informed HRSA that the third-party platform it would use to implement the rebate model "may reject claims for various reasons." *See* Dkt. 1-6 at 9.

through the text and structure of the 340B statute. This Court should reject J&J's blatant attempt to subvert the will of Congress and to substitute its own vision in place of a system that meets the goals of the 340B Program.

## BACKGROUND

### I.    Statutory Background

Congress enacted the 340B Program in 1992 to cap the amount that 340B Providers must pay for drugs that are prescribed to their patients. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). The statute was intended to curb the significant drug price increases that followed the Omnibus Budget Reconciliation Act of 1990, which required manufacturers to offer rebates for Medicaid drugs that would match their lowest prices, or "best prices," offered to other purchasers. The House Committee on Veterans' Affairs found that manufacturers had significantly increased their prices to reduce the financial impact of the new Medicaid rebates on their profits. H.R. Rep. No. 102-384(I) (1991), 1991 WL 255976. The 340B statute was passed to require manufacturers to pass on the value of the new Medicaid rebates to safety net hospitals, community clinics, and other health providers. 137 Cong. Rec. E3,138-02 (daily ed. Sept. 24, (1991)) (statement of Rep. Wyden), 137 Cong Rec E 3,138-02, at *E3,138-02 (Westlaw). Congress's intent was to "reduce the costs of operations" for 340B Providers and allow them to "stretch scarce Federal funding as far as possible" so that they could reach more eligible patients. H.R. Rep. No. 102-384(II), at 12 (1992), 1992 WL 239341.

Under the 340B Program, drug manufacturers enter into agreements with the Secretary of Health and Human Services (HHS) known as Pharmaceutical Pricing Agreements (PPAs). 42 U.S.C. § 256b(a)(1). PPAs reiterate the statutory formula through which the prices for covered drugs are calculated: the average manufacturer price (AMP) as understood under the Social Security Act less a rebate percentage, which is determined through a formula set out in the 340B

Statute using calculations made in the prior quarter under the Medicaid Drug Rebate Program (MDRP). *Id.* § 256b(a)(1), (a)(2)(A).[2] Since the inception of the 340B Program, drug manufacturers have met their price reduction obligations under the 340B statute and PPAs through up-front price reductions in the cost of covered drugs. Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).[3]

 Beyond the most basic purpose of capping the cost of drugs for 340B Providers, the 340B statute lays out a comprehensive scheme through which drug manufacturers and 340B Providers participate in the 340B Program under the supervision of the Health Resources and Services Administration (HRSA) in HHS. For example, the 340B statute allows manufacturers and HRSA to audit 340B Providers to ensure compliance with the prohibition on diversion (selling a 340B drug to an ineligible patient). The Secretary has also implemented a policy to prevent Medicaid duplicate discounts (wherein after selling a drug at the 340B discount, the manufacturer subsequently provides a Medicaid rebate on that same drug in response to a request from a State

---

[2] The minimum amount of the discount is the greater of: (a) the "minimum [statutory] rebate percentage," currently either 23.1, 17.1 or 13 percent depending on the type of drug; or (b) the difference between AMP and "the lowest price" the drug company has charged during the "rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity," whichever is greater. The discount is further increased when AMP increases faster than the consumer price index for all urban consumers. 42 U.S.C. § 1396r-8(c)(1), (2).

[3] HRSA recognized one exception to the general presumption that up-front price reductions are required under 340B. State AIDS Drug Assistance Programs (ADAPs) are permitted to participate in the 340B Program through rebates, rather than discounts, because they reimburse pharmacies for drugs and do not always purchase covered drugs directly. Because the ADAP drug purchasing mechanism prevented most ADAPs from accessing the benefits of 340B, in 1998 HRSA authorized ADAPs to utilize rebates as "an optional alternate means of accessing section 340B discount pricing" and made clear that it was doing so to meet "the unique needs" of ADAPs and was not authorizing a rebate option beyond ADAPs. Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,242 (June 29, 1998). In allowing ADAPs to access 340B pricing through rebates, HRSA cautioned manufacturers that they may not "condition a rebate contract or agreement upon . . . entities' compliance with the provisions of section 340B." *Id.* at 35,239.

Medicaid agency) which requires 340B Providers to report their Medicaid billing numbers to HRSA if they use 340B for Medicaid patients covered under a Medicaid fee-for-service program. 42 U.S.C. § 256b(a)(5)(A)–(C), Notice Regarding the Section 340B Drug Pricing Program – Program Guidance Clarification, 65 Fed. Reg. 13,983 (March 15, 2000); *see also*, *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). The Secretary may impose various sanctions for violations found through an audit. 42 U.S.C. § 256b(a)(5)(D); *see also Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696, 700 (3d Cir. 2023). Through an Administrative Dispute Resolution (ADR) process, 340B Providers may bring complaints that they were overcharged for 340B drugs and manufacturers (after conducting an audit) may bring complaints that 340B Providers are violating the prohibition on diversion and/or not complying with their requirements to prevent duplicate discounts. 42 U.S.C. § 256b(d)(3).

Recognizing the value it provides, Congress expanded the 340B Program as part of the 2010 Affordable Care Act (ACA) to include additional 340B Providers and additional language stating that PPAs "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." Public Law 111-1148, 124 Stat. 119(a); 42 U.S.C. § 256b(a)(1).

## II.     The 340B Program Delivers Benefits to Low-Income Patients and Communities.

340B Providers, including 340B Hospitals such as *Amici* UMass Memorial Medical Center (UMass) and Genesis HealthCare System (Genesis), play a critical role in creating a safety net for low-income and other vulnerable patients. Hospitals participate in 340B only if they can demonstrate that they serve a disproportionate number of low-income patients or that they are designated by Medicare as "critical access" hospitals (CAH). In 2020, the low-income share for

340B Hospitals was 40.6% compared to 26.2% for non-340B hospitals.[4] As a result, 340B Hospitals treat a high percentage of patients for which they are underpaid, or not paid at all, and provide three-quarters (77%) of all hospital care for Medicaid patients, a program known for low reimbursement that does not typically cover the cost of care, and two-thirds (67%) of hospital uncompensated and unreimbursed care.[5] Unsurprisingly, 340B Providers have substantially lower operating margins—and often *negative* margins—compared to non-340B providers.[6]

The discounts provided under the 340B program allow 340B Hospitals to provide care to their vulnerable patients. As found by the U.S. General Accountability Office (GAO), "the up-front savings [340B Providers] realized on the cost of drugs, allowed [340B Providers] to support their missions by maintaining services and lowering medication costs for patients, which is consistent with the purpose of the program."[7] Moreover, the GAO found that 340B Providers "used the 340B revenue generated by certain patients to offset losses incurred from other patients, which helped support the financial stability of the organization and allowed them to maintain services."[8]

As a result of the financial support from the 340B Program, 340B Hospitals have *increased* the amount of net patient revenue spent on uncompensated and unreimbursed care when compared to non-340B hospitals, with the gap widening from 17.5% higher for 340B Hospitals in 2019, to

---

[4]    Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with Low Incomes*, Dobson DaVanzo Health Economics Consulting 21 (Sept. 26, 2022) https://tinyurl.com/4vxkvxrm.

[5]    *Id.* at 7.

