# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHNSON & JOHNSON HEALTH CARE
SYSTEMS INC.,

       *Plaintiff*,

    v.

ROBERT F. KENNEDY, JR., in his official
capacity, and U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

and

THOMAS J. ENGELS, in his official capacity, and
HEALTH RESOURCES AND SERVICES
ADMINISTRATION,

       *Defendants*.

Civil Action No. 1:24-cv-3188

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND REPLY IN SUPPORT OF SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 9

I. THE 340B STATUTE GRANTS J&J DISCRETION TO ADOPT A REBATE MODEL ..... 9

   A. The Plain Meaning of the Statutory Text Is That Manufacturers May
      Utilize 340B Rebate Models ................................................................................. 9

      1. HRSA Misreads the Statute's Text and Context ......................................... 10

      2. Amici's Interpretation of the Text Errs Repeatedly .................................... 14

   B. The Government and Amici's Structural Arguments Misconstrue the
      Statute and the Rebate Model ............................................................................. 18

   C. The Purpose and History of the 340B Statute Support J&J's Rebate Model .................. 23

II. IF HRSA HAS DISCRETION TO DIRECT A PRICING MECHANISM, IT MUST USE
   THE PPA AND NOTICE-AND-COMMENT RULEMAKING ........................................... 26

   A. If HRSA Has Authority to Pre-Approve or Reject a Rebate Model, It Must
      Do So Through the PPA ...................................................................................... 26

   B. Any HRSA Action to Mandate or Prohibit a Pricing Mechanism Is A
      Legislative Rule .................................................................................................. 29

III. HRSA'S REJECTION OF J&J'S REBATE MODEL WAS ARBITRARY AND
    CAPRICIOUS ........................................................................................................ 32

CONCLUSION .................................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abuzeid v. Mayorkas*,
62 F.4th 578 (D.C. Cir. 2023) ................................................................................10

*Am. Bottling Co. v. NLRB*,
992 F.3d 1129 (D.C. Cir. 2021) ...............................................................................6

*Amalgamated Transit Union v. Skinner*,
894 F.2d 1362 (D.C. Cir. 1990) .............................................................................29

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) .............................................................................30

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*,
966 F.3d 782 (D.C. Cir. 2020) ...............................................................................21

*Astra USA, Inc. v. Santa Clara Cnty.*,
563 U.S. 110 (2011) ...............................................................................17, 21, 28

*Burlington N. & Santa Fe. Ry. Co. v. Surface Transp. Bd.*,
403 F.3d 771 (D.C. Cir. 2005) ...............................................................................34

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
799 F.3d 202 (2d Cir. 2015) ..................................................................................12

*Catholic Health Initiatives v. Sebelius*,
617 F.3d 490 (D.C. Cir. 2010) ...............................................................................31

*Cent. Tex. Tel. Coop. v. FCC*,
402 F.3d 205 (D.C. Cir. 2005) ...............................................................................31

*City of Arlington v. FCC*,
569 U.S. 290 (2013) ...............................................................................................32

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
583 U.S. 416 (2018) ...............................................................................................10

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) ...............................................................15, 23, 27

*Elec. Energy, Inc. v. EPA*,
106 F.4th 31 (D.C. Cir. 2024) ...............................................................................29

*Etelson v. Off. of Pers. Mgmt.*,
    684 F.2d 918 (D.C. Cir. 1982) ...................................................................34

*Fed. Educ. Ass'n Stateside Region v. FLRA*,
    104 F.4th 275 (D.C. Cir. 2024) .................................................................27

*Genus Med. Techs. LLC v. FDA*,
    994 F.3d 631 (D.C. Cir. 2021) ..................................................................27

*IMS, P.C. v. Alvarez*,
    129 F.3d 618 (D.C. Cir. 1997) ....................................................................6

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
    569 F.3d 493 (D.C. Cir. 2009) ..................................................................15

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ..........................................................................13, 14

*Med. Marijuana, Inc. v. Horn*,
    145 S. Ct. 931 (2025) ...............................................................................29

*Mercy Hosp., Inc. v. Azar*,
    891 F.3d 1062 (D.C. Cir. 2018) ................................................................14

*Nasdaq Stock Market LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022) .................................................................34

*Nat. Res. Def. Council v. Wheeler*,
    955 F.3d 68 (D.C. Cir. 2020) ....................................................................31

*Nat'l Council for Adoption v. Blinken*,
    4 F.4th 106 (D.C. Cir. 2021) .....................................................................31

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .............................................................29, 30

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) ....................................................... *passim*

*Pac. Gas & Elec. Co. v. FERC*,
    113 F.4th 943 (D.C. Cir. 2024) .................................................................12

*PhRMA v. David*,
    510 F. Supp. 3d 891 (E.D. Cal. 2021) .......................................................12

*PhRMA v. HHS* (*Orphan Drug I*),
    43 F. Supp. 3d 28 (D.D.C. 2014) ....................................................26, 29, 32

*Rubin v. Islamic Republic of Iran,*
    583 U.S. 202 (2018) ........................................................................10

*Sanofi Aventis U.S. LLC v. HHS,*
    58 F.4th 696 (3d Cir. 2023) ...........................................................17

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) .......................................................................13

*United States v. Bronstein,*
    849 F.3d 1101 (D.C. Cir. 2017) .....................................................27

*United States v. Jicarilla Apache Nation,*
    564 U.S. 162 (2011) .......................................................................14

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
    570 U.S. 338 (2013) .......................................................................27

*Wis. Cent. Ltd. v. United States,*
    575 U.S. 274 (2018) .......................................................................14

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .......................................................................27

## **Statutes**

42 U.S.C. § 256b ...........................................................................1, 13

42 U.S.C. § 256b(a) ...........................................................................27

42 U.S.C. § 256b(a)(1).................................................................. *passim*

42 U.S.C. § 256b(a)(4)...........................................................................3

42 U.S.C. § 256b(a)(5)(B) ......................................................................7

42 U.S.C. § 256b(a)(5)(C) ..................................................................7, 19

42 U.S.C. § 256b(d)(1)(B)(i)(I) ...........................................................15

42 U.S.C. § 256b(d)(1)(B)(iv)(I) ..........................................................17

42 U.S.C. § 256b(d)(3)..........................................................................23

## **Rules & Regulations**

42 C.F.R. § 10.10(b) ............................................................................15

42 C.F.R. § 10.10(c)..............................................................................15

42 C.F.R. § 423.100 .................................................................................................12

42 C.F.R. § 447.505(b) ............................................................................................12

42 C.F.R. § 1001.952(h)(4) ................................................................................12, 17

42 C.F.R. § 1001.952(h)(5) ......................................................................................12

58 Fed. Reg. 27,289 (May 7, 1993) .........................................................................24

59 Fed. Reg. 25,110 (May 13, 1994) .........................................................................5

62 Fed. Reg. 45,823 (Aug. 29, 1997) ............................................................16, 22, 24

63 Fed. Reg. 35,239 (June 29, 1998) ..................................................................24, 25

81 Fed. Reg. 20,649 (Apr. 8, 2016) ..................................................................16, 28

82 Fed. Reg. 1,210 (Jan. 5, 2017) ............................................................................15

84 Fed. Reg. 38,639 (Aug. 7, 2019) .........................................................................35

## Legislative Materials

137 Cong. Rec. 23973 (1991) ..................................................................................25

138 Cong. Rec. 34293 (1992) ..................................................................................26

S. 1729, 102d Cong. (1991) .....................................................................................25

H.R. 3405, 102d Cong. (1991) .................................................................................25

H.R. Rep. No. 102-384, pt. 2 (1992) .................................................................. *passim*

H.R. 2890, H.R. 3405 and H.R. 5614: Hearing Before the House Subcomm. on
Health & the Env't of the Comm. on Energy & Com.*, 102d Cong. (1992) ............................25

*S. 1729: Hearing Before the Senate Comm. on Lab. & Hum. Res.*,
102d Cong. (1991) ...................................................................................................25

## Other Authorities

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
Texts* (2012) ...........................................................................................................14

## INTRODUCTION

The Health Resources and Services Administration ("HRSA") acted unlawfully when it sent letters purporting to bar Plaintiff Johnson & Johnson Health Care Systems Inc. ("J&J") from using rebates to offer reduced pricing to certain hospitals under the federal 340B prescription drug pricing program, 42 U.S.C. § 256b, and then published a policy on its website declaring that no drug manufacturer may use rebates for 340B pricing absent HRSA permission.  The 340B statute plainly allows J&J to use rebates to effectuate 340B pricing instead of upfront discounts, and does not authorize HRSA or the Secretary of Health and Human Services (the "Secretary") to bar J&J from doing so.  The statutory text instead grants J&J discretion to use a rebate model if it so chooses, subject to any provisions in the Pharmaceutical Pricing Agreement ("PPA") governing how J&J should "tak[e] into account" J&J's chosen rebate mechanism to ensure that the "amount required to be paid" by covered entities does not exceed the 340B price.  42 U.S.C. § 256b(a)(1).

Alternatively, to the extent the statute does confer authority on the Defendant officials and agencies ("the government") to mandate that manufacturers use discounts instead of rebates, which for the reasons explained it does not, the statute at most authorizes the Secretary to direct a mechanism *in the PPA*, which sets out manufacturers' obligations under the 340B program.  *See id.*  The Secretary has not exercised any such authority, so J&J retains discretion to utilize the pricing mechanism of its choice.  And if the Secretary ever did attempt to direct a pricing mechanism, the Administrative Procedure Act ("APA") would require the Secretary to use notice-and-comment rulemaking and to make a reasoned decision that is reasonably explained.  Agency letters and a website post cannot prohibit J&J's 340B rebate model (the "Rebate Model").

For all of these reasons, the Court should grant J&J's motion for summary judgment and deny the government's cross-motion.  The government's brief, ECF No. 42, gives the 340B statute a circular reading that misinterprets key terms and fails to give meaning to each word that Congress

1

enacted; mischaracterizes J&J's Rebate Model and ignores undisputed evidence in the Administrative Record ("AR") that reinforces both the Rebate Model's legality and its demonstrated lack of administrative or financial burden on covered entities; and falls well short of rationalizing HRSA's unreasoned decision-making, relying on a series of impermissible post hoc justifications. Strikingly, unlike in parallel 340B rebate model litigation pending in this District, the government's motion completely omits any argument as to the audit rights that the 340B statute nominally confers on manufacturers—no doubt a tacit recognition that J&J's rights have been frustrated by covered entity resistance to audits, as this Court knows from the half-dozen cases before it challenging HRSA approvals of J&J audits.

Proposed Amici 340B Health, UMass Memorial Medical Center, and Genesis Healthcare System ("amici") advance a different and entirely unsupportable interpretation of the statute that reads out the word "rebate" altogether and would render unlawful a rebate program for state AIDS Drug Assistance Programs ("ADAPs") that has operated without challenge for decades. The Court should disregard amici's statutory interpretation, as well as an extra-record declaration and survey results amici impermissibly attempt to introduce. The Court should then deny the government's cross-motion for summary judgment, grant J&J's motion, and hold that J&J may implement its Rebate Model as proposed.

## BACKGROUND

The government and amici make several claims about J&J's Rebate Model that are refuted by materials in the AR that were before HRSA when it took the actions at issue. The record reflects that J&J corresponded extensively with the agency about the Rebate Model's design, mechanics, and purpose, yet the government and amici overlook or mischaracterize these detailed submissions, especially regarding the Rebate Model's limited scope and the lack of administrative or financial burden it will create for covered entities.

The record shows that J&J first approached HRSA regarding its Rebate Model in June 2024. AR49. Over the next four months, through numerous meetings, letters, presentations, and other communications with HRSA, J&J presented detailed information about how its Rebate Model would function and answered every question HRSA raised about it. J&J explained that the initial implementation of the Rebate Model would have a limited scope, applying only to purchases by Disproportionate Share Hospitals ("DSH"), one of the fifteen categories of covered entity listed in the 340B statute. AR62, AR79; *see* 42 U.S.C. § 256b(a)(4). As J&J noted to HRSA, studies and J&J's own purchase data suggest that DSH covered entities—"large, financially robust hospitals"—had been particularly prone to abuse of the 340B program. AR216-AR217; *see* AR240-AR241 (identifying abuse by DSH entities, including thousands of transactions where DSH covered entities sought duplicate discounts in violation of the 340B statute). J&J also explained that its Rebate Model would be limited to only *two* drugs: STELARA and XARELTO, both of which had been subject to dramatic recent increases in 340B purchases by covered entities and would be subject to the "maximum fair price" provisions of the Inflation Reduction Act ("IRA") during its first year of operation (starting in 2026). AR160, AR53, AR 161, AR237; *see* AR73.

J&J also detailed the mechanics of the Rebate Model, emphasizing that the Rebate Model would not impose significant new financial or administrative burdens on DSH covered entities. *Contra* Defs.' Mem. of P. & A. in Supp. of Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot. for Summ. J. ("Gov't Br.") at 19, ECF No. 41-1; Br. of 340B Health, *et al.* as *Amici Curiae* in Supp. of Defs. ("Amici Br.") at 12, ECF No. 43-1 (arguing to the contrary by relying on post hoc information not presented to HRSA and misunderstanding or deliberately obfuscating how J&J's Rebate Model will work in practice). Under the Rebate Model, DSH covered entities would

purchase the applicable J&J medicines from wholesalers at commercial prices and then receive a rebate to realize the 340B ceiling price promptly after submitting commercially standard claims data for each purchase—*before* the covered entities paid for the medicines at all under standard wholesaler payment terms. AR169. The AR contains extensive evidence that J&J presented to address HRSA's concerns that "covered entities would be forced to pay a higher price point up front for *every* purchase" under the Rebate Model. AR203; *see also* Gov't Br. 19.

*First*, J&J explained that the Rebate Model would impose minimal administrative burden because the claims data required to validate a rebate payment are commercially standard data that covered entities *already collect* as part of the normal course of business, including for reports to other stakeholders. *See* AR56, AR61, AR207, AR242. To validate a claim, a covered entity would submit two categories of data: "Purchase Data," which indicates what drug was purchased, by whom, how much was obtained, from which wholesaler, and where it was shipped; and either "Pharmacy Claim Data" or "Medical Claim Data," which indicates where the product was dispensed. AR76-AR77; AR90-AR92; AR242-AR244. J&J would then validate this information against the HRSA database to verify that a covered entity purchased and dispensed the product. AR59; AR80; AR178; AR181-AR182; AR185. J&J explained that all of these data elements are already collected by DSH covered entities in various forms and shared with third parties in the following ways:

- Pharmacy Claim Data is already collected and reported to J&J through the 340B ESP platform for contract pharmacy sales, as well as existing J&J contract pharmacy policies. AR61, AR75, AR242-AR243; *see also* AR174-AR175 (HRSA internal email and chart acknowledging the categories of Pharmacy Claim Data covered by 340B ESP fields).

- Pharmacy Claim Data and Medical Claim Data elements are already reported to payors as part of standard billing and reimbursement practices. AR76; AR242-AR243.

4

- Purchase Data is made available by every major wholesaler purchasing customer portal for download by the covered entity.  AR76; AR81; AR90-AR92; AR242.

As J&J explained to HRSA, inclusion of these elements in the Rebate Model is also consistent with HRSA's own guidance, which advises that manufacturers may "request standard information" and utilize "customary business practices in transacting" with covered entities.  59 Fed. Reg. 25,110, 21,113-14 (May 13, 1994); *see* AR199.  Further, J&J's rollout of the Rebate Model also would have included various other methods to minimize any theoretical administrative costs on the covered entities, including by providing 60 days advance notice before the model takes effect; offering training and support to covered entities during and after the notice period; and allowing for a multi-month grace period during which covered entities would be exempted from the Rebate Model's 45-day deadline to submit claims data.  AR62.

*Second*, J&J explained that, when properly utilized, the Rebate Model would impose minimal upfront costs, if any, on covered entities.  AR75.  J&J made clear to HRSA that covered entities that timely submit rebate claims would generally receive the rebate payment *before* their current wholesaler invoices are due under standard payment terms.  J&J explained the process as follows:

- To receive a rebate, a covered entity needs only to submit the required claims information, which demonstrates that the entity purchased and dispensed or administered the medication.  AR244.

- Rebate payments will be disbursed when the number of validated dispensed units equals the number of units in the purchased package size.  AR75; AR82; AR179.

- For STELARA, the unit of dispense is the same as the number of units in the package, meaning that covered entities can seek a rebate immediately upon dispense.  For XARELTO, almost all 340B utilization is in unit-of-use bottles, so covered entities can also seek a rebate immediately upon dispensing the product.  AR75; AR82; AR93-AR94; AR179; AR185-AR186.

- J&J committed to paying DSH covered entities 340B rebates within seven to ten days of the covered entity's submission of the Purchase Data and Pharmacy Claim Data or Medical Claim Data. AR244; *see also* AR59; AR61; AR75; AR192; AR207.

- Most DSH hospitals have 15- to 30-day payment terms with wholesalers. AR244; *see also* AR61-AR62. As a result, covered entities that timely file claims will receive a rebate *before* they would normally pay the wholesaler under the current upfront discount model for effectuating 340B pricing. AR192; AR198-AR199; AR208-AR209.

This uncontradicted evidence in the AR demonstrates that J&J's Rebate Model will not impose material financial or administrative burdens on DSH covered entities. In fact, as J&J explained to HRSA, DSH covered entities receiving a rebate payment *before* paying their wholesaler will be in, at worst, a materially similar position to covered entities under the current upfront discount pricing model. AR245; *see also* AR75. This record evidence contradicts the extra-record claims by amici, and echoed by the government, that "340B Providers will be forced to front significant funds to purchase 340B drugs." Amici Br. 11.[1]

In addition to the lack of negative impact from its Rebate Model, J&J also set forth the factors necessitating implementation of the Rebate Model, including J&J's concerns with 340B program integrity, suspected and documented program abuse by DSH covered entities, the challenges J&J faces in attempting to comply with its obligations under the IRA, and J&J's interest

---

[1] To support their views about the supposed impacts of J&J's Rebate Model, amici cite to a "recent survey conducted by 340B Health." *See* Amici Br. 11-12. Other parts of the amici brief also cite to a Declaration by Maureen Testoni, the CEO of 340B Health, which contains multiple levels of hearsay regarding HRSA audits of covered entities. *See* Decl. of Maureen Testoni in Supp. of 340B Health *et al. Amicus Curiae* Br., ECF No. 43-2. Neither the survey results nor the Testoni Declaration are part of the AR in this case, despite 340B Health having ample opportunity to submit information to HRSA regarding J&J's model. *See* AR564-AR569 (340B Health letter to HRSA). As J&J argued in its Motion to Strike similar material filed by other amici, *see* ECF No. 39-1, judicial review of APA claims must be limited to the materials that were before the agency at the time the decision was made. *See Am. Bottling Co. v. NLRB*, 992 F.3d 1129, 1140 (D.C. Cir. 2021); *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623-24 (D.C. Cir. 1997) (granting motion to strike extra-record affidavits submitted with brief). J&J respectfully requests, consistent with its prior Motion to Strike, that the references to the 340B Health survey and the entire Testoni Declaration be stricken from the record in this case and not considered. *See* ECF No. 39-1.

in "decreas[ing] the need for inefficient and expensive audits."  *See, e.g.*, AR56; AR58-AR59; AR162-AR164; AR216-AR217; AR237-AR241.  Defendants do not dispute the evidence in the AR substantiating these concerns.  Amici claim J&J makes "unsubstantiated claims about non-compliance," that amici argue should be pursued through audits.  Amici Br. 1.  But amici ignore that J&J *has* sought to employ the audit process under 42 U.S.C. § 256b(a)(5)(C), yet has been unlawfully stymied by massive resistance from the covered entities it sought to audit.  As J&J informed HRSA:

- J&J identified concerning trends in purchases of STELARA by several covered entities, including an over 200% increase in 340B STELARA sales growth at one covered entity.  AR161.

- J&J identified thousands of transactions in which DSH covered entities received a 340B discount and then submitted or caused to be submitted a claim for a Medicaid rebate in violation of the 340B statute.  AR241; *see also* AR53.

- J&J made good-faith inquiries with approximately a dozen covered entities, but those entities provided little substantive response.  AR162-AR163.  The majority refused to explain how they determine whether individuals receiving drugs purchased at the 340B price are the entities' patients and therefore 340B-eligible.  *See* 42 U.S.C. § 256b(a)(5)(B) (barring covered entities from transferring 340B-priced drugs to anyone who is not "a patient of the entity").  Other covered entities refused to provide information without J&J first producing evidence of specific noncompliance, despite the fact that the 340B statute grants manufacturers audit rights precisely so that they can *obtain* such evidence.  AR163.

- Covered entities' stonewalling continued even after HRSA approved J&J's audit requests.  AR164.  J&J was unable to begin the majority of the audits.  Multiple covered entities hired outside counsel and refused to provide documents or information requested by J&J's auditor.  AR164.  Some sought to lobby HRSA to rescind the audit approvals.  AR164.  Counsel for these covered entities demanded that J&J produce all correspondence with HRSA that led to HRSA's approval of the audit requests, but refused to agree to keep that information confidential.  AR164.

Six of these entities eventually filed suit against HRSA seeking to halt the audits.  AR217; *see Or. Health & Sci. Univ. v. Johnson, et al.*, No. 1:24-cv-02184-RC (D.D.C. filed July 24, 2024); *MaineGeneral Med. Ctr. v. Johnson, et al.*, No. 1:24-cv-02187-RC (D.D.C. filed July 24, 2024);

*Univ. of Rochester v. Johnson, et al.*, No. 1:24-cv-02268-RC (D.D.C. filed Aug. 1, 2024); *Children's Nat'l Med. Ctr v. Johnson, et al.*, No. 1:24-cv-02563-RC (D.D.C. filed Sept. 6, 2024); *Univ. of Wash. Med. Ctr. v. Becerra, et al.*, No. 1:24-cv-02998-RC (D.D.C. filed Oct. 22, 2024); *Univ. of Kan. Hosp. Auth. v. Kennedy, et al.*, No 1:25-cv-00549-RC (D.D.C. filed Feb. 24, 2025). As J&J explained to HRSA, these attempts to frustrate J&J's audit rights have rendered those rights ineffective.  AR56; AR59; AR192; AR198; AR210; AR217.

Finally, the AR demonstrates that J&J extensively engaged with HRSA over many months regarding HRSA's questions and concerns about the Rebate Model, even following HRSA's September 17, 2024 rejection of the Rebate Model and threats to terminate J&J from the 340B program.  The government claims (at 6, 20) that J&J should have "further engage[d] with the Agency," rather than filing suit, but the AR shows that it is HRSA that failed to continue engagement with J&J.  After HRSA rejected J&J's rebate model and threatened J&J's termination from the program, J&J expressly asked to meet with HRSA to discuss this matter, AR207, presented its case for the Rebate Model yet again, AR234-AR246, and followed up that meeting with a specific request that HRSA approve its Rebate Model, AR232.  Additionally, while reserving its legal rights, J&J also asked HRSA to specify what set of facts, if not those presented by J&J during its extensive engagement with HRSA, would be needed for the agency to approve a rebate mechanism.  AR232.  To this day, HRSA has not responded to J&J's question.

The AR amply demonstrates that J&J has consistently sought to work with HRSA in good faith to address the various questions that HRSA raised about the Rebate Model and to provide HRSA with all of the information it requested.  And as the AR makes clear, J&J repeatedly sought to obtain a favorable resolution from HRSA on its Rebate Model, but HRSA dug in its heels and refused to offer J&J a path for obtaining approval of a rebate mechanism.

## ARGUMENT

### I.    THE 340B STATUTE GRANTS J&J DISCRETION TO ADOPT A REBATE MODEL

The text, structure, purpose, and history of the 340B statute make clear that J&J may utilize its Rebate Model to effectuate 340B pricing without prior agency approval.  The best reading of the parenthetical clause in the statute, which authorizes the Secretary to "provide" how "the amount required to be paid" to manufacturers for 340B drugs must "tak[e] into account any rebate or discount," is that the Secretary may direct in the PPA *how manufacturers must account for* the rebates or discounts they choose to provide—and nothing more.  42 U.S.C. § 256b(a)(1).  That interpretation properly gives effect to every word of the statute and is consistent with its plain meaning and structure.

The government and amici's dueling alternative interpretations, which conflict with each other as well as with the statutory text, are both wrong.  Each fails to assign meaning to all words of the statute and makes a variety of other errors, including conflating the choice of pricing mechanism with calculation of the ceiling price, and embracing cramped and inaccurate meanings for key terms like "price" and "offer."  The only interpretation that gives all parts of the statute a meaningful reading is J&J's.  The Court should reject HRSA and amici's flawed contrary interpretations and hold that J&J can implement its Rebate Model without agency pre-approval.

### A.    The Plain Meaning of the Statutory Text Is That Manufacturers May Utilize 340B Rebate Models

As J&J has explained, the text of the 340B statute authorizes manufacturers to select the pricing mechanism of their choice, including rebates.  The government's proposed alternative interpretation is circular and erroneous, and amici's reading is strained and facially untenable.  The Court should disregard these mistaken constructions of the statute, which fail to grapple with its key terms and give effect to all of its language.

### 1.    *HRSA Misreads the Statute's Text and Context*

The 340B statute provides: "The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs … purchased by a covered entity … does not exceed the ceiling price.…"  42 U.S.C. § 256b(a)(1).  As J&J explained in its opening brief, the phrase "as provided by the Secretary" modifies the entire preceding phrase "taking into account any rebate or discount"; Congress's placement of parentheses around the full phrase indicates that Congress intended it to operate as "a unified whole."  *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 440 (2018); *see* Mem. in Supp. of Pl.'s Mot. Summ. J. ("J&J Br.") at 27-28, ECF No. 18-1.  The phrase "as provided by the Secretary" thus authorizes the Secretary, at most, to provide in the PPA *how* a manufacturer should "tak[e] into account" the manufacturer's chosen pricing mechanism to ensure that the "amount required to be paid" by the covered entity does not exceed the ceiling price.  42 U.S.C. § 256b(a)(1).  That could include, for example, guidance from HRSA directing manufacturers to use specific accounting mechanisms or recordkeeping methods to track discounts provided or rebates paid, or a direction that rebate payments must be made within a certain timeframe consistent with standard business practices.  *See* J&J Br. 28-29.  Contrary to the government's claim, J&J's interpretation ensures that the statute is "properly construed so that effect is given to all its provisions" and "no part [is] inoperative or superfluous, void or insignificant." *Abuzeid v. Mayorkas*, 62 F.4th 578, 585 (D.C. Cir. 2023) (quoting *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018)).

Indeed, it is the government's proffered interpretation that fails that basic test, among other serious flaws.  First, although the government correctly recognizes that the statute expressly permits rebate models, it erroneously claims that Secretarial approval is required before

manufacturers may use them. *See* Gov't Br. 8-9. According to the government, the phrase "as provided by the Secretary" means that "the Secretary may 'have as a condition' or "stipulate' that the price to be paid will include a rebate or discount." *Id.* at 8. "In other words," the government insists, "in instances where the Secretary is providing for 'any rebate or discount,' the Secretary has discretion to determine whether the manufacture[r] can sell the drugs to the covered entity at the ceiling price by way of an upfront discount or a rebate." *Id.* But that interpretation gives no meaning to the phrase "taking into account," words that are unnecessary to the government's reading of the statute.

The government then responds to J&J's reading that the phrase "as provided by the Secretary" modifies the statute's entire parenthetical phrase—"(taking into account any rebate or discount, as provided by the Secretary)"—and not just "any rebate or discount," as the government claims. *Id.* at 9 (citing J&J Br. 37). The government maintains that even if J&J were right, the statutory parenthetical would "mean[] that the 'amount required to be paid' (i.e., paid by the covered entity) should factor in any rebate or discount that the Secretary stipulates or provides." Gov't Br. 9. But "the price to be paid" for 340B drugs is the "ceiling price" set by a statutory formula. *See* 42 U.S.C. § 256b(a)(1). The *only* considerations that "the amount required to be paid" may lawfully "factor in" are "the average manufacturer price for the drug under title XIX of the Social Security Act in the preceding calendar quarter," and "the rebate percentage described in paragraph (2)" of subsection (a) of the statute. 42 U.S.C. § 256b(a)(1). The mechanism for effectuating the ceiling price is not part of the price calculation. Accordingly, there is no role for the Secretary to stipulate what the "price to be paid will include." Gov't Br. 8. The government's contrary reading is not faithful to the plain text of the statute.

Furthermore, the government disregards the meaning of "price" in the context of drug purchasing. As J&J has explained, J&J Br. 37, case law holds that the "price" of a drug is the *net* price after any rebates or discounts. *See, e.g.*, *PhRMA v. David*, 510 F. Supp. 3d 891, 898 (E.D. Cal. 2021) ("[t]he transaction price of a prescription drug … includes discounts and rebates"); *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 206 (2d Cir. 2015) (explaining manufacturers routinely "*offer*[] lower *prices* … through *rebates* or discounts") (emphases added). HHS has enacted various rules premised on the same understanding. *See, e.g.*, 42 C.F.R. §§ 423.100, 447.505(b), 1001.952(h)(4)-(5). The government does not acknowledge these authorities, let alone distinguish them. But the guidance from the case law and these regulations aligns with the 340B statute's fixed formula for setting the ceiling price, or what the government calls "the price to be paid." The government's claim that the phrase "taking into account" gives the Secretary discretion to "factor in any rebate or discount that the Secretary stipulates or provides" in setting the amount required to be paid is thus inconsistent with both the text and context of the statute.

Instead, the better reading of "taking into account," and the rest of the parenthetical in the statute, is that the Secretary can provide (or "stipulate") how manufacturers should account for the rebates or discounts they provide and thus ensure that "the price to be paid" by each covered entity in fact is at or below the ceiling price. Gov't Br. 8; *see, e.g.*, *Pac. Gas & Elec. Co. v. FERC*, 113 F.4th 943, 950-51 (D.C. Cir. 2024) (rejecting a "[r]eading … at odds with the most natural reading of the statutory provision"). That interpretation gives independent meaning to and comports with all elements of the statute. And nothing in the statute's text or structure, correctly so interpreted, suggests that manufacturers lack discretion to select the pricing mechanism of their choice. The government asserts that the statute would have said "as provided by the manufacturer" if Congress

had intended to grant manufacturers such discretion and that "as provided by the Secretary" would be surplusage under J&J's reading. Gov't Br. 9. But that again assumes the conclusion that the function of "as provided by the Secretary" is to confer authority on the Secretary to direct the pricing mechanism, rather than to empower the Secretary to direct how manufacturers should account for their chosen mechanism to ensure the "amount required to be paid" does not exceed the ceiling price. *See id.*[2]

The government also misreads the "must-offer" provision of the statute. In contrast to HRSA's position in pre-litigation correspondence that *any* rebate model is inconsistent with the must-offer provision, AR203, the government now contends that it would violate must-offer only if J&J implements its Rebate Model without agency approval. Gov't Br. 13-14. Setting aside that the Court's review is confined to the agency rationale as HRSA articulated it, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), the government's argument fails on its face. In effect, the government claims that a drug purchase for which the ceiling price is effectuated through a HRSA-approved rebate model is a purchase at the ceiling price—but an identical purchase under an identical model that HRSA has *not* approved is *not* a purchase at the 340B price. That cannot be correct. The definitions of "offer" and "price" in the statute do not change just because HRSA has approved a manufacturer's rebate model. "[T]he basic nature and meaning of a statute does not change when an agency happens to be involved." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 408 (2024). Rather, "every statute's meaning is fixed at the time of enactment.'" *Id.* at 400

---

[2] The government asserts that J&J's interpretation improperly adds terms like "records" and "recordkeeping" into the text. Gov't Br. 9-10. But those concepts are merely illustrative of how the Secretary might provide that manufacturers should "tak[e] into account," or account for, the pricing mechanism they select. Stipulating a certain manner of creating and maintaining records is one potential means by which the Secretary could require manufacturers to "tak[e] into account any rebate or discount." 42 U.S.C. § 256b(a)(1).

(quoting *Wis. Cent. Ltd. v. United States*, 575 U.S. 274, 284 (2018)).  The must-offer provision, as the D.C. Circuit recently made clear in *Novartis Pharmaceuticals Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024), requires only a meaningful offer to furnish drugs at or below the 340B price; a rebate without government pre-approval can, and in this case does, qualify as a meaningful offer of the 340B price.  *See id.* at 463.  In this case, for the reasons explained, J&J's Rebate Model easily satisfies the must-offer requirement.

### 2.    *Amici's Interpretation of the Text Errs Repeatedly*

The Court should also reject amici's proposed statutory interpretation, which differs markedly from the government's and is untenable on its face.  Breaking with the government, amici insist that the 340B statute *requires* upfront discounts and that rebate models are never permitted.  Amici Br. 15-16, 31.  Amici specifically claim that Congress mandated upfront discounts when it added the must-offer sentence to § 256b(a)(1) in 2010.  *See id.* at 16-17.  But that theory finds no support in the statute's text, structure, or history, and contravenes basic statutory interpretation principles.

First, amici's interpretation effectively excises the word "rebate" right out of the statute, a glaring violation of the interpretive canon against surplusage that amici themselves cite.  *See* Amici Br. 18 (noting the Supreme Court is "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law" (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011))); *see also, e.g.*, *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) ("We presume that Congress did not 'include words that have no effect.'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012))).  Amici point to no evidence in the 2010 amendments indicating that Congress sought to remove rebates as an option for effectuating the 340B price.  Nor could they.  If Congress had intended to revoke authorization of rebate models when it added the "must-offer"

14

provision in 2010, it would have removed the word "rebate" from the operative statutory provision. *See* J&J Br. 9, 36-37.

Another consequence of amici's interpretation of the 2010 amendment is that the rebate program used by state ADAPs, and affirmatively recognized by HRSA in 1998, has been unlawful for the last fifteen years. That too cannot be correct. Amici's only response is that ADAP rebates are "not before this Court" and that HRSA's ADAP guidance predates the 2010 amendments. Amici Br. 26. But setting aside that amici cite the very same pre-2010 guidance in their brief (at 4 & n.3), neither point resolves the obvious contradiction between amici's interpretation of the statute and the ongoing ADAP rebate program. That conflict alone undercuts amici's self-serving and atextual interpretation of the statute. Amici cannot "rewrite a statute's plain text" to make it correspond with a particular policy preference. *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 335 (D.C. Cir. 2020) (quoting *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) (Kavanaugh, J.)).

Nor do amici offer a plausible reading of the "taking into account" parenthetical. Amici claim that portion of the statute authorizes HRSA to deviate from the ceiling price formula for new drugs with insufficient historical pricing data and drugs for which the formula produces a negative price. Amici Br. 15-17. Yet HRSA has never cited that language for its guidance in those areas. *See* 42 C.F.R. § 10.10(b)-(c) (regulations addressing "provisional pricing" and "penny pricing"). Instead, HRSA relied on § 256b(d)(1)(B)(i)(I), a 2010 addition to the statute that authorizes HRSA to "[d]evelop[] and publish[] through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices." *See* 82 Fed. Reg. 1,210 (Jan. 5, 2017) (promulgating provisional and penny pricing rules). Amici's contrary account is plainly erroneous and fails to give meaning to key language in the statutory text.

Amici also claim that the "rebate" mentioned in the parenthetical refers to the Medicaid rebate, not a mechanism for effectuating the ceiling price.  Amici Br. 20.  But that squarely contradicts the text; the "rebate" described in the first sentence of § 256b(a)(1) and the "rebate percentage" identified later in the same sentence, which figures in the calculation of the ceiling price, are not the same.  Amici's argument also again fails to account for the ADAP rebate program, which HRSA recognized on the premise that "section 340B does not specify whether entities should receive the section 340B pricing 'through a point of purchase discount, through a manufacturer rebate, or through some other mechanism.'"  62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (quoting H.R. Rep. No. 102-384, pt. 2, at 16 (1992)).  If amici were right that "rebate" in the parenthetical was the Medicaid rebate, then ADAP rebate models would be unlawful, and HRSA's explanation for recognizing them would be inconsistent with the statute.

Amici also protest that J&J's interpretation renders the must-offer provision "entirely redundant," but that again assumes that the must-offer provision's only function is to require upfront discounts.  Amici Br. 19.  The actual function of the must-offer language is to establish certain "manufacturer integrity" provisions to be included in the PPA, which HRSA implemented through the PPA addendum that it promulgated in 2016.  81 Fed. Reg. 20,649 (Apr. 8, 2016).  As the D.C. Circuit explained in the *Novartis* case, the must-offer provision requires manufacturers to make "a bona fide offer," meaning that "some conditions" on 340B sales "may be onerous enough to effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling."  102 F.4th at 462.  As a result, for manufacturers using rebates, the must-offer provision sets an obligation for manufacturers to pay those rebates to covered entities in a sufficiently timely fashion to ensure a bona fide offer at or below the ceiling price.  J&J's Rebate Model complies with this requirement by committing to pay rebates within seven to ten days after receipt of

16

standard claims data, which means covered entities will receive rebate funds *before* they have to make any payment for their purchased drugs under standard payment terms if data is timely submitted.  AR208-AR209; *see Novartis Pharms.*, 102 F.4th at 460-61 (holding that the 340B statute "preserves" manufacturers' ability to impose "reasonable conditions," including "request[ing] standard information" from covered entities).

Nor does anything in *Novartis*, the Third Circuit's decision in *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023), or the Supreme Court's ruling in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), require upfront discounts as amici claim.  Amici Br. 18.  In rejecting covered entity attempts to bring overcharge claims in federal court, *Astra* merely made a passing reference that Section 340B "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities." 563 U.S. at 113.  In *Novartis*, the D.C. Circuit found that the must-offer provision "merely requires manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount." 102 F.4th at 460.  Rebate models are fully consistent with that description.  And, although the *Sanofi* decision mentions that participating manufacturers "must offer their drugs at a discount," 58 F.4th at 699, a rebate is a type of discount, as the 340B statute recognizes in directing the Secretary to develop a mechanism for reporting of "rebates and other discounts" that manufacturers provide to other purchasers, 42 U.S.C. § 256b(d)(1)(B)(iv)(I); *see also, e.g.*, 42 C.F.R. § 1001.952(h)(4) (defining "rebate" as "any *discount* the terms of which are fixed and disclosed in writing to the buyer at the time of the initial purchase to which the discount applies, but which is not given at the time of sale").  The Court should disregard amici's arguments, which mischaracterize or ignore these authorities, and instead should find that J&J's Rebate Model complies with all provisions of the 340B statute.

### B.    The Government and Amici's Structural Arguments Misconstrue the Statute and the Rebate Model

The government and amici's structural arguments are also flawed.  Amici insist that J&J's rebate model is an "end run" around the 340B statute's audit provisions, Amici Br. 20-22, but that claim is meritless for several reasons.

First, amici's assertion that "J&J's rebate model renders entirely meaningless the audit provision" misunderstands both the rebate model and the statute, and also ignores the undisputed facts in the Administrative Record.  Amici Br. 21.  Put simply, using a rebate model is neither an audit nor an appropriate substitute for an audit.  The claims information J&J's Rebate Model would use to validate claims is a discrete and limited set of straightforward data that confirm that a covered entity purchased the drug and dispensed it at a 340B-eligible location.  The AR specifies the required data elements in detail: "Purchase Data," which indicates what drug was purchased, how much was obtained, from which wholesaler, and where it was shipped; and either "Pharmacy Claim Data," which indicate when a prescription was filled, at which pharmacy, what drug was dispensed and how much, and the receiving patient's insurer, or "Medical Claim Data," which indicate who prescribed the drug, when, what the drug was, and how much was prescribed.  *See* AR76-AR77.  The record reflects that this is straightforward, commercially standard data, all of which is either currently submitted to the 340B ESP platform that covered entities use for pharmacy sales; available for download from wholesaler portals; or commonly required for drug reimbursement.  AR242-AR243; *see* AR174-AR175 (HRSA analysis of availability of data).

The information examined in a 340B audit is far more extensive and sought for different purposes.  Unlike the commercially standard, claim-specific data elements the Rebate Model would use, 340B audits are retrospective inquiries that systematically review covered entity purchase and dispensing data, among many other categories of information, to investigate the

entity's compliance with the 340B statute's prohibitions on diversion and duplicate discounts. *See* 42 U.S.C. § 256b(a)(5)(C). To that end, manufacturer audits may seek programmatic information about an entity's policies and procedures for managing their 340B purchasing, the personnel involved, the internal compliance measures used, covered entities' agreements and communications with third parties related to 340B, and various other categories of information in addition to systematic production of purchase and claims data. *See, e.g.*, Compl. Ex. 3, *Or. Health & Sci. Univ. v. Johnson*, No. 1:24-cv-02184-RC (D.D.C. July 24, 2024) (HRSA-approved J&J audit plan of covered entity). Audits also involve interviews of key covered entity personnel. Amici's insistence that the elements of the Rebate Model are "exactly the same information the audit provision contemplates," Amici Br. 21-22, is simply wrong.

It is also striking that amici point to audits as the exclusive remedy for compliance concerns, and even more striking that they suggest that auditing requires manufacturers to meet "a fairly low bar," Amici Br. 13 n.23. There are six cases currently pending before this Court in which hospitals are suing HRSA to invalidate approvals of J&J audits that take the exact opposite position. *See Or. Health & Sci. Univ. v. Johnson, et al.*, No. 1:24-cv-02184-RC (D.D.C. filed July 24, 2024); *MaineGeneral Med. Ctr. v. Johnson, et al.*, No. 1:24-cv-02187-RC (D.D.C. filed July 24, 2024); *Univ. of Rochester v. Johnson, et al.*, No. 1:24-cv-02268-RC (D.D.C. filed Aug. 1, 2024); *Child.'s Nat'l Med. Ctr v. Johnson, et al.*, No. 1:24-cv-02563-RC (D.D.C. filed Sept. 6, 2024); *Univ. of Wash. Med. Ctr. v. Kennedy, et al.*, No. 1:24-cv-02998-RC (D.D.C. filed Oct. 22, 2024); *Univ. of Kan. Hosp. Auth. v. Kennedy, et al.*, No 1:25-cv-00549-RC (D.D.C. filed Feb. 24, 2025). As a result of these and other covered entities' wrongful frustration of duly approved audits, the value of the statutory audit right has been severely limited. If anything, the futility of the audit process has heightened the need for J&J's Rebate Model, not detracted from it.

19

Perhaps even more striking is the government's total silence regarding the audit issue in this case. In its corresponding briefs in other rebate model litigation pending in this District, the government argues at length that the availability of audits mitigates the need for a rebate model. *See* Defs.' Mem. of P. & A. in Supp. of Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. at 19-20, *Eli Lilly & Co. v. Kennedy*, No. 24-cv-3220 (D.D.C. Mar. 17, 2025), ECF No. 35-1 (stating, among other things, that "[b]ecause Plaintiffs can audit covered entities to ensure compliance with the terms of the program, Plaintiffs do not need to unilaterally impose cash rebates on the manufacturers to ensure the program's integrity.") Here, however, the government's submission does not mention the word "audit" a single time. The government's silence on audits in this case is deafening; evidently, the government recognizes that J&J cannot rely on audits to ensure compliance, contrary to the arguments by amici.

The government also ignores the critical importance of the proposed Rebate Model for J&J to comply with its obligations under the Inflation Reduction Act ("IRA"), an issue the government again discusses at length in the parallel rebate model litigation. Defs.' Mem. of P. & A. at 21-25, *Lilly*, No. 24-cv-3220 (D.D.C. Mar. 17, 2025). Because J&J has two drugs subject to Maximum Fair Price obligations beginning January 1, 2026, the challenges of adhering to the IRA's de-duplication requirements are just as or even more pressing for J&J as for the other plaintiff manufacturers, as the AR makes clear. *See, e.g.*, AR59; AR167; AR198; AR207; AR239. J&J also shares the other manufacturers' concerns with the government's responses, which fail to appreciate the compliance challenges manufacturers face and the inadequacy of the solutions proposed by the CMS. *See* ECF Nos. 19, 19-1 (J&J motion to expedite and accompanying

declaration); Pls.' Br. in Opp'n to Defs.' Cross-Mot. for Summ. J. & Reply in Supp. of Summ. J. at 18-22, *Lilly*, No. 24-cv-3220 (D.D.C. Mar. 31, 2025).[3]

Additional structural arguments by amici fare no better.  Amici claim (at 22) that the 340B statute "exhibits a preference against vigilantism" and in favor of audits, citing the Supreme Court's decision in *Astra USA, Inc v. Santa Clara County*, 563 U.S. 110 (2011).  In *Astra*, the Court held that covered entities cannot bring private litigation to enforce manufacturers' alleged obligations under the PPAs.  *Id.* at 113.  Because covered entities lack a private right of action under the statute, the Court held that allowing private suits through the agreements implementing the statute would "render[] meaningless" Congress's decision to withhold such a right.  *See id.* at 118.  But Congress *did* include rebates as a permissible pricing mechanism in the statute, so no supposed statutory norm against vigilantism applies.  And, contrary to amici's portrayal, audits are not a reasonable substitute for J&J's Rebate Model for the reasons just described.

Amici also claim that, if the 340B statute permitted rebates, it would be similarly structured to the Medicaid rebate statute and include detailed parameters and deadlines for payments.  Amici Br. 24.  The Medicaid Drug Rebate Program, however, is a highly complex program administered both by CMS and by the fifty states, so its detailed statutory structure is unsurprising.  Moreover, the 340B program was enacted shortly after the Medicaid rebate program, making clear that Congress at that time knew how to impose rebate parameters if it wanted to do so.  *See, e.g.*, *Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of Treasury*, 966 F.3d 782, 788 (D.C. Cir. 2020) ("Congress knows how to impose time limits.").  Yet Congress instead enacted a statute that does not require

---

[3] Nor is amici's suggestion (at 30-31) that manufacturers could work with the more than 25,000 existing covered entities on data sharing arrangements to further IRA compliance remotely satisfactory.  Indeed, the fierce and ongoing resistance J&J faces to its duly authorized audits raises serious questions about the feasibility of entering into data sharing agreements.  *See* pp. 7-8, 20, *supra* (discussing litigation challenging J&J audits).

a specific pricing mechanism to be used, as HRSA has acknowledged.  *See* 62 Fed. Reg. at 45,824 (citing H.R. Rep. No. 102-384, pt. 2, at 16).  The logical inference from Congress's differing decisions is that it reserved discretion for manufacturers in developing the parameters of the 340B pricing mechanism, subject to the must-offer requirement.

Amici additionally argue that J&J's interpretation would produce "absurd results," Amici Br. 23, but each "result" ignores governing case law and the undisputed record.  Amici first cast doubt on whether J&J will timely make payments under the Rebate Model, asserting that nothing stops J&J from taking months or years to effectuate the ceiling price.  *Id.* at 23-24.  That fails for two reasons.  First, J&J repeatedly committed to HRSA that, under the Rebate Model, payments will be made within seven to ten days of the covered entity submitting valid claims data.  AR59; AR61; AR75; AR80-AR81; AR179; AR187; AR192; AR198; AR207-AR208.  Amici point to no countervailing evidence in the AR, and in fact none exists.  Notably, the ADAP rebate program recognized by HRSA has no express statutory guidance on timing for rebate payments, yet amici point to no evidence of abuse in that regard.  In fact, an ADAP advocacy group has moved for leave to file an amicus brief in *support* of J&J's summary judgment motion and rebate model.  *See* ECF No. 21.

Second, as noted in section I.A.2, *supra*, the *Novartis* case's interpretation of the must-offer provision places a limiting principle on manufacturers' design of their rebate models.  In requiring that manufacturers make "a bona fide offer" to purchase their products at the reduced price, the *Novartis* decision made clear that manufacturers may establish conditions on 340B sales, but certain conditions "may be onerous enough to effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling."  102 F.4th at 463.  A manufacturer's non-payment of rebates for an excessive period would be in tension with that reasoning and the statutory

22

obligations it interprets.  To the extent a covered entity at some point believes J&J has run afoul of Congress's intent, as described in *Novartis*, its recourse is an administrative dispute resolution claim before HRSA.  *See* 42 U.S.C. 256b(d)(3).  The same principles address amici's complaints that allowing a rebate model would deprive the statute's enforcement and compliance provisions of meaning and grant J&J unfettered discretion to set conditions on rebate payments.  Amici Br. 24-25.  Again, the statute's bona fide offer requirement, as described in the *Novartis* decision, limits the conditions and timing manufacturers may apply to their rebate models.

### C.    The Purpose and History of the 340B Statute Support J&J's Rebate Model

Courts need not "resort to legislative history" to interpret "statutory text that is clear," *Eagle Pharms.*, 952 F.3d at 339 (citation omitted), but the history and purpose of the 340B statute reaffirm the conclusions that flow from its text and structure.  In general, Congress's broad aim in enacting the 340B statute was to restore the status quo at the time the Medicaid Drug Rebate Program was enacted in 1990, before which manufacturers voluntarily offered reduced pricing to safety net providers.  *See* H.R. Rep. No. 102-384, pt. 2, at 11-12.  Specifically, Congress sought to make reduced prices available to covered entities again by preventing those lower prices from impacting the manufacturer's rebate obligations under the Medicaid rebate program.  *See id.* at 10-12 (explaining that the 340B Program would "remove any disincentive that the Medicaid rebate program creates to discourage manufacturers from providing substantial voluntary or negotiated discounts to these clinics, programs, and hospitals").  Consistent with that aim and prior practice, Congress vested 340B-participating manufacturers with discretion as to the form the restored price reductions under 340B would take.  *See id.* at 16 ("The Committee bill does not specify whether 'covered entities' would receive these favorable prices *through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism*." (emphasis added)).  J&J's Rebate Model utilizes and is fully consistent with the flexibility Congress provided in the statute.

The government offers arguments drawing on the statute's purpose and history, none of which moves the needle. First, the government contends that the initial 340B program guidance issued in 1993 only allowed rebates where covered entities were seeking to realize the ceiling price for purchases made before the program was implemented. Gov't Br. 10 (citing 58 Fed. Reg. 27,289, 27,292 (May 7, 1993)). Yet, as J&J has explained, the guidance also recognized that the 340B statute was "an attempt to provide Federal purchasers with a process whereby they will receive drug discounts *or rebates*," making clear from the outset that rebates were a permissible long-term pricing mechanism. J&J Br. 8 (quoting 58 Fed. Reg. at 27,290 (emphasis added)).

The government also points to the 1997 proposed ADAP guidance, which the government claims informed manufacturers that the Secretary has the authority to determine the pricing mechanism that is "most effective and most efficient." Gov't Br. 10 (quoting 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997)). That passage in the guidance was a quotation from the 1992 House committee report, which as J&J has noted is inconsistent with the plain and unambiguous text of the statute and should receive no weight where it conflicts. J&J Br. 35 n.8. The same is true of other passages from the report that discuss agency authority over pricing mechanisms. Gov't Br. 12-13. To the extent the report is relevant at all, however, it reinforces—in language the government carefully omits—that the PPA is the only mechanism through which HRSA could specify a pricing mechanism if it had such authority. *See* Section II, *infra*; *see also* J&J Br. 35 & n.8 (noting the report states that the Committee "expects that the Secretary of HHS, *in developing these agreements*, will use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity'" (quoting H.R. Rep. No. 102-384, pt. 2, at 16)).[4] Such

---

[4] The government also contends that HRSA's final ADAP guidance "declined to authorize [manufacturers] to pay rebates to all other covered entities." Gov't Br. 10 (citing 63 Fed. Reg. 35,239, 35,241-42 (June 29, 1998)). But the guidance stopped short of expressly claiming HRSA

a provision is absent from J&J's PPA, so J&J retains discretion to adopt its Rebate Model without prior approval from HRSA.

Amici broadly agree on Congress's purposes, which they further support with a September 24, 1991 floor statement by Representative Ron Wyden of Oregon, who that same day introduced a 340B precursor bill that would have granted access for clinics funded by the Public Health Service "to the same drug prices earned by Medicaid." Amici Br. 3 (citing 137 Cong. Rec. 23973-94 (1991) (statement of Rep. Ron Wyden)). The Wyden bill, H.R. 3405, mirrored the final 340B statute in several elements of its structure—except that the *sole* mechanism it proposed for effectuating price reductions to covered entities was a *rebate*. H.R. 3405, 102d Cong. (1991), https://bit.ly/43HEhEF. Specifically, the legislation provided that "[a]n entity receiving financial assistance under [the Public Health Service] Act may not purchase any drug from a manufacturer unless there is in effect an agreement with the Secretary that requires the manufacturer to provide a *rebate*, as determined under subsection (c)," which pointed to the Medicaid rebate statute, "to covered entities for the purchase of the drug." *Id.* § 2 (emphasis added); *see also H.R. 2890, H.R. 3405 and H.R. 5614: Hearing Before the House Subcomm. on Health & the Env't. of the Comm. on Energy & Com.*, 102d Cong. 16 (1992) (draft legislation). A companion Senate bill would have established the same structure for effectuating reduced pricing for Public Health Service clinics. *See* S. 1729, 102d Cong. (1991), https://bit.ly/3EmVCZ1; *see also S. 1729: Hearing Before the Senate Comm. on Lab. & Hum. Res.*, 102d Cong. (1991). To be sure, the legislation evolved in the year before the 340B statute was enacted, but the fact that Congress initially proposed making rebates the program's *only* pricing mechanism confirms that Congress still intended rebates to be

---

has exclusive authority to approve or reject rebate models, which would have been inconsistent with the statute's plain text. The final guidance also confirmed that HRSA was not "propos[ing] a specific mechanism for accessing [340B] rebates" in order to "allow maximum flexibility" between the state ADAPs and manufacturers. 63 Fed. Reg. at 35,241; *see* J&J Br. 9.

an option after it added discounts to the bill.  *See* J&J Br. 26-27 (citing 138 Cong. Rec. 34293-94 (1992) (statement of Sen. Alan Cranston) (describing a near-final version of the 340B legislation as requiring manufacturers "to provide rebates or discounts" to covered entities).

## II.    IF HRSA HAS DISCRETION TO DIRECT A PRICING MECHANISM, IT MUST USE THE PPA AND NOTICE-AND-COMMENT RULEMAKING

The 340B statute does not vest HRSA with discretion to direct a pricing mechanism.  But even if HRSA were correct that the Secretary may mandate discounts or prohibit rebate models, the only regulatory vehicle through which HRSA could implement such a directive is the PPA—and the only procedure it could use is notice-and-comment rulemaking.  *See* J&J Br. 33-36, 39-42.

The government, supported this time by amici, maintains that HRSA can lawfully direct a mechanism without modifying the PPA or using notice-and-comment.  That is mistaken.  All of the available evidence indicates that HRSA may act on a pricing mechanism, if at all, exclusively through its agreements with manufacturers.  The government and amici's arguments that HRSA merely set forth an interpretive rule in its letters to J&J rejecting its rebate model, and its website post to all other manufacturers declaring that rebate models without agency consent are prohibited, are also meritless.  Nothing in the 340B statute's text empowers HRSA to mandate a pricing mechanism or to bar manufacturers from using the mechanism of their choice—let alone to terminate them from the program for acting without government pre-approval.  Because there would not be an adequate legislative basis for enforcement absent HRSA's action, HRSA's letters and website post are legislative rules that required notice-and-comment, "the hallmark of a legislative rule."  *PhRMA v. HHS* (*Orphan Drug I*), 43 F. Supp. 3d 28, 46 (D.D.C. 2014)).

### A.    If HRSA Has Authority to Pre-Approve or Reject a Rebate Model, It Must Do So Through the PPA

HRSA lacks power to direct a pricing mechanism at all, but if the statute did confer such authority, it would authorize HRSA to act exclusively through the PPA.  Indeed, the entire relevant

paragraph of the 340B statute discusses solely the contents of the PPA, and the subsection in which it appears is titled "Requirements for agreement with Secretary." 42 U.S.C. § 256b(a). In short, the subsection's "scope is apparent from its title," *United States v. Bronstein*, 849 F.3d 1101, 1109 (D.C. Cir. 2017)—it covers only the content of the Secretary's "agreement" with each manufacturer. The statute cannot credibly be interpreted to bury language establishing an independent source of agency authority over pricing mechanisms within a paragraph that otherwise addresses only the PPA. *See Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 643 (D.C. Cir. 2021) (explaining that Congress "does not … hide elephants in mouseholes" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 467-68 (2001))). "Just as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

Further, to the extent relevant, "[w]hat legislative history there is reinforces the text." *Fed. Educ. Ass'n Stateside Region v. FLRA*, 104 F.4th 275, 284 (D.C. Cir. 2024). The primary 1992 House committee report on the legislation that became the 340B program provides that, although "[t]he Committee bill does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism.… [t]he Committee expects that the Secretary of HHS, *in developing these agreements*, will use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'" H.R. Rep. No. 102-384, pt. 2, at 16. Thus, to the extent the 340B statute's legislative history is considered, it supports the same conclusion. *But see Eagle Pharms.*, 952 F.3d at 339 (explaining courts need not "resort to legislative history" where, as here, the "statutory text … is clear").

The government's single paragraph in response contends that the PPA is merely a "uniform agreement" that recites manufacturers' statutory duties, and that, because HRSA's purported "authority to determine whether price reductions are offered through upfront discounts or rebates is found within the text of the statute," HRSA need not specify a mechanism in the PPA for its directives to bind J&J.  Gov't Br. 16-17 (citing *Astra USA, Inc.*, 563 U.S. at 113).  Those claims are unpersuasive for two reasons.  First, the government again assumes and relies on the erroneous conclusion that the statute's text grants HRSA discretion to pre-approve manufacturer's choice of pricing mechanism.  The text provides no such authority for the reasons described above.  *See* section I.A, *supra*.

Second, the government's reliance on *Astra USA* is misplaced.  To be sure, the Supreme Court there stated that "PPAs simply incorporate statutory obligations and record the manufacturers' agreement to abide by them," and the PPA to date has accordingly echoed the statute.  *Astra USA*, 563 U.S. at 118.  But the existing PPA also contains terms that go beyond the statutory text, including provisions relating to manufacturer retention of records to document the inputs for the ceiling price calculation, and confidentiality of manufacturer and covered entity information.  AR39-AR40, AR42.  HRSA imposed these requirements by providing for them in the PPA.  Moreover, the PPA is not a static document and has changed over time.  *See* 81 Fed. Reg. 20,649 (Apr. 8, 2016) (final HRSA notice announcing PPA addendum).  The only procedural limitations on amendments addressing pricing mechanism are that they must be adopted through a writing signed by both parties, as the agreement itself makes clear, AR44, and must be promulgated following notice-and-comment rulemaking, as explained in section II.B, *infra*.

Moreover, if Congress had intended to authorize HRSA to mandate a pricing mechanism through guidance or rulemaking as the government maintains, it would have used such

terminology, as it did in other portions of the 340B statute.  Instead, when it addressed the 340B pricing mechanism, Congress referred exclusively to the "agreement" between the Secretary and manufacturers.  That choice must be given meaning.  *See Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 940 (2025) ("Congress' use of certain language in one part of the statute and different language in another can indicate that different meanings were intended." (citation omitted)). Regulations and contracts are substantively distinct; regulations are fixed until revised by the agency, but contractual agreements are always subject to modification by consent of the parties.

As this Court has explained, "[w]here Congress prescribes the form in which an agency may exercise its authority ... [the court] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form."  *Orphan Drug I*, 43 F. Supp. 3d at 38 (quoting *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990)).  If HRSA could direct a pricing mechanism (it cannot), it could only do so through the PPA.  HRSA's letters purporting to bar J&J from proceeding with its rebate model, and its website post claiming to prohibit all manufacturers from using rebate models without preapproval, are therefore void.

### B.    Any HRSA Action to Mandate or Prohibit a Pricing Mechanism Is A Legislative Rule

Even if the 340B statute authorized the Secretary to specify a pricing mechanism, any such action, including HRSA's letters to J&J and website statement here, constitute legislative rules unlawfully promulgated without notice-and-comment rulemaking.  That is because HRSA's actions "purport[ed] to impose legally binding obligations or prohibitions on regulated parties," and those obligations were offered as "the basis for an enforcement action for violations of those obligations or requirements."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.); *see also, e.g.*, *Elec. Energy, Inc. v. EPA*, 106 F.4th 31, 40 (D.C. Cir. 2024) (explaining that, to determine whether a regulatory action is a legislative rule, "we look to whether

the action binds private parties or the agency itself with the force of law" (cleaned up)).  Nothing in the statutory text authorizes HRSA to mandate or bar a pricing mechanism, let alone to begin termination proceedings for contravening HRSA's supposed pre-approval authority.  Accordingly, HRSA's claimed authority to prohibit rebate models and remove J&J from the 340B program goes well beyond the statute, purporting to fill a gap, and thus constituting a legislative rule.

The government claims that HRSA's letters and website post announced a mere interpretive rule that lacks "legal effect," and for which notice-and-comment accordingly is not required.  Gov't Br. 15.  But the government misapplies the interpretive rule test that it draws from *American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106 (D.C. Cir. 1993).  *American Mining Congress* set out four factors for determining whether a rule is legislative or interpretive, satisfaction of "any" of which means the rule is legislative.  *Id.* at 1112.  The most pertinent of the factors here is "whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties."  *Id.*  HRSA's letters to J&J and website post satisfy that test, and qualify as legislative, on at least two grounds.[5]

First, the statute does not provide a legislative basis for HRSA to mandate or prohibit a pricing mechanism for all of the reasons discussed in section I, *supra*.  *Contra* Gov't Br. 16; Amici Br. 31 n.33.  The Court need go no further to find HRSA's actions "purport[ed] to impose legally binding obligations" on J&J and other manufacturers beyond the statute, and thus was required to use notice-and-comment rulemaking.  *Nat'l Mining Ass'n*, 758 F.3d at 251.  Indeed, a rule is

---

[5] HRSA's website post arguably also satisfies the spirit of *American Mining Congress*'s second factor, which asks whether the rule was published in the Code of Federal Regulations.  995 F.2d at 1112.  The internet was in its infancy when *American Mining Congress* was decided in 1993, but HRSA arguably "purport[ed] to act legislatively" by publishing its policy on its website, thus making clear that it sought to apply the rule to all manufacturers.  *See id.*

interpretive only when it "derives a proposition from an existing document, such as a statute, regulation, or judicial decision, whose meaning compels or logically justifies the proposition." *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) (quoting *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 83 (D.C. Cir. 2020)).  HRSA's determination that unapproved rebate models violate the 340B statute is neither compelled nor justified by the text.

Second, even if HRSA were empowered to require discounts or prohibit rebates, nothing in the 340B statute supports that adoption of a rebate model without permission will lead to *termination* from the program.  Yet that is exactly what HRSA's letters to J&J threatened.  In its September 17, 2024 letter, HRSA decreed that an unapproved rebate model "violates J&J's obligations under the 340B statute" and thus "subjects J&J to potential consequences, such as termination of J&J's [PPA]."  AR203.  In its September 27, 2024 letter, HRSA was even more direct, declaring that J&J "will violate Section 340B(a)(1)" if it "proceeds with implementing its rebate proposal without Secretarial approval," and that HRSA accordingly "will begin the process … related to terminating the agreement" if J&J moves forward.  AR214.  Yet HRSA pointed to no specific language in the 340B statute establishing that termination is an authorized remedy for a manufacturer's unapproved adoption of a rebate model.  Instead, HRSA was filling a gap in the law and purporting to impose enforcement obligations and duties that the statute does not contain.[6] As a result, HRSA's actions "cannot fairly be seen as interpreting a statute or a regulation," and thus constitute legislative rulemaking.  *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 494 (D.C. Cir. 2010) (quoting *Cent. Tex. Tel. Coop. v. FCC*, 402 F.3d 205, 212 (D.C. Cir. 2005)).

---

[6] That the government and amici disagree so strenuously on whether the statute permits HRSA to authorize rebate models is simply more evidence that HRSA's announced policy and threatened termination is gap-filling, not mere interpretation of a statute with clear meaning.

The reason the government is loath to concede that its pronouncements were legislative is that HRSA undisputedly lacks authority to adopt a binding rebate prohibition and to impose termination as the sanction for violations. As the government agrees, this Court's decision in *Orphan Drug I* held that there are only "three provisions in the statute where Congress authorized rulemaking authority under the 340B Program," and the D.C. Circuit in the *Novartis* case affirmed that HRSA "lacks rulemaking authority over the section 340B program." Gov't Br. 12, 16 (quoting *Novartis Pharms*, 102 F.4th at 459); *see also* Amici Br. 25 (making the same concession). None of the three narrow areas in which HRSA has limited regulatory authority for 340B extends to prohibiting a pricing mechanism or terminating manufacturers that breach the supposed prohibition. *See* J&J Br. 31-32. As a result, HRSA's policymaking and attempted enforcement here is not only legislative, but without statutory authority. "Congress has not given HHS [or HRSA] broad rulemaking authority … and '[w]here Congress has established a clear line, the agency cannot go beyond it….'" *Orphan Drug I*, 43 F. Supp. 3d at 45 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013)); *see* J&J Br. 31-32. Accordingly, the Court should vacate HRSA's rejection of J&J's Rebate Model and HRSA's announced policy requiring manufacturers to seek preapproval before using rebates to effectuate 340B pricing.

## III. HRSA'S REJECTION OF J&J'S REBATE MODEL WAS ARBITRARY AND CAPRICIOUS

HRSA's decisions to reject J&J's Rebate Model and adopt a pre-approval policy for all manufacturers' rebate models were arbitrary and capricious. The government and amici's responses ignore record evidence, and in amici's case, impermissibly rely on extra-record evidence that the Court should disregard.

First, HRSA has not adequately or reasonably distinguished between manufacturer rebate models and the replenishment models that covered entities unilaterally adopted without seeking or

receiving approval from HRSA.  The government agrees that covered entities using replenishment models initially purchase drugs at wholesale acquisition cost and dispense them to 340B-eligible and ineligible patients alike; a third-party administrator or other entity evaluates the claims data for those dispenses and decides how many units of the drug were furnished to 340B patients; and once the number of 340B-eligible units dispensed reaches the package size in which the drug is sold, the stock of the drug is "replenish[ed]" at the 340B price.  Gov't Br. 19 (citing AR60 (J&J letter to HRSA)); *see also Novartis Pharms.*, 102 F.4th at 457-58.  J&J's Rebate Model is similar in critical respects—drug units are purchased at wholesale acquisition cost and the 340B price is realized after the initial sale.  *See* J&J Br. 44.

    The government and amici object that covered entities using replenishment models pay the wholesale price only for their initial purchases and that subsequent replenishment purchases are made at the 340B price.  Gov't Br. 18-19; Amici Br. 26.  But that is not a material difference from J&J's Rebate Model on the record before the Court, which documents J&J's commitment to HRSA that payments to DSH entities under the Rebate Model will be made within seven to ten days after J&J receives claims data.  AR59; AR61; AR75; AR192; AR207-AR209; AR244.  J&J detailed to HRSA its understanding—which HRSA did not contest, and neither the government nor amici rebut here—that most hospitals have 15- to 30-day standard payment terms in their wholesaler agreements.  On that basis, J&J made clear that covered entities that promptly submit rebate claims should receive the rebate payment *before* their wholesaler invoice is due under standard payment terms.  AR192; AR198-AR199; AR208-AR209.  On those facts, there is no material distinction between replenishment models and J&J's Rebate Model; under either model, covered entities on

net pay out only the 340B price, not the full wholesale cost.[7]  HRSA's failure to consider these key facts established in the AR made its decision-making unreasonable.

The government also does not deny that HRSA is arbitrarily playing favorites when it silently permits covered entities to use replenishment models, but threatens severe sanctions on manufacturers for proposing to adopt rebate models.  The government's response is that J&J's "intention to impose the rebate models on the covered entities without their consent, as opposed to covered entities voluntarily choosing the replenishment process, was another key distinction" between J&J's Rebate Model and replenishment models.  Gov't Br. 19 (citations omitted).  But that response assumes its conclusion, namely that HRSA can reasonably grant covered entities free rein to change how the program operates as they see fit, without agency pre-approval or manufacturer consent, while denying manufacturers any such flexibility.  The implication is that HRSA stands by its decision to treat one class of program stakeholders—covered entities—more favorably than another set of stakeholders—manufacturers.  But that violates basic precepts of administrative law, which hold that "agency action 'is at its most arbitrary when it treats similarly situated people differently'" without "an adequate explanation."  *Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1141 (D.C. Cir. 2022) (quoting *Etelson v. Off. of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982); *Burlington N. & Santa Fe. Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005)).

It is also no answer that PPAs allow HRSA to "ensure that the manufacturer conducts itself in accordance with the pricing agreement," whereas covered entities have no such arrangement.  Gov't Br. 21.  If anything, HRSA's lack of contractual control over covered entities

---

[7] Amici's claim (at 26) that rebate models threaten their operations because covered entities "will *always* pay full price and then at a later time receive a rebate" is therefore inaccurate.  It also appears to rely solely on amici's impermissible extra-record, hearsay declaration, which the Court should disregard and strike for reasons discussed at p. 6, *supra*.

suggests that their unilateral adoption of replenishment models should be subjected to *more* agency scrutiny than manufacturers' rebate models, not less.  In any event, the government's claim fails on its own terms: HRSA requires covered entities to register and recertify their eligibility annually so that HRSA may "ensure the ongoing responsibility to administer the 340B Program while maintaining efficiency, transparency, and integrity."  84 Fed. Reg. 38,639, 38,640 (Aug. 7, 2019); *see Recertification*, HRSA Off. of Pharmacy Affs., https://bit.ly/42o9xWH (last updated June 2024).  HRSA therefore has regular opportunities to police covered entity compliance, just as it regulates manufacturers through the PPA.  It was unreasonable for HRSA here not to consider its annual recertification process for covered entities and evaluate how it compares to the manufacturer oversight that the PPA affords.

The government's final salvo is that HRSA was "still reviewing the information that [J&J] had submitted in support of its proposal" as of October 30, 2024, and that J&J could have "collaborated with the Agency to develop a price reduction mechanism" instead of filing suit. Gov't Br. 20-21 (citing AR247).  But the government neglects to mention that HRSA's October 30 email responded to outreach from J&J on October 21, 2024, in which J&J expressly asked HRSA to identify conditions under which HRSA would approve J&J's Rebate Model.  AR248-AR249.  To date, HRSA has yet to respond to that request, which was the culmination of an extensive, multi-month effort by J&J to work with HRSA on solutions to the challenges motivating the Rebate Model and to timely provide all of the information HRSA would have needed to make an informed, rational decision.  Indeed, J&J first contacted HRSA about its Rebate Model in late June 2024, AR49, nearly three months before HRSA summarily rejected the Rebate Model and threatened to terminate J&J for noncompliance, and more than four months before J&J ultimately

filed suit. J&J cannot reasonably be accused of failing to engage with HRSA in good faith. To the contrary, the AR demonstrates that it was HRSA, not J&J, that cut off engagement.

## CONCLUSION

For the foregoing reasons, J&J respectfully requests that the Court grant its Motion for Summary Judgment, declare that J&J may utilize its Rebate Model for the 340B program and that HRSA's rejection of the Rebate Model was unlawful, and vacate and set aside HRSA's letters announcing that rejection decision and its website policy pronouncement requiring Secretarial approval for implementation of 340B rebate models.

DATED: April 16, 2025

Respectfully submitted,

*/s/* Jeffrey L. Handwerker
Jeffrey L. Handwerker (D.C. Bar No. 451913)
jeffrey.handwerker@arnoldporter.com
Samuel I. Ferenc (D.C. Bar No. 1616595)
sam.ferenc@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000

Paula R. Ramer (*admitted pro hac vice*)
paula.ramer@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000

*Counsel for Plaintiff Johnson & Johnson Health Care Systems Inc.*

**CERTIFICATE OF SERVICE**

I certify that on April 16, 2025, I filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to the registered participants identified on the Notice of Electronic Filing.

/s/ Jeffrey L. Handwerker
Jeffrey L. Handwerker