UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHNSON & JOHNSON HEALTHCARE SYSTEMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>ROBERT F. KENNEDY, JR, Secretary of Health and Human Services<br><br>Defendant. | Civil Action No. 24-3188 (RC) |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants, the Secretary of Health and Human Services and the Administrator of the Health Resources and Services Administration ("Agency"), respectfully submit this reply in further support of their motion for summary judgment.

## INTRODUCTION

In its reply and cross opposition ("Opp'n" (ECF No. 45)), Plaintiff Johnson & Johnson Healthcare Systems Inc, fails to advance arguments that would warrant denying Defendants' motion for summary judgment. As explained below, under the most straightforward reading of the 340B Statute, which allows the Agency to prevent manufacturers from unilaterally imposing their preferred price reduction methods on covered entities. Because the Agency's authority to take this action is derived from the text of the statute, legislative rulemaking is not required for the Agency to prevent manufacturers from unilaterally implementing their own rebate models. Finally, because of the disruption that Plaintiff's rebate models will cause the 304B Program, the Agency's decision not to allow Plaintiff to implement its models "at this time" was not arbitrary and capricious.

## ARGUMENT

**I.    The Secretary's Authority to Prevent Manufacturers from Unilaterally Imposing 340B Rebate Models is Supported by the Text of the Statute.**

The ceiling price that a manufacturer must offer to a covered entity "tak[es] into account any rebate or discount, as provided by the Secretary." 42 U.S.C. § 256b(a)(1). Despite the statute's plain meaning, Plaintiff asks the Court to rewrite the statute to remove the Secretary from the process. Plaintiff argues that the phrase "taking into account any rebate or discount, as provided by the Secretary," only "authorizes the Secretary, at most, to provide in the [pricing agreement] how a manufacturer should 'tak[e] into account' the manufacturer's chosen pricing mechanism to ensure that the 'amount required to be paid' by the covered entity does not exceed the ceiling

price." Opp'n at 16. Plaintiff claims that this would include the authority to issue guidance "directing manufacturers to use specific accounting mechanisms or recordkeeping methods to track discounts provided or rebates paid, or a direction that rebate payments must be made within a certain timeframe consistent with standard business practices." *Id*. This interpretation adds additional requirements to a statute where Congress spoke unambiguously. Nothing in 42 U.S.C. § 256b(a)(1) references the Secretary's authority over accounting methods, recordkeeping, tracking of payments or timing of payments. The Oxford English Dictionary, "one of the most authoritative on the English language," *Kouichi Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 569 (2012), defines "provide" as "to stipulate in a will, statute, etc." Provide, Oxford English Dictionary https://www.oed.com/dictionary/provide_v?tab=meaning_and_use#27997055. That is what Congress did here. The phrase "as provided by the Secretary" means that the Secretary can stipulate whether a price reduction, i.e. "the amount required to be paid" is effectuated, meaning the amount is "tak[en] into account" by a rebate or discount. 42 U.S.C. § 256b(a)(1).

Moreover, the term "provide" can be used to state "a general, independent rule." *Alaska v. United States*, 545 U.S. 75, 106 (2005); *see also, Republic of Iraq v. Beaty*, 556 U.S. 848, 858 (2009) (quoting, *United States v. Morrow*, 266 U.S. 531, 534 (1925)) ("a proviso can also be used 'to introduce independent legislation.'"). Using a proviso to state a general independent rule "may be lazy drafting, but is hardly a novelty." *Beaty*, 556 U.S. 858. For example, the Supreme Court held that a statute reading "'the President may suspend the application of any provision of the Iraq Sanctions Act of 1990: . . . Provided further, that the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism . . . .' gave the president "an additional power' in the second proviso." *Id.* (citation omitted). "It was not, on any fair reading, an exception to,

qualification of, or restraint on the principal power." *Id.* So too here, the phrase "as provided by the Secretary" gives the Secretary the authority to stipulate whether a 340B discount is effectuated through a rebate or upfront discount. 42 U.S.C. § 256b(a)(1).

Plaintiff argues that the "amount required to be paid" or "ceiling price" is set by a statutory formula, and that the mechanism for effectuating the ceiling price is not part of the price calculation. Opp'n at 17. But if Congress did not intend for the Secretary to have a role in determining whether the ceiling price was offered through a rebate or discount, then there would be no reason to include the terms "rebate" and "discount" next to the "as provided by the Secretary." 42 U.S.C. § 256b(a)(1). The Statute would instead just reference the Secretary's authority to calculate a price reduction consistent with the statutory formula. *See Air Transp. Ass'n of Am., Inc. v. Dep't of Agric.*, 37 F.4th 667, 672 (D.C. Cir. 2022) ("if possible, we are to construe a statute so as to give effect to every clause and word") (cleaned up).

Plaintiff argues that, in the context of drug purchasing, the term "price" is the net price after any rebates or discounts. Opp'n at 18. But this argument does nothing to advance Plaintiff's preferred interpretation of the Secretary's role in the process because the relevant portion of the statute does not use the term "price." Instead, the statute calls for an agreement between the manufacturer and the Secretary, "under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs . . . purchased by a covered entity does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act." 42 U.S.C. § 256b(a)(1). Specifically, rather than refer to a "price," the statute refers to an "amount required to be paid." *Id.* That "amount required to be paid" "to the manufacturer for covered outpatient drugs" "tak[es] into account any rebate or discount, as provided by the Secretary." *Id.* The statute uses the term

"amount" rather than "price" rendering Plaintiff's argument that a rebate amount is included in the price inapplicable. Opp'n at 18. For Plaintiff's definition of "price" to support Plaintiff's interpretation of the statute, the statute would describe an agreement "under which the price required to be paid to the manufacturer for covered outpatient drugs . . . purchased by a covered entity does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act." Indeed, not only would the term "amount" need to be stricken and replaced with the term "price," but the parenthetical about rebates and discounts would need to be deleted because the option to offer the price reduction through a rebate or discount would be implied through the term "price." In short, the Agency offers a straightforward interpretation of the statute that gives effect to each word and phrase without adding additional words.

The portions of the legislative history that Plaintiff cites are consistent with the text of the statute, which, in the abstract, allows rebates as a method to effectuate 340B price reductions. Opp'n at 30. But nothing in the legislative history suggests that Congress contemplated a system where manufacturers would unilaterally decide whether to offer rebates or discounts without any role for the Secretary. Consistent with the most straightforward reading of the statute, the House Energy and Commerce Committee explained that 340B price reductions "would be implemented, at the discretion of the Secretary, either by a point-of-purchase discount, a rebate, or other mechanism." H.R. Rep. No. 102-384, pt. 2, at 12.

Moreover, Plaintiff only tells part of the story on how the Agency came to recognize rebates for AIDS Drug Assistance Programs. Opp'n at 30 n.4. In issuing this guidance, the Agency did not deny that it has the authority to block the rebate system or take enforcement action if the Agency was not convinced that the rebates would further the objectives of the 340B Program. *Id.* Quite the opposite. In issuing this guidance, the Agency reiterated that the Secretary would use

the price reduction mechanism "that is the most effective and most efficient." *Id*. (quoting H.R. Rep. No. 102-384, pt. 2, at 16). Thus, the Agency's position that a manufacturer cannot unilaterally choose whether to offer 340B-priced drugs to covered entities through discounts or rebates without Secretarial input is consistent with "[t]he longstanding practice of the government," which "like any other interpretive aid—can inform [a court's] determination of what the law is." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024). The Agency has long guarded its prerogative to determine the most apt price reduction mechanism for a given type of covered entity. 62 Fed. Reg. at 45,824.

Accordingly, the Agency's decision to prevent Plaintiff from unilaterally implementing its own rebate models was within the Agency's statutory authority.

## II.   Neither Legislative Rulemaking nor an Amendment to the Pharmaceutical Pricing Agreement is Required to Prevent Unilateral Implementation of Rebate Models.

Plaintiff advances an alternative theory that the Secretary may only exercise his discretion to provide for rebates or discounts by amending the Pharmaceutical Pricing Agreement ("pricing agreement"). Opp'n at 33. This argument lacks merit. As the Agency explained, the pricing agreements are not a contract or a regulatory vehicle, rather, the pricing agreements "are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of [Health and Human Services]." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). The pricing agreement "set[s] out terms identical to those contained in the statute," and thus the pricing agreement and the statute are "one and the same." *Id.* at 114.

Plaintiff argues that the pricing agreement is not a static document and changes overtime. Opp'n at 34. But the pricing agreement changes when the statutory requirements change. Take Plaintiff's example of the 2016 addendum. Opp'n at 34 (citing 81 Fed. Reg. 20,649 (Apr. 8,

- 5 -

2016)). That addendum was added because the Patient Protection and Affordable Care Act amended 42 U.S.C. 265(a)(1) to add a requirement that

> Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the 'ceiling price'), and shall require that the manufacturer offer each covered entity covered drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

Pub. L. No. 111-148, Sec. 7102(b)(1), 124 Stat. 827 (2010).

The Agency explained that it added the addendum to the pricing agreement on April 8, 2016, "to ensure that the provisions of the 340B statute requiring inclusion in the [pricing agreement] are satisfied." 81 Fed. Reg. 20,649 (citing Pub. L. No. 111-148, Sec. 7102(b)(1)). Because the pricing agreement and the statute are "one and the same," it would be logical for the Agency to add this addendum in response to Congress amending the 340B statute. *Astra USA, Inc.*, 563 U.S. at 114.

Accepting Plaintiff's argument that the Secretary should create an individualized pricing agreement with each manufacturer specifying whether that manufacturer should offer rebates or discounts depending on the needs of the covered entity would not only contradict binding Supreme Court precedent but would also contradict long-standing Agency practice. Each manufacturer that elects to participate in the 340B Program signs the same pricing agreement with the Secretary. AR 036-47. Indeed, when the Agency debuted the program on December 15, 1992, the Agency sent manufacturers copies of the agreement via certified mail and requested that manufacturers who wished to opt-in to the Program sign and return the agreements to the Agency by January 6, 1993. 58 Fed. Reg. 27,289, 27,291 (May 7. 1993). The Agency did not conduct notice and comment rulemaking prior to sending these agreements to the manufacturer for signature. *See generally*, 58

Fed. Reg. 27,289.  Even though the pricing agreements were designed to be and have always been form agreements, in creating the Program, Congress anticipated that the Secretary would use whichever price reduction "mechanism that is the most effective and most efficient from the standpoint of each type of covered entity."  H.R. Rep. No. 102-384, pt. 2, at 16 (1992).

The Agency also did not need to undergo notice and comment rulemaking to assert its statutory prerogative to provide for rebates or discounts.  42 U.S.C. § 256b(a)(1).  "[A]n agency is not required to use notice-and-comment procedures to issue an [] interpretive rule."  *Perez v. Mortg. Bankers Ass'n,* 575 U.S. 92, 101 (2015).  The Secretary's authority to provide for rebates or discounts is in the text of the statute and thus the Agency's direction to manufacturers to refrain from implementing rebate models without preapproval did not require notice and comment rulemaking.  Plaintiff argues the notice on its website qualifies as a legislative rule because without it "there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties."  Opp'n at 36 (*American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993)).  But accepting this argument would require the Court to accept Plaintiff's interpretation of the statute, which removes the Secretary from the process contrary to the text of the statute.[1]  Because the statute provides the "adequate legislative basis" for Agency action, notice and comment rulemaking is not necessary for the Agency to prevent Plaintiff from unilaterally imposing its rebate model on covered entities.  *American Mining Congress*, 995 F.2d at 1112.

---

[1]   Plaintiff's argument that the Agency's post on its website "arguably" satisfies the second factor in *American Mining Congress.*, 995 F.2d at 1112, which asks "whether the agency has published the rule in the Code of Federal Regulations," is absurd.  *See* Opp'n at 36 n.5.  Even though the Internet was not widely used in 1993 when *American Mining Congress* was decided, Agencies had other methods to communicate interpretive rules.  Had the D.C. Circuit intended to hold that publishing a rule somewhere other than the Code of Federal Regulations was sufficient to satisfy this factor, the D.C. Circuit would have specified as such.

The Secretary's option to terminate the pricing agreement with Plaintiff if it fails to comply with the terms of the agreement is also derived from statute. Specifically, the Medicaid statute allows the Secretary "to provide for termination of a rebate agreement for violation of the requirements of the agreement or other good cause shown." 42 U.S.C. § 1396r-8(b)(4)(B)(i). Because a manufacturer must participate in the 340B program to receive Medicaid rebates, the Medicaid statute specifies that the same provision "shall apply to the terminations of agreements described in section 340B(a)(1) of the Public Health Service Act," which is the Pharmaceutical Pricing Agreement. *Id.*, § 1396r-8(b)(4)(B)(v). Likewise, the pricing agreement itself reiterates that the Secretary can "terminate the Agreement for a violation of the Agreement or other good cause." AR 042. If Plaintiff were to impose a rebate model on the covered entities that the Secretary had not "provided" for, then Plaintiff would be in violation of the pricing agreement which justifies terminating the agreement. AR 042, 214.

Accordingly, because the Agency's position that manufacturers cannot unilaterally impose rebate models on covered entities is derived from the text of the statute, notice and comment rulemaking was not required for the Agency to prevent manufacturers from implementing these models.

### III. The Agency's Decision was Not Arbitrary and Capricious.

Many of Plaintiffs' arguments that the Agency's decision was arbitrary and capricious rely on the premise that the Agency foreclosed them from implementing rebate models under any circumstances. *See generally* Opp'n at 37-42. But this is not the Agency's position. As the Agency explained to Plaintiff, the Agency has not "provided for" the rebate models "to date." AR 066. The 340B Program has been operating without the types of rebate models that Plaintiff proposes for more than thirty years and no manufacturer approached the Agency about large-scale

adaptation of rebate models before Plaintiff in June 2024. *See* AR 048-49. But rather than continue to collaborate with the Agency, Plaintiff filed suit asking the Court to adopt a novel theory that the 340B Statute allows drug manufacturers to choose a price reduction mechanism regardless of what has been "provided by the Secretary." 42 U.S.C. § 256b(a)(1). Compl. ¶ 132.

### A. The Agency Identified Key Differences Between the Proposed Rebate Model and the Product Replenishment Model.

Plaintiff ignores critical distinctions between the rebate model and the product replenishment model. Opp'n at 39. Asking a covered entity to make one initial purchase at the wholesale cost and then make subsequent purchases at a discount is different than what Plaintiff is asking of covered entities, namely, to make every purchase at the wholesale cost and then rely on the diligence of the manufacturer to timely reimburse the covered entities for the difference between the wholesale cost and the 340B price before the covered entity needs to pay the wholesaler. AR 203, 350. Under the product replenishment model, the covered entity does not need to rely on timely validation from the manufacturer and is guaranteed to receive the 340B price for a drug because the covered entity only needs to pay the 340B price upfront. AR 203. In imposing the rebate model on covered entities, Plaintiff is asking the covered entities to potentially pay higher upfront costs which "reduces the hospitals' resources available for other patient care." AR 568. Further, unlike the rebate model, the covered entities have voluntarily chosen to use the product replenishment process. AR 203. Plaintiff notably does not claim that the covered entities forced it to participate in the product replenishment system against Plaintiff's will, but Plaintiff nevertheless seeks to force the covered entities to acquiesce to Plaintiff's preferred system. *See generally,* Opp'n. Accepting Plaintiff's argument that the Agency's decision not to approve the cash rebate models was arbitrary and capricious would force covered entities to switch from a

- 9 -

system that both manufacturers and covered entities have opted into to one that the manufacturers support, but the covered entities oppose. AR 203.

The Agency appropriately weighed the covered entities' concerns about the rebate and credit models against the manufacturers' preferences because the covered entities are the beneficiaries of the 340B Program. 42 U.S.C. § 256b(a)(1) (the pricing agreement "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price . . ."). The purpose of the 340B Program was to help covered entities "stretch scarce federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12. If the Agency were to allow manufacturers to implement a price reduction mechanism that made it more difficult for the covered entities to stretch their resources, the Agency would undermine the purpose of the Program. Because the Agency oversees the transactions between the manufacturers and the covered entities, the Agency could not limit its consideration of proposed changes to the methods of effectuating price reductions only to how the changes will affect the manufacturers. See generally, 42 U.S.C. § 256b(a)(1).

### B. The Rebate Model is not Necessary to Prevent Covered Entities from Taking Duplicative Discounts or Diverting 340B Drugs to Non-340B Patients.

Plaintiff notes that in similar lawsuits brought by other drug manufacturers the Agency described audits as an option for manufacturers to prevent covered entities from taking duplicative discounts or diverting 340B drugs to non-eligible patients. Opp'n at 26. From this, Plaintiff extrapolates that the Agency was conceding that Plaintiff could not rely on audits to ensure compliance with the prohibition on duplication and diversion given that covered entities have filed lawsuits to prevent the audits from proceeding. Opp'n at 25-26. Plaintiff is mistaken. Unlike Plaintiff, many of the other manufacturers' filings have argued that the rebate models were the

only viable option for them to ensure that covered entities were not receiving discounts under the 340B Program and the Inflation Reduction Act's Medicare Drug Price Negotiation Program ("the Negotiation Program") for the same unit of drug.  *See, e.g.*, *Bristol Meyers Squibb v. English*, Civ. A. No. 24-3337 (DLF) , Pl. Mot. for Summ J. at 47-49 (ECF No. 17-1); *Novartis Pharmacuticals Corp. v. Kennedy,* Civ. A. No. 25-0117 (DLF), Pl. Mot. for Summ J. at 34-36 (ECF No. 25-1).  In response, the Agency identified audits as one of several alternatives that manufacturers could use to prevent duplication and diversion.  *See e.g., Novartis*, Def. Mot. for Summ J. at 25 (ECF No. 31-1).  Because Plaintiff did not make the same argument in this case, the Agency did not need to raise the audit option in response.

Regardless, manufacturer audits are a viable alternative for Plaintiff to ensure that covered entities are not obtaining duplicative discounts.  To initiate a manufacturer audit, a manufacturer simply needs to show reasonable cause that a covered entity is violating the 340B statute through duplication or diversion.   61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).  A manufacturer can demonstrate reasonable cause with evidence such as "significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity." *Id*. at 65,406.  Additionally, the Agency does not need to "approve" the audit workplan for a manufacturer to conduct an audit. *Id.*  The Agency simply reviews the plan to ensure that audit work performed is "relevant to the audit objectives while protecting patient confidentiality and information of the covered entity which is considered proprietary." *Id.* If, based on the manufacturers' submission, the Agency finds reasonable cause to believe that a violation is occurring, the Agency "will not in intervene" with the Audit. *Id.* at 65,410. Plaintiff argues that covered entities have resisted cooperating with the audits that Plaintiff has attempted to initiate, but the Agency has advised these covered entities to cooperate with the audits and has

defended this position in lawsuits from various covered entities challenging the audits. *See e.g., University of Wash. Med. Ctr. v. Kennedy,* Civ. A. No. 24-2998 (RC) (D.D.C.)*; Oregon Health & Sci. Univ. v. Engels*, Civ. A. No. 24-2184 (RC) (D.D.C.)*; Children's Nat'l Med. Ctr. v. Engels*, Civ. A. No. 24-2563 (RC) (D.D.C.).

Plaintiffs can collect data that it needs on the 340B status of prescriptions through methods other than its proposed rebate model. As Amici 340B Health notes, many manufacturers already "require 340B Hospitals to collect and report data to a vendor employed by the relevant manufacturer." 340B Health Br. at 19 (ECF No. 43-1). For example, Oregon Medicaid maintains a database where covered entities submit Medicaid rebate claims and identify dispensed 340B drug units. State and Regional Hosp. Assn' Br. at 29-30 (ECF No. 38-1). The rebate vendor uses this data to remove 340B claims from the claims that are identified as Medicaid rebate eligible and subtracts the 340B claims from the Medicaid rebate invoices that the State submits to the manufacturers. *Id*. Plaintiff makes no arguments explaining why these existing data collection regimes are not sufficient for them to track 340B prescriptions to track duplication and diversion.

Various Amici propose other alternatives to the rebate model that would address Plaintiffs' concerns about duplication of 340B and Negotiation Program Discounts. For example, 340B Health has proposed that covered entities and manufacturers enter data sharing arrangements for 340B drugs that are dispensed to Medicare beneficiaries to ensure that providers will receive either the 340B discount or, if it is lower, the maximum fair price under the Negotiation Program, but not both. 340B Health Br. at 37-38 (ECF No. 43-1). This proposal from 340B Health, which would not involve a rebate for 340B purchases, is consistent with guidance from the Centers for Medicare & Medicaid Services ("CMS") which encouraged manufacturers to use "data available from covered entities and their 340B [third party administrators], and other prescription drug

supply chain stakeholders" to ensure that the covered entity received the lesser of the 340B price or the Negotiation Program price. CMS, Medicare Drug Price Negotiation Program: Final Guidance, at 232 (Oct. 2, 2024).

As another solution, Amicus State and Regional Hospital Associations have proposed a variation of the product replenishment model. State and Regional Hosp. Assn' Br. at 28 (ECF No. 38-1). Under this proposal, covered entities would only be able to purchase a replenishment stock on a given drug through a 340B account or a Negotiation Program account thus making it impossible for the covered entities to obtain a discount on the same unit of a given drug through both programs. *Id.*

Accordingly, because Plaintiff has other means available to prevent duplication and diversion, including any duplication and diversion that could occur between the 340B Program and the Negotiation Program, Plaintiff's arguments that its rebate models are the only way to prevent duplication and diversion lack merit.

### C. The Agency Requires Additional Time to Consider the Rebate Model Given the Disruption that It Will Cause to the 340B Program.

Finally, Plaintiff dismisses the Agency's arguments that it has not had a sufficient opportunity to conduct a thorough review of the rebate model to ensure that the rebate model will not undermine the 340B Program or adversely affect covered entities or the patients that the covered entities serve. Opp'n at 41. Drug manufacturers did not begin to propose to the Agency widespread use of rebates in place of upfront discounts until June 2024. AR 049, 507. When these manufacturers did not obtain instant approval from the agency, they bypassed the Agency and filed lawsuits beginning with Plaintiff on November 12, 2024. Compl. Importantly, the Agency did not issue the letters directing Plaintiff to cease implementation of the rebate model because the Agency had conducted a thorough review of the proposed rebate model or because the Agency no

longer wanted to engage with Plaintiff on its concerns regarding the 340B Program. Rather the Agency issued the letters because Plaintiff told agency that it intended to begin implementing the rebate model for Disproportionate Share Hospitals' purchases of Stelera and Xerelto beginning October 15, 2024. AR 062, 214. The September 27, 2024, enforcement letter was necessary to ensure that Plaintiff did not proceed with implementing the unapproved rebate model the following month. AR 212. But the Agency has not ruled out providing for the rebate model following a careful review and evaluation of that model consistent with the goals of the program. AR 066 ("to date, the Secretary has not provided for such a rebate model . . ."). The Agency only ceased efforts to reach an agreement with Plaintiff when Plaintiff filed this lawsuit.

Although many of the manufacturers now prefer rebates or credits the covered entities prefer upfront discounts. See AR 635-39. Because the Agency has not yet fully considered "all aspects of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983), the Agency justifiably declined to approve Plaintiff's credit model to preserve the 340B Program as it has operated since 1992.

\*   \*   \*

## CONCLUSION

For these reasons and the reasons stated in Defendants' cross motion for summary judgment, the Court should grant summary judgment in Defendants' favor and deny Plaintiff's motion for summary judgment.

Dated: April 26, 2025
       Washington, DC

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By:     /s/ John J. Bardo
JOHN J. BARDO, D.C. Bar #1655534
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 870-6770

*Attorneys for the United States of America*