[6]    Steven Heath et al., *340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant Financial Stress*, (Dobson DaVanzo Health Economics Consulting (2022)), https://shorturl.at/0Vpm6; *340B Drug Pricing Program: Fact vs. Fiction*, Am. Hosp. Ass'n 3 (Mar. 2021), https://shorturl.at/YpmW8.

[7]    Report to Congressional Committees, GAO-11-836, *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO 17–18 (Sept. 2011), https://www.gao.gov/assets/gao-11-836.pdf (2011 GAO Report).

[8]    *Id* at 17.

29.1% higher in 2022.[9] Similarly, in 2020 alone, 340B Hospitals provided nearly $85 billion in community benefits, an increase of nearly 25% from 2019.[10] Compared to their non-340B counterparts, 340B Hospitals offer significantly more un- or under-reimbursed essential community services, including those that address broader health, wellness, and social needs.[11]

The 340B Program funds care to low-income and underserved communities by allowing 340B Providers to purchase necessary drugs at discounted prices but still receive the full reimbursement for those drugs from insurers (340B savings). *See Sanofi* 58 F.4th at 699; *Novartis* 102 F.4th at 455. The 340B Program works by empowering 340B Providers—those best suited to understanding the patients that they serve and the communities in which they operate—to determine how best to use 340B savings. The 340B Program does not dictate how funds must be used, but many 340B Providers provide drug discounts to patients, among other services.

Like other 340B Providers, *Amicus* UMass uses 340B savings to serve the vulnerable communities in which it operates. For example, UMass uses 340B savings to fund free care to low-income patients and to provide several community services, including free prescription medications to uninsured patients, free health and dental care to underserved populations, and its Road to Care Mobile Addiction Team, which provides health services to individuals with behavioral health and substance use disorders at sites frequented by the homeless. Desai Decl. to

---

[9]   KNG Health Consulting, *340B Hospitals Increased Contributions to Uncompensated and Unreimbursed Care During the Pandemic* (February 2025), 340B Health, https://tinyurl.com/29dfbbky.

[10]   *Setting the Record Straight on 340B: Fact vs. Fiction*, Am. Hosp. Ass'n, 2 (Jan. 2025), https://shorturl.at/dhlTx; Steven Heath et al., *340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant Financial Stress*, Dobson DaVanzo Health Economics Consulting (2022), https://tinyurl.com/2skct63s.

[11]   Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with Low Incomes* (Dobson DaVanzo Health Economics Consulting (Sept. 26, 2022)), https://tinyurl.com/4vxkvxrm at 14.

Mot. to Intervene ("Desai Decl.") ¶¶ 8-12 (Dkt. No. 14-2). In 2023, UMass's Road to Care Mobile Addiction Team had 3,699 clinical encounters and served nearly 869 patients, a 76% increase from the prior year. *Id.* ¶ 12. UMass also provides medical services at the Hector Reyes House, a residential substance abuse treatment program for Latino men. *Id.* ¶ 10. Through these services and others, in fiscal year 2023 alone, UMass served over 14,631 individuals and provided 669 prescriptions at no cost to qualifying patients. *Id.* ¶ 7.

Similarly, Genesis uses 340B savings to fund community health programs, including its 340B Patient Assistance Program, which provides discounted medications to eligible patients, allowing them to access essential drugs at a lower cost. Carr Decl. to Mot. to Intervene ("Carr Decl.") ¶ 5 (Dkt. No. 14-3). Genesis also relies on 340B savings to fund its Meds to Bed Program, which ensures that patients have access to necessary medications once they are discharged from the hospital, and a free shuttle service to discharged patients who need a ride home from the hospital and have no other means of transportation. *Id.* ¶¶ 6-7.

## III.    The Product Replenishment Model

For decades, most 340B Hospitals have used virtual inventory (replenishment) models to manage their different drug inventories for 340B and non-340B drugs. Testoni Decl. ¶ 3**.** Contrary to J&J's claims, its rebate model is not at all similar to the product replenishment models.

340B drugs can only be used for eligible outpatients and may not be used for hospital inpatients.[12] Virtual inventory systems used by 340B Hospitals act as a program integrity safeguard to ensure that 340B-discounted drugs are only provided to eligible hospital outpatients of 340B Hospitals that use a single neutral physical drug inventory of 340B and non-340B drugs rather than two physically separate inventories. Testoni Decl. ¶¶ 3-4. 340B Hospitals typically use a single

---

[12]    *See FAQs*, HRSA, https://www.hrsa.gov/opa/faqs (last visited Mar. 18, 2025).

inventory because maintaining two physically separate inventories is generally wasteful and an unnecessary use of limited space. *Id.* ¶ 4. Additionally, a single inventory is preferred for compliance reasons, as maintaining two physically separate inventories increases the likelihood of human error. *Id.*

Under the virtual replenishment model, 340B Hospitals make an initial purchase of a 340B eligible drug at the drug's list price, record whether the drug is dispensed to inpatients or eligible 340B outpatients, and then repurchase the drug at the 340B price once an entire package of a drug has been dispensed to 340B patients. *Id.* ¶ 6. The 340B Hospital then will forever replenish that stock by purchasing the drug at the 340B price. *Id.* Thus, unlike J&J's proposed rebate model which requires 340B Hospitals to always purchase its 340B drugs subject to its rebate model at market price and then wait for a rebate to be issued, the virtual inventory system only has the 340B Hospital paying market price for a 340B drug one time. *Id.* ¶ 9. J&J's rebate models would delay 340B Hospitals' access to the 340B price for every purchase and significantly increase their drug inventory costs.

When 340B drugs are dispensed to eligible 340B Hospital patients through a contract pharmacy, 340B Hospitals never pay the market price for the drug. *Id.* ¶ 10. In that situation, the pharmacy dispenses drugs from its regular inventory, which the pharmacy purchased at market price. *Id.* ¶ 7. Then, a third-party administrator or the pharmacy itself identifies the patients who received those drugs that are eligible for 340B discounts. *Id*. Once an entire packages has been dispensed to 340B patients, the 340B Hospital purchases the drug at the 340B discounted price and the manufacturer (or its wholesaler) ships the drug to the pharmacy that dispensed the drug,

replenishing the pharmacy's stock for the drug it dispensed to 340B patients.[13] *Id.* The pharmacy then passes on to the 340B Hospital (which had purchased the drug at the 340B price) the payment it received when it dispensed the drug at the non-discounted price, less an agreed upon dispensing fee. *Id.* The contract pharmacy is the only purchaser which pays the up-front market price; no rebate is involved. *Id.* Despite J&J's claims to the contrary, the replenishment model is in no way similar to its proposed rebate model.

## IV.    J&J's Rebate Proposal

In July 2024, J&J informed HRSA and HHS that it intended to implement a rebate plan, replacing the up-front discounts on covered drugs it (and every other drug manufacturer) has provided since the inception of the 340B Program.[14] On August 14, 2024, HRSA responded to J&J via letter, raised several concerns about the proposed rebate model, requested more information, and informed J&J that because the Secretary of HHS had not approved the rebate model, implementation of the model would be inconsistent with statutory requirements.[15] In its letter, HRSA noted that the rebate model represents a "shift" that "would disrupt how the 340B Program has operated for over thirty years. As a result of this shift, covered entities, including those which primarily serve rural and underserved populations, would need to pay significantly higher prices

---

[13]    Both the United States Supreme Court and the Federal Trade Commission have endorsed accounting systems similar to the product replenishment model as appropriate ways for entities to distinguish between drugs that qualify for discounts and those that do not so as to prevent diversion. *See Abbott Laboratories v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 20 (1976 Federal Trade Commission, University of Michigan Advisory Opinion, at 1 (Apr. 9, 2010) https://tinyurl.com/bddasrpa.

[14]    *See* Letter from Perry E. Knight, Vice President, Law – Strategic Customer Group, Johnson & Johnson, to Rear Admiral Krista M. Pedley, Director, Office of Special Health Initiatives, HRSA, et al. (July 31, 2024) (Dkt. No. 1- 4).

[15]    Letter from Chantelle V. Britton, Director, Office of Pharmacy Affairs, HRSA, to Perry E. Knight, Vice President, Law – Strategic Customer Group, Johnson & Johnson (Aug. 14, 2024) (Dkt. No. 1-5).

on prescription drugs at the time of purchase."[16] HRSA also had questions about how the rebate claims submitted by 340B Providers would be adjudicated, how long any such adjudication would take, and what appeals or reconsideration mechanisms would be in place.[17]

Soon after J&J's announcement, Sanofi-Aventis U.S., Novartis Pharmaceutical Company, Eli Lilly Company (Lilly), and Bristol Myers Squibb announced their intention to implement rebate models as well.[18] If this Court determines that the rebate model is lawful, more drug manufacturers will almost certainly announce their own rebate models, eventually converting the entire 340B Program into a rebate model, following a similar pattern to four and a half years ago when Lilly announced that it would restrict the number of pharmacies that 340B Providers could contract with to distribute 340B drugs. While that restriction was initially limited to a single drug, Lilly subsequently expanded the limitation to cover all of its 340B drugs, and thirty-eight additional drug companies followed with similar restrictions.[19]

Should the entire 340B Program shift to a rebate model, 340B Providers will be forced to front significant funds to purchase 340B drugs, dramatically hampering 340B Providers' ability to continue providing the type of services to low-income patients and communities discussed above. *See* Carr Decl. ¶ 15; Desai Decl. ¶ 21. A recent survey conducted by 340B Health of over two hundred 340B Hospitals found that if the entire 340B Program turned into a rebate model and

---

[16]   *Id.* at 1

[17]   *Id.* at 2-3.

[18]   HRSA denied those manufacturer's proposed rebate models. Those manufacturers have also filed suit against HRSA and related government defendants in this District, and those cases are pending in front of Judge Friedrich. See Case nos. 24-cv-3220; 24-cv-3496; 24-cv-3337; 25-cv-1117.

[19]   *Drugmakers Pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, (July 2023) https://tinyurl.com/y767zwh7(last accessed Feb. 27, 2025); *UPDATED: Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021*, 340B Health (Jan. 13, 2023) https://tinyurl.com/2s48z683 (last accessed Feb. 27, 2025).

340B Hospitals were forced to purchase 340B drugs at their full, up-front prices and then wait—even just a month—to be reimbursed, more than two-thirds of those hospitals would be unable to maintain their current levels of community benefits and free services. Ninety percent of responding hospitals also reported the rebate models would negatively impact access to patient care services for low-income and rural populations and that they would be unable to maintain their current levels of uncompensated care.[20]

340B Hospitals will also have to spend funds to comply with the model's data collection and reporting requirements, requirements which will become more onerous when the other drug manufacturers impose their own, individual rebate models with different requirements. *See* Desai Decl. ¶ 23; Carr Decl. ¶ 15. This has been the experience of 340B Hospitals under manufacturers' restrictive contract pharmacy policies, which require 340B Hospitals to collect and report data to a vendor employed by the relevant manufacturer. 340B Health's survey found that nearly 75% of the hospitals that have had to collect and submit contract pharmacy claims data needed to allocate additional resources to address the issues that arose while working with the vendor.[21]

Despite J&J's claim that it needs greater visibility into the 340B Program, the data collection and reporting requirements serve other purposes for J&J. The data collected under J&J's rebate model would help prevent payments of rebates on 340B drugs under J&J's "commercial pharmacy benefit manager" agreements.[22] That purpose is not connected to any 340B statutory directive. Rather than negotiating more favorable terms for its voluntary agreements with

---

[20]    *Preliminary Results of 340B Health Survey: Impact of Rebates on 340B Hospitals*, 340B Health (Mar. 18, 2025), https://tinyurl.com/4jj3ukjf at 2.

[21]    *Id.*

[22]    Dkt. No. 1-4 at 3.

commercial partners, J&J would instead require that 340B Hospitals incur the cost of data sharing and purchasing at non-340B prices to assist J&J in policing its commercial agreements.

J&J's rebate model also provides no effective way to challenge J&J's decisions to deny rebates when J&J unilaterally determines that a claim is ineligible for the 340B discount. While the 340B statute allows manufacturers to audit 340B Providers if they suspect that they have received discounts for unqualified patients or failed to comply with the mechanism established by the Secretary pertaining to billing Medicaid for 340B drugs, there is no analogous statutory provision for 340B Providers to audit manufacturers. 42 U.S.C. § 256b(a)(5)(C).[23] The only meaningful recourse that a 340B Provider would have under J&J's proposed rebate model would be to file a claim through the statutorily created ADR process, and to appeal any adverse decision in federal court. Participation in ADR and the federal court appeals process would likely require significant delays, the retention of outside counsel and hundreds of thousands of dollars in legal fees. *See* Desai Decl. ¶ 20.

In the fall of 2024, J&J informed HRSA that it was, for the time being, forgoing implementation of its proposed rebate model.[24] Shortly thereafter, J&J filed this lawsuit.

---

[23]  In fact, J&J has initiated at least eleven audits of 340B Providers, J&J Mot. for Summ. J. at 14, and HRSA itself audits 200 340B Providers per year. Report to Congressional Committees, GAO-21-107, *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 17–18, GAO (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf (2020 GAO Report) at 12. Manufacturers must meet a fairly low bar in order to audit 340B Providers. A manufacturer must (1) submit an audit plan to HRSA prior to auditing a 340B Provider; and (2) establish "reasonable cause" to audit—that is, establishing "that a reasonable person could believe that a [340B Provider] may have violated a requirement." Manufacturer Audit Guidelines and Dispute Resolution Process 0905-ZA-19, 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).

[24]  Letter from Scott White, Chief Operations Officer, North America Innovative Medicine, Johnson & Johnson, to Carole Johnson, Administrator, HRSA (Sept. 30, 2024) (Dkt. No. 1-12).

**LEGAL STANDARD**

When reviewing agency action under the summary judgment standard, "[t]he district court

sits as an appellate tribunal." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225

(D.C. Cir. 1993). Because "the reviewing court generally will not resolve factual disputes, but

instead reviews the decision as an appellate court addressing issues of law," *Henry v. Sec'y of

Treasury*, 266 F. Supp. 3d 80, 86 (D.D.C. 2017), the court has no role as a fact-finder and treats

the issues presented as questions of law, *see, e.g., Pol'y & Rsch., LLC v. United States Dep't of

Health & Hum. Servs.*, 313 F. Supp. 3d 62, 74 (D.D.C. 2018); *Nat'l Ass'n for Advancement of

Colored People v. DeVos*, 485 F. Supp. 3d 136, 141 (D.D.C. 2020).

**ARGUMENT**

**I.    340B Requires Up-Front Price Reductions, Not Post-Purchase Refunds.**

**A.    The Plain Statutory Language Requires Up-Front Price Reductions.**

By its plain terms, the 340B statute requires up-front price reductions from manufacturers

when 340B Providers purchase covered drugs. The relevant text, 42 U.S.C. § 256b(a)(1), contains

two relevant provisions. The first, known as the "purchased by" provision*, Sanofi*, 58 F.4th at 699–

700, states that:

> The Secretary shall enter into an agreement with each manufacturer
> of covered outpatient drugs under which the amount required to be
> paid (taking into account any rebate or discount, as provided by the
> Secretary) to the manufacturer for covered outpatient drugs . . .
> purchased by a covered entity . . . does not exceed an amount equal
> to the average manufacturer price for the drug . . . reduced by the
> rebate percentage described in paragraph (2).

42 U.S.C. § 256b(a)(1). The very next sentence of the statute, known as the "shall offer" provision,

*Sanofi*, 58 F.4th at 703, reads:

> Each such agreement shall require . . . that the manufacturer offer
> each covered entity covered outpatient drugs for purchase at or

14

> below the applicable ceiling price if such drug is made available to
> any other purchaser at any price.

42 U.S.C. § 256b(a)(1). Under the statute, "ceiling price" means "the maximum price that covered entities may permissibly be required to pay for the drug." *Id.*

These two provisions work in tandem to establish the basic function of the 340B statute. The "purchased by" provision establishes the maximum price that 340B Providers can be asked to pay for 340B drugs. That price is determined under the 340B statute by reducing a drug's "average manufacturer price" (AMP) by the average Medicaid rebate paid by the drug manufacturer to state Medicaid agencies in the prior quarter.

The Medicaid rebate amount for each drug and the 340B discount for each drug are intended to reflect the same percentage reduction. However, because 340B is an up-front discount, the Medicaid rebate calculation cannot always serve as the basis for the 340B discount, requiring the Secretary to determine "the amount required to be paid," by using the rebate and discount authority in the subsection (a)(1) parenthetical which provides the flexibility to make these adjustments in these circumstances. Two examples of when the Secretary makes adjustments to achieve a 340B discount that is different from the ceiling price calculation in the 340B statute illustrate the point. The first example pertains to setting the 340B discount for new drugs, and the second pertains to setting the 340B discount for drugs for which the Medicaid rebate calculation results in a 340B price of $0 or a negative number, which may occur due to a statutory penalty designed to limit excessive price increases by manufacturers.

Drugs new to the market have no Medicaid "rebate percentage," as that percentage is calculated after the drugs have been on the market for a minimum of a calendar quarter. 42 U.S.C. § 1396r-8(k)(8). Thus, the Secretary cannot use the formula set out in the 340B statute to determine the 340B price. Accordingly, the Secretary issued regulations that establish the 340B price by

taking the drug's list price and reducing it by the appropriate minimum percentage required under the Medicaid rebate formula. 42 C.F.R. § 10.10(c); *see also* 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). This price is temporary until an average manufacturer price can be determined, which could take several quarters. 42 C.F.R. § 10.10(c).

Similarly, the Secretary cannot use the Medicaid rebate percentage to calculate the 340B discount when the Medicaid rebate amount is higher than or equal to the drug's price, resulting in a negative ceiling price or a ceiling price of zero. 42 C.F.R. § 10.10(b). This can occur when manufacturers raise their prices faster than the rate of inflation, which triggers an inflationary penalty in the Medicaid rebate statute that increases the rebate amount. 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). The Secretary concluded that the 340B statute does not require manufacturers to remit payment to 340B Providers and that permitting zero payment at purchase would "lead to operational challenges," which do not exist under the Medicaid rebate structure. 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). Accordingly, the Secretary adjusted the amount to be paid to $0.01. *Id.;* 42 C.F.R. § 10.10(b). Under both situations, the Secretary had to adjust "the amount to be paid" to "take into account any rebate or discount" due to the fact that the total Medicaid rebate described in the second paragraph of the 340B statute was not feasible under the 340B Program.

Standing alone, the "purchased by" provision says nothing about *how* the "amount required to be paid" is effectuated. Instead, it simply describes how much the manufacturer may charge. The issue of how the amount required to be paid is effectuated is addressed in the "shall offer" provision, which was added in 2010 in the Affordable Care Act. The "shall offer" provision requires that drug manufacturers "offer"— that is, "present for acceptance or rejection,"[25]—

---

[25]  *Offer*, American Heritage Dictionary, https://bit.ly/4jZThmZ (last accessed Feb. 17, 2025); *Offer*, Merriam-Webster, https://bit.ly/42V6kA3 (last accessed Feb. 17, 2025).

covered drugs at or below the ceiling price. The "ceiling price" is "the maximum price that covered entities may permissibly be required to pay for the drug." 42 U.S.C. § 256b(a)(1). Drug manufacturers may not require covered entities to "pay" — "to give money to in return for goods or services rendered"[26]— more than this maximum price when it "offer[s] each covered entity covered outpatient drugs for purchase." In other words, the "shall offer" provision means that manufacturers must provide up-front price reductions that keep covered drugs under the ceiling price when those drugs are initially purchased by 340B Providers.

Because manufacturers must offer to sell covered drugs at this maximum ceiling price, any attempt to sell covered drugs to 340B Providers above this price in the first instance would, by definition, run afoul of the statutory language. The drugs would be *offered* for sale *above* the ceiling price. Even if manufacturers remitted some amount of payment later, the clear mechanics of the "shall offer" provision would be thwarted. This is significant because 340B Providers often operate on tight margins and need the immediate cashflow provided by up-front price reductions.

Like any transaction then, the 340B statute spells out the "what"—covered drugs in exchange for a statutorily defined amount—and the "how"—manufacturers offering the drugs for sale to covered entities at an up-front reduced price. Both pieces of information are necessary to effectuate the ultimate sale of goods. Beyond simply comporting with common sense and laying out the two fundamental components of the transaction, this reading of the statute gives effect to all the words in the statute. *See Liu v. Sec. & Exch. Comm'n*, 591 U.S. 71, 89 (2020) (relying on the "cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute" (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019))); *Donnelly v. F.A.A.*, 411 F.3d 267, 272 (D.C. Cir. 2005) (eschewing a reading that "fails

---

[26] *Pay*, American Heritage Dictionary, https://bit.ly/3X0YIZ6 (last accessed Feb. 17, 2025).

to give meaning to every word of the statute"). This is especially important here, given that Congress added the "shall offer" provision nearly 20 years after 340B's initial enactment.

Consistent with this statutory language, courts have time and time again recognized that the statute requires an up-front price reduction rather than a post-transaction refund. The Supreme Court has explained that "Section 340B of the Public Health Services Act imposes *ceilings* on prices drug manufacturers *may charge* for medications sold to specified health-care facilities." *Astra*, 563 U.S. at 113 (emphases added). Likewise, courts have highlighted that the "shall offer" provision requires of manufacturers what its plain language demands: that "[i]f drug makers make drugs available to anyone at any price, they must '*offer*' those drugs to 'covered entities' *at a discount*." *Sanofi*, 58 F.4th at 703 (emphases added); *see also Novartis*, 102 F.4th at 460 (interpreting the "shall offer" provision to require "manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount").

Though this plain reading shows that up-front price reductions are required by statute, contrasting this reading with J&J's proffered interpretation bolsters the point. Under J&J's understanding of the statute, the "purchased by" provision, standing alone, accomplishes all of the work. That provision, according to J&J, spells out the what and the how of the 340B transaction, because the purchased by provision contains both a statutory price (the "what") and provides for the means to effectuate the transaction through either a rebate or a discount (the "how"). This cannot be correct. Under this reading, half of 42 U.S.C. § 256b(a)(1) is superfluous. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("As our cases have noted in the past, we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988)).

What is more, J&J's reading renders a core section of 42 U.S.C. § 256b(a)(1) that was enacted later in time surplusage, a double strike against its interpretation. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." (internal quotation marks and citations omitted)). J&J has offered no interpretation of the statute that does not render the "shall offer" provision entirely redundant, despite Congress's decision that the addition of that provision was necessary nearly 20 years after 340B's initial enactment. In fact, J&J barely even discusses this provision. And it would be especially strange for a phrase found in a parenthetical to have the force that J&J believes it has, when the "shall offer" provision spells out how manufacturers must offer drugs for purchase at the ceiling price. *See Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022) (noting that a phrase "found in a parenthetical . . . is typically used to convey an 'aside' or 'afterthought'") (quoting B. Garner, Modern English Usage 1020 (4th ed. 2016))).

Contrary to J&J's evident view, giving the later-enacted "shall offer" provision its natural force—requiring an up-front price reduction—does not render the parenthetical language of the "purchased by" provision meaningless. As discussed above, the Secretary has used that authority to make adjustments to the 340B ceiling price when the 340B statute's reliance on the Medicaid rebate calculation could not be aligned with calculation of the 340B ceiling price. Nor does the "shall offer" provision implicitly overrule the "provided by" language. As discussed, the two provisions, which are directly next to each other in the statutory text, work together in harmony to spell out the specifics of the 340B transaction.

19

Beyond being the only sensible reading of *both* sentences of § 256b(a)(1), this understanding of the statute comports with its broader language. It is black-letter law that statutory interpretations must take into account the statutory context in a way that makes sense of the statute as a whole. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) ("Statutory language, however, 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989))); *King v. Burwell*, 576 U.S. 473, 486 (2015) ("Our duty, after all, is to construe statutes, not isolated provisions." (internal quotation marks omitted)). Doing so makes clear that the "any rebate or discount" language goes to the calculation of the 340B price, not how the manufacturers must effectuate that price. For example, § 256b(a)(1) notes that the "amount required to be paid" is reduced by a "rebate percentage" which is determined based on the "average total rebate" required by section 1927(c) of the Social Security Act. 42 U.S.C. § 256b(a)(2)(A). In other words, the rebate referenced in the statutory text goes into calculating the 340B price, *not* spelling out how that price is actually made available to covered entities.

### B.  Rebates are Inconsistent with the Structure of the 340B Statute as a Whole.

If the plain language in subsection (a)(1) was not enough, the structure of the entire 340B statute also makes clear that J&J's rebate model is not permitted. Take, for example, the audit and sanction provisions of the statute. With respect to audits, the 340B statute provides that:

> AUDITING—A covered entity **shall permit the Secretary and the manufacturer** of a covered outpatient drug that is subject to an agreement under this subsection with the entity . . . to audit at the Secretary's or the manufacturer's expense **the records of the entity that directly pertain to the entity's compliance** with the requirements [prohibiting duplicate discounts and diversion to non-340B patients].

42 U.S.C. § 256b(a)(5)(C) (bolding added). Similarly, the statute states that:

> If the Secretary finds, after audit . . . and after notice and hearing, **that a covered entity is in violation of a requirement** [prohibiting duplicate discounts and diversion], **the covered entity shall be liable to the manufacturer** of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug . . . under the agreement between the entity and the manufacturer under this paragraph.

*Id.* § 256b(a)(5)(D) (bolding added). J&J's rebate model, which is an end-run around these provisions, is entirely at odds with the statutory structure for several reasons.

First, only the Secretary and manufacturers are provided with statutory audit rights and to access "the records of the entity that directly pertain to the entity's compliance with the" prohibitions on duplicate discounts or rebates and diversion of covered drugs. This makes sense only when discounts are provided up front. Because manufacturers must make 340B drugs available to 340B Providers at the ceiling price, the *only* way that manufacturers (or the Secretary) can ensure compliance with the statute's prohibitions is through auditing 340B Providers after those Providers purchase covered drugs at reduced prices. This is why manufacturers and the Secretary are afforded the ability to audit, whereas 340B Providers have no such statutory right. Had Congress intended that a post-purchase refund would be allowed, Congress would have given 340B Providers the ability to audit manufacturers' rebate models. Congress clearly did not do so, and so J&J's proposal would leave 340B Providers helpless to determine whether the drug manufacturers are complying with the law.

J&J's rebate model renders entirely meaningless the audit provision. Through rebate models, drug manufacturers like J&J will force 340B Providers to turn over all "claim-level data necessary to validate 340B claims" so that they can identify those for which they do not also owe a Medicaid rebate *before* even offering the 340B discount, thereby eliminating need to use the audit provision. J&J Mot. for Summ. J. 15. Yet this type of information is exactly the same

information the audit provision contemplates, and J&J's interpretation thus renders nugatory the audit provision and is an end-run around the proper procedure. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 321 (2014) (explaining, under prior *Chevron* framework, that "an agency interpretation that is inconsistent with the design and structure of the statute as a whole does not merit deference" (internal quotation marks and citation omitted, and alteration adopted)); *see also, e.g.*, *Moss by Mutakabbir v. Smith*, 794 F. Supp. 11, 13 (D.D.C. 1992) (declining to bless a course of action that "would be a complete end-run around the procedures established by the statute"); *Mapes v. Reed*, 487 F. Supp. 3d 20, 25 (D.D.C. 2020) (a litigant "is not permitted to 'end-run'" statutory procedures when those procedures provide the proper recourse). At best, the audit provision, like the "shall offer" provision, is superfluous under J&J's incorrect reading of the 340B statute.

Second, the statutory scheme exhibits a preference against vigilantism and in favor of empowering the Secretary to conduct audits or to authorize manufacturers to do so. But J&J's rebate model, which is precluded by the text and structure of the 340B statute, defeats these goals. In *Astra*, the Supreme Court rejected an attempt by covered entities to sue directly under PPAs for alleged overcharges. 563 U.S. at 116. The Court reasoned that "Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions" and that allowing 340B Providers to take matters into their own hands would frustrate the statutory scheme. *Id.* at 114; *see also, id.* ("That control could not be maintained were potentially thousands of covered entities permitted to bring suits alleging errors in manufacturers' price calculations."). Because HRSA is best suited to oversee all aspects of the 340B program and to take appropriate compliance actions when necessary, Congress "assigned no auxiliary enforcement role to covered entities." *Id.* at 117.

That logic applies with equal force here. Congress enacted a statutory scheme through which manufacturers must offer up-front price reductions on covered drugs to 340B Providers. When 340B Providers dispute that the proper price was offered to them, they may seek recourse through the procedures available under the 340B statute. Likewise, when manufacturers believe that 340B Providers have violated the statute's prohibition on duplicate discounts or diversion, manufacturers may audit Providers and seek sanctions through the Secretary. Through the rebate model, J&J seeks to short-circuit these processes and take matters into its own hands, imposing *its* view of compliance. This is plainly at odds with the text and structure of 340B.

### C.    J&J's Reading Blesses Absurd Results that Threaten to Undermine the 340B Statute Altogether.

"[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Yet hiding in plain sight of J&J's interpretation of the statute are a host of absurdities that would follow and would upend the 340B program. These consequences further demonstrate that the statute does not contemplate a rebate model and instead requires up-front price reductions.

As is clear from J&J's pleadings and briefing, the form of the rebate model that J&J claims is allowed by the 340B statute is entirely decided by J&J. Most obviously, J&J, not HRSA, nor the Secretary, nor Congress, decides *when* 340B Hospitals are in fact given post-purchase refunds following those entities' submission of whatever information and data J&J demands. J&J, like all other manufacturers seeking to flip the 340B program on its head, claims that 340B Providers will receive post-purchase refunds promptly, perhaps not more than a few days after submission of whatever information J&J requires. But nothing guarantees that this is the case, other than J&J's word. On J&J's reading of the statute, it could evidently give post-purchase refunds a week, or two

weeks, or even months after 340B Providers purchase 340B drugs. What is to stop J&J from giving post-purchase refunds six months after 340B Hospitals make a 340B purchase? Or even years later? Certainly nothing in the 340B statute, as J&J interprets it, constrains these results. And there is no mechanism in the 340B statute that would allow 340B Providers to demand faster payment of the refunds, because the statute does not contemplate such post-purchase rebates in the first place. The reason why is clear: the statute—through the "shall offer" provision—requires up-front discounts at the time of purchase.

This statutory silence related to the proposed rebate model is striking. It contrasts with other public health statutes that *do* in fact allow post-purchase refunds and rebates. For example, the Medicaid rebate law, which is cross-referenced in 340B, 42 U.S.C. § 1396r-8, lays out a multitude of specifics related to the Medicaid Drug Rebate Program, including how these rebates must be provided, what information must be exchanged among parties, and myriad other details for the program to function. Notably, an entire subsection of the statute pertains to "Terms of rebate agreement[s]," 42 U.S.C. § 1396r-8(b), including that "[s]uch rebate[s] shall be paid by the manufacturer *not later than 30 days after*" receiving the information required of the state seeking the rebate. *Id.* § 1396r-8(b)(1)(A) (emphasis added). If the 340B statute allowed such post-purchase refunds or rebates, it would include, at a minimum, a deadline for providing rebates.

The lack of any statutorily prescribed guidance related to J&J's rebate model also breeds other absurdities. Given that J&J would evidently be allowed to give the post-purchase refunds whenever it wants, the enforcement and compliance provisions of the 340B statute lose all meaning. For example, a 340B Provider cannot feasibly complain that it has not received the 340B price because J&J, and all other manufacturers, can simply say that it has not yet given the post-purchase refund. Or a manufacturer can simply declare that it is still parsing the information that

it has demanded from 340B Providers to determine whether the entity is in fact entitled to the ceiling price. How long this process could last—with absolutely no recourse available to 340B Providers—is not spelled out by the 340B statute.

Finally, nothing other than J&J's good faith prevents it from demanding all manner of conditions, information, and data before it provides a post-purchase refund under its rebate model. Again, the rebate model, unlike a pre-purchase reduction in price, is not in any way constrained or guided by the statutory text, because it is not contemplated by the text. Even if it were, HRSA and HHS lack rulemaking authority under 340B, rendering it unable to impose restrictions on J&J's implementation. *See, e.g.*, *Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 42–43 (D.D.C. 2014). A model that relies on good faith to function will just as easily be subject to the arbitrariness and whims of pharmaceutical manufacturers. This is fundamentally at odds with the 340B Program and the purpose that Congress intended. *See Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 730–31 (2022) (noting that "Congress . . . actually intended for the 340B program's drug reimbursements to subsidize other services provided by 340B hospitals").

The 340B statute plainly does not condone these hostage-taking results. Through the non-statutory rebate model, manufacturers can, and *Amici* believe likely will, abuse the 340B Program, which is designed to provide drug discounts to 340B Providers so that the entities may continue to provide necessary care to vulnerable patient populations. Not only is this approach misguided as a policy matter: it is barred by the statutory text and structure of 340B.

### D.    J&J's Attempts to Obfuscate the Statutory Text Fail.

J&J's resort to mistaken policy arguments, as well as outdated legislative history and agency guidance, to support its interpretation and to override the plain language of the 340B statute is unavailing.

25

First, just as J&J evidently overlooks the "shall offer" provision in its flawed statutory interpretation, J&J relies on legislative history and agency guidance that *pre-date* the 2010 ACA amendment to the 340B statute that added the very provision that controls the outcome of this case. Though resorting to legislative history and prior agency guidance would be inappropriate under any circumstance, here, where the plain text of the 340B statute forecloses J&J's argument, outdated, pre-amendment legislative history can have no bearing on this case. *See, e.g.*, *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

Second, in a further effort to distract from the statutory text, J&J turns to ADAP rebates, which are not before this Court. As discussed, ADAPs face unique challenges preventing them accessing 340B benefits through an up-front discount. Setting that aside, HRSA's guidance related to ADAPs precedes the 2010 addition of the "shall offer" provision to the 340B statute, so HRSA's practices related to ADAPs, like outdated legislative history, offers no insight into the present meaning of the statute.

Third, J&J states that the replenishment model is analogous to a rebate mechanism because both models "work after the fact to reconcile transactions made initially at a commercial price to the 340B discount." J&J Mot. for Summ. J. 12. But that statement overlooks an essential fact: the price of the drug at the point of purchase. As described above, under the contract pharmacy replenishment model, 340B Hospitals are never asked to pay the full price of a drug upfront: they *only pay the statutorily imposed discount price*. Testoni Dec. ¶ 10. Under the in-house replenishment model, the 340B Hospital pays market price for a drug one time. *Id.* ¶ 9. Under J&J's proposed rebate model, 340B Hospitals will *always* pay full price and then at a later time receive a rebate. Likewise, under the replenishment model, 340B Hospitals are not required to

provide J&J with patient data, essentially giving J&J the power to conduct front-end audits of 340B Hospitals, without permission from HRSA and contrary to the statute.

Fourth, at times, J&J suggests that *Novartis*, 102 F.4th 452 and *Sanofi*, 58 F.4th 696 allow drug manufacturers to impose whatever conditions they wish on the sale of covered drugs. Not so. These cases, which principally concern delivery conditions related to covered drugs for contract pharmacies, merely explain that manufacturers may place *certain* conditions on the distribution of drugs when the 340B statute is otherwise silent as to those conditions. *Novartis*, 102 F.4th at 460, 464.

Indeed, the D.C. Circuit explicitly noted just how limited its decision was. *Id.* at 459 ("For their part, the manufacturers assert a nearly unfettered ability to impose conditions . . . Fortunately, we need only consider the *specific conditions* addressed in the enforcement letters under review." (emphasis added)). The D.C. Circuit reasoned that because "Section 340B is . . . silent about delivery conditions," the statute "preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions" related to contract pharmacies. *Id.* at 460. Importantly, the D.C. Circuit explicitly recognized that the 340B statute *is not* silent with respect to the issue here; when construing the "shall offer" provision, it explained that "section 340B merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." *Id.*; *see also Sanofi*, 58 F.4th at 703 (stating that the "shall offer" provision requires that "[i]f drug makers make drugs available to anyone at any price, they must 'offer' those drugs to [340B Providers] at a discount"). If anything, *Novartis* and *Sanofi*, through recognizing the force of the "shall offer" provision, directly support *Amici's'* arguments.

Fifth, and perhaps most obviously, J&J's briefing betrays the fact that this litigation is nothing more than a full-frontal attack on the 340B program. These policy-driven points are

disingenuous; indeed, as discussed, the 340B program is meant to stretch scarce healthcare dollars and subsidize covered entities treating vulnerable populations. To the extent that J&J or other drug manufacturers believe that the 340B program fails to achieve this venerable purpose—which it clearly does not—J&J's concerns should be addressed to Congress. Regardless, J&J's invocation of a false parade of horribles has nothing to do whatsoever with the question at the heart of this case: whether the 340B statute requires up-front price reductions. As discussed above, the answer to that question is unambiguously yes. *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016) ("[P]olicy arguments cannot supersede the clear statutory text.").

### E.    J&J's Justifications for the Rebate Models Lack Merit.

J&J's stated reasons for proposing a rebate model are to address what it describes as widespread abuses in the 340B Program and because the rebate model is necessary to comply with the Inflation Reduction Act. Neither reason withstands scrutiny.

J&J's use of cherry-picked statistics is nothing more than a misleading attempt to paint a picture of abuse in a program that has successfully operated for more than 30 years. For example, J&J claims that HRSA found that from 2012 to 2019, HRSA audits revealed over 429 instances of duplicate discounts with the Medicaid drug rebate program. But that statistic does not provide evidence of the widespread abuse that J&J claims.

The claimed duplicate discount findings are not evidence that a state tried to collect a Medicaid rebate on a 340B drug, nor that a manufacturer actually paid a Medicaid rebate on a 340B drug. The 340B statute prohibits covered entities from billing Medicaid for 340B discounted drugs that are subject to a rebate under the Medicaid Rebate Act. 42 U.S.C. § 256b(a)(5)(A)(i). The statute also requires the Secretary to establish a mechanism to ensure that covered entities comply with that prohibition. 42 U.S.C. § 256b(a)(5)(A)(ii). These two provisions are intended to prevent manufacturers from providing the same reduction twice: once when selling the drug at the

340B discount and then again when invoiced by Medicaid for a rebate on that same drug. Per that directive, HRSA requires that at registration, 340B Providers state whether they plan to use 340B drugs for Medicaid Fee-for-Service (FFS) patients and, if so, to provide their Medicaid billing number(s) to be included on the HRSA 340B Medicaid Exclusion File (MEF) so that states and manufacturers will know that Providers' drugs are not eligible for a Medicaid rebate.[27] Failure to have the correct numbers on the MEF will be identified as a "duplicate discount" finding in a HRSA audit.[28] HRSA does not contact the State Medicaid agency to verify whether a manufacturer actually paid a rebate on a 340B drug, or whether the state Medicaid agency even requested a rebate on that drug.[29] If a 340B Provider is able to obtain confirmation from its state Medicaid agency that the agency had not sought rebates from manufacturers for the 340B Providers' 340B claims, HRSA will downgrade the audit finding from "duplicate discount" to "Medicaid Exclusion File Error," indicating that no manufacturer paid a rebate as a result of the informational error on the MEF, and no repayment is due to manufacturers. Testoni Decl. ¶ 15.

In fiscal year 2022, nearly two-thirds of all duplicate discount findings were later confirmed not to have resulted in duplicate discounts.[30] That is likely an underestimate, as many state Medicaid agencies do not respond to hospital requests on this issue, or do not provide a timely response. Testoni Decl. ¶ 15. It is not surprising that most MEF information errors do not actually result in states seeking rebates on 340B drugs, as more than 20 states do not use HRSA's MEF and have instead adopted their own policies to identify and remove 340B drugs from their rebate

---

[27] *See Clarification on the Use of Medicaid Exclusion File*, HRSA (Dec. 12, 2014), https://tinyurl.com/ycvupudr.

[28] *Id.*

[29] *Id.*

[30] *See HRSA Program Integrity, FY 22 Audit Results*, HRSA (Oct. 28, 2024), https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results.

requests prior to submitting them to manufacturers.[31] J&J's citations to HRSA audit findings provide no evidence that J&J has actually paid a Medicaid rebate for a 340B discounted drug, nor that it has paid such a rebate to a state Medicaid agency.

J&J also justified its decision to adopt a rebate model based on changes in pharmaceutical pricing made by the Inflation Reduction Act (IRA) that Congress enacted in 2022 to lower the drug prices paid by Medicare. Beginning in 2026 for Medicare patients, under the IRA J&J will have to provide the lower of the 340B price or the maximum fair price (MFP) that it and CMS have negotiated on two of its drugs, STELARA and XARELTO, the two drugs that are, at least initially, the subject of J&J's rebate model. Dkt. No. 1-6. Even though J&J would not be required to charge the MFP until 2026, J&J justifies its rebate plan by claiming that, without it, J&J will be unable able to comply with the non-duplication provision in the IRA, which protects manufacturers from providing both the 340B price and the MFP refund on the same drug claim. Dkt. No. 1-4

But no one, not even J&J, expects that it will limit its rebate policy to just those two drugs. *See e.g.,* Compl. ¶ 79. Moreover, a rebate model is not the only way to implement the IRA's non-duplication provision; there are other options. As just one example, manufacturers could work with 340B Providers on limited data sharing arrangements for 340B drugs that are dispensed to Medicare beneficiaries to ensure that providers will receive either the 340B discount or the MFP if it is lower, as required by the IRA. This could be done either in advance of or after the MFP refund has been paid, potentially involving a neutral third party. This and other options have been

---

[31]    U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (Jan. 27, 2020), Appendix III, https://bit.ly/3ZG0ctH.

presented to CMS by *amicus* 340B Health.[32] Of course, until this action is resolved J&J has no incentive to work with 340B Providers or CMS to address this issue.

## II.    Requiring Manufacturers to Offer Pre-Purchase Price Reductions as Mandated by the 340B Statute Does Not Violate the APA.

### A.    J&J's APA Arguments Fail with its Incorrect Reading of the 340B Statute.

J&J's APA arguments necessarily fail because J&J's reading of the 340B statute is incorrect. The 340B statute leaves no discretion to HRSA or the Secretary with respect to how the 340B price must be effectuated. The "shall offer" provision requires that manufacturers offer covered drugs to covered entities prior to the drugs' sale at a reduced price. Therefore, HRSA and HHS merely followed the plain language of the statute when they denied J&J's request to implement its rebate model. HRSA and HHS exercised no discretion or decision-making because the statute forbids it. A claim under the APA fails at the outset when the agency acted in a manner required by statute. *Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112, 122 (D.D.C. 2022). That is the case here. J&J necessarily asks for HRSA to act *ultra vires* and to allow a rebate model that it has no discretion to sanction. Because HRSA followed a statutory command when it denied J&J's request to implement a rebate model, that ends this case. *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 534 (2007). This Court need not and should not examine HRSA's decision-making process because there was no decision to be made: Congress, through the 340B statute and specifically through the "shall offer" provision, mandated that up-front price reductions, not post-purchase refunds, be the manner through which 340B prices are effectuated.[33]

---

[32]   340B Health Comment Letter to CMS relating to Medicare Drug Price Negotiation Program (MDPNP) Draft Guidance, July 2, 2024, https://www.340bhealth.org/files/340B-Health-Comments-on-5.3.24-IRA-Draft-Guidance-7_.2.24.pdf

[33]   Likewise, contrary to J&J's argument, HRSA did not enact a legislative rule. "A rule is legislative if it supplements a statute, adopts a new position inconsistent with existing regulations,

### B.     Even if a Rebate Model were Permissible, HRSA's Actions were not Arbitrary or Capricious.

Even assuming that the 340B statute allows HRSA to choose, in its discretion, how 340B prices are offered to 340B Providers, HRSA exercised its discretion soundly in rejecting J&J's attempt to implement the flawed rebate model.

Under arbitrary-and-capricious review—a "narrow standard"—a court does not "substitute its judgment for that of the agency" and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009). In line with this deferential standard, "a court presumes that the agency's action is valid." *McDonough v. Mabus*, 907 F. Supp. 2d 33, 43 (D.D.C. 2012). "An agency need only articulate a rational connection between the facts found and the choice made, and the court will not intervene unless the [agency] failed to consider relevant factors or made a manifest error in judgment." *United W. Bank v. Off. of Comptroller of Currency*, 928 F. Supp. 2d 70, 83 (D.D.C. 2013) (quoting *Am. Radio Relay League, Inc. v. F.C.C.*, 524 F.3d 227, 233 (D.C. Cir. 2008)).

Applying this "highly deferential" standard, *id.*, HRSA's explanation for requiring up-front price reductions over post-purchase refunds reflects reasoned decision-making.[34] As discussed throughout this brief, HRSA understood that the only manner through which the 340B statute can

---

or otherwise effects a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). HRSA did not—and indeed, *could not*—supplement the 340B statute, because the statute itself requires the very course of action that HRSA undertook and mandates that J&J offer up-front price reductions. At most, then, HRSA's actions could constitute an interpretive rule, because they did nothing more than "clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required." *Id.* (internal quotation marks omitted and alteration adopted). Interpretative rules do not require notice-and-comment rulemaking.

[34]     It appears that J&J, like other drug manufacturers recently proposing to move to rebate models, met with HRSA about the rebate model, where HRSA may have provided additional justifications for its decision. *Amici* have no insight into what was said or discussed at those meetings.

fulfill its goals of furthering care for vulnerable patients is through up-front discounts. HRSA explained to J&J that a shift to a rebate model would disrupt over 30 years of manufacturers providing up-front discounts, and fundamentally undermine the 340B program because 340B Providers would be forced to pay higher prices for covered drugs. *See supra* at 10-11. Further, HRSA distinguished the replenishment systems that many 340B Providers use to manage their drug inventories from J&J's proposed rebate model. *See id.* (explaining the differences between J&J's proposed rebate model and product replenishment).

As HRSA recognized, the rebate model improperly empowers drug manufacturers to engage in self-help and vigilantism and prevents 340B Providers from realizing the benefits of the 340B program—namely, accessing covered drugs at reduced up-front prices. These communications more than reflect a "path [that] may reasonably be discerned," *Fox Television*, 556 U.S. at 513-14, especially in light of the repeated litigation of all aspects of the 340B statute and CMS guidance pertaining to the interaction between 340B and the IRA. J&J faults HRSA for not providing detailed rebuttals to each one of its policy arguments, including the decision to allow ADAPs to access the benefits of the 340B program through rebates. But HRSA has explained why ADAPs are uniquely situated vis-à-vis other covered entities. *See supra* at 4.

HRSA's explanations for the denial of the rebate model were brief. But the APA does not require HRSA to respond to every tangential point raised by J&J, especially when the agency and other HHS entities have already addressed any potential issues. That is especially true when these issues do not reflect factors that the agency is required to consider and when the issues raised in fact distort the 340B program. What the APA requires is "that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423

(2021). That J&J's attempts to drum up tangential issues did not draw an explicit response from HRSA does not mean that HRSA acted in a manner that is arbitrary and capricious.

### C.    If the Court Determines that HRSA Acted in an Arbitrary and Capricious Manner, the Proper Remedy is to Send the Issue Back to HRSA Without Vacating HRSA's Policy Letters.

J&J requests wide-ranging relief, including that this Court agree with its statutory interpretation, allow J&J to proceed with a rebate model, and that the Court essentially prevent HRSA from pursuing any enforcement actions or litigation against J&J in connection with its rebate model. But J&J is not entitled to such sweeping relief. Instead, should this court determine that HRSA's decision-making was arbitrary and capricious, all that J&J is entitled to is a setting aside of the policy letters and a remand to HRSA to reconsider J&J's request and further explain itself. 5 U.S.C. § 706(2) (empowering a reviewing court to "set aside agency action, findings, and conclusions"); *see also, e.g.*, *St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 208 (D.D.C. 2015) (vacating a rule promulgated in a fashion that was arbitrary and capricious is the "typical remedy"). Any other relief sought by J&J necessarily requires that this Court to adopt an interpretation of the 340B statute that affirmatively *requires* HRSA to permit rebate models, which has no basis in the text.

Moreover, because, as discussed (1) a myriad of reasons support HRSA's decision to require up-front price reductions as opposed to post-purchase refunds; and (2) allowing J&J to disrupt the 30-years of effectuating the 340B price through discounts will cause immediate harm and disruption, this Court should leave HRSA's letters in effect while giving HRSA an opportunity to further explain its decision-making if it finds that HRSA acted in an unlawful manner. *See, e.g.*, *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) ("The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of

34

an interim change that may itself be changed."); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005).

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court grant Defendants' Motion for Summary Judgment and dismiss the case.

Dated: April 2, 2025

                William B. Schultz (D.C. Bar No. 218990)
                Margaret M. Dotzel (D.C. Bar No. 425431)
                **ZUCKERMAN SPAEDER LLP**
                2100 L Street NW, Suite 400
                Washington, DC 20037
                Tel: (202) 778-1800
                Fax: (202) 822-8106
                wschultz@zuckerman.com
                mdotzel@zuckerman.com

                *Attorneys for Proposed Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on April 2, 2025, I filed the foregoing with the Clerk of the Court using the

ECF System, which will send notification of such filing to the registered participants identified on

the Notice of Electronic Filing.

_____

William B. Schultz