# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHNSON & JOHNSON HEALTH CARE
SYSTEMS INC.,

        *Plaintiff*,

   v.

ROBERT F. KENNEDY, JR., in his official
capacity, and U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

and

THOMAS J. ENGELS, in his official capacity, and
HEALTH RESOURCES AND SERVICES
ADMINISTRATION,

        *Defendants*.

Civil Action No. 1:24-cv-3188

**PLAINTIFF'S BRIEF IN RESPONSE TO BRIEF OF INTERVENORS AND
REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

I.  HRSA ACTED UNLAWFULLY IN REJECTING J&J'S REBATE MODEL ...................... 3

    A.  Manufacturers May Use Rebate Models Without HRSA Pre-Approval ............................ 3

    B.  Any Authority HRSA Has to Direct a Pricing Mechanism May Be
        Exercised Exclusively Through the PPA ......................................................................... 8

II.  EXTENSIVE EVIDENCE IN THE ADMINISTRATIVE RECORD SUPPORTS J&J'S
    MOTION FOR SUMMARY JUDGMENT ........................................................................ 13

    A.  HRSA Rejected J&J's Rebate Model Without Considering Key Aspects of
        the Problems that J&J Raised ....................................................................................... 13

    B.  Audits Are Not Comparable to or a Substitute for Rebate Models ................................. 18

    C.  J&J's Rebate Model Would Impose Little to No Additional Costs or
        Burdens for Covered Entities ....................................................................................... 20

    D.  J&J's Rebate Model Is Materially Similar to Covered Entities'
        Unilaterally Adopted Replenishment Models ............................................................... 22

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bottling Co. v. NLRB*,
  992 F.3d 1129 (D.C. Cir. 2021) ............................................................23

*Am. Library Ass'n v. FCC*,
  406 F.3d 689 (D.C. Cir. 2005) .............................................................11

*Amalgamated Transit Union v. Skinner*,
  894 F.2d 1362 (D.C. Cir. 1990) ................................................2, 8, 10, 11

*Astra USA, Inc. v. Santa Clara Cnty.*,
  563 U.S. 110 (2011) ...............................................................10, 11, 12

*Ateba v. Jean-Pierre*,
  706 F. Supp. 3d 63 (D.D.C. 2023) .........................................................24

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ........................................................................10

*Commonwealth Edison Co v. U.S. Dep't of Energy*,
  877 F.2d 1042 (D.C. Cir. 1989) ............................................................13

*Cyan, Inc. v. Beaver Cnty. Emps.' Ret. Fund*,
  583 U.S. 416 (2018) .........................................................................6

*Eagle Pharms., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ..............................................................9

*Eli Lilly & Co. v. Kennedy* (*Lilly*),
  No. 24-cv-03220, 2025 WL 1423630 (D.D.C. May 15, 2025) ....................... *passim*

*Env't Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) .............................................................23

*Fed. Educ. Ass'n Stateside Region v. FLRA*,
  104 F.4th 275 (D.C. Cir. 2024) .............................................................9

*Genus Med. Techs. LLC v. FDA*,
  994 F.3d 631 (D.C. Cir. 2021) ..............................................................8

*Hill Dermaceuticals, Inc. v. FDA*,
  709 F.3d 44 (D.C. Cir. 2013) ..............................................................23

*Hisp. Affs. Project v. Acosta*,
  263 F. Supp. 3d 160 (D.D.C. 2017) .......................................................................23

*IMS, P.C. v. Alvarez*,
  129 F.3d 618 (D.C. Cir. 1997) .............................................................................23

*Int'l Ctr. for Tech. Assessment v. Johanns*,
  473 F. Supp. 2d 9 (D.D.C. 2007) .........................................................................23

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .............................................................................................5

*Mdewakanton Sioux Indians of Minn. v. Zinke*,
  264 F. Supp. 3d 116 (D.D.C. 2017) .....................................................................24

*Med. Marijuana, Inc. v. Horn*,
  145 S. Ct. 931 (2025) ...........................................................................................10

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) ........................................................................7, 22

*PhRMA v. HHS* (*Orphan Drug I*),
  43 F. Supp. 3d 28 (D.D.C. 2014) ................................................................. *passim*

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ...............................................................................13

*United States v. Bronstein*,
  849 F.3d 1101 (D.C. Cir. 2017) .............................................................................9

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011) ...............................................................................................4

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) ...............................................................................................9

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ...............................................................................................8

**Statutes**

42 U.S.C § 256b.......................................................................................................9

42 U.S.C. § 256b(a) ..............................................................................................8, 9

42 U.S.C. § 256b(a)(1)................................................................................... *passim*

42 U.S.C. § 256b(d)(1)(B)(i)(I) ............................................................................4, 5

42 U.S.C. § 1320f-2(d) ...........................................................................................17

42 U.S.C. § 1395w-3a(i) .........................................................................................18

42 U.S.C. § 1395w-3a(i)(1)(B) ...............................................................................18

42 U.S.C. § 1395w-114b ........................................................................................18

42 U.S.C. § 1395w-114b(a)(2) ...............................................................................18

**Rules & Regulations**

Fed. R. Evid. 201(b) ...............................................................................................24

42 C.F.R. § 10.10(b) .................................................................................................5

42 C.F.R. § 10.10(c) .................................................................................................5

59 Fed. Reg. 25,110 (May 13, 1994) ......................................................................20

80 Fed. Reg. 63,560 (Oct. 20, 2015) .......................................................................12

81 Fed. Reg. 20,649 (Apr. 8, 2016) .........................................................................12

82 Fed. Reg. 1,210 (Jan. 5, 2017) .............................................................................5

**Other Authorities**

H.R. Rep. No. 102-384, pt. 2 (1992) ..........................................................................9

CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027* (Oct. 2, 2024), http://bit.ly/3Y719J0 ........................................17

## INTRODUCTION

Pursuant to the Court's Order of May 15, 2025, ECF No. 49, Plaintiff Johnson & Johnson Health Care Systems Inc. ("J&J") submits this response to the Brief of 340B Health, UMass Memorial Medical Center, and Genesis HealthCare System ("Intervenors"), ECF No. 43-1 ("Intervenor Br.").

J&J appreciates the opportunity to elaborate on the responses to Intervenors' arguments made in J&J's Brief in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Summary Judgment, ECF No. 45. As J&J has explained in the prior briefing, the 340B statute expressly *permits* rebate models. Intervenors' contrary arguments are inconsistent with the statute's plain text, as another court in this District concluded in parallel litigation involving 340B rebate models proposed by other drug manufacturers. *See Eli Lilly & Co. v. Kennedy* (*Lilly*), No. 24-cv-03220, 2025 WL 1423630, at *9 n.11 (D.D.C. May 15, 2025) ("disagree[ing]" with Intervenors that the 340B statute "categorically prohibits rebate models" because the statute "explicitly contemplates a rebate mechanism" by providing that "the 'amount required to be paid' by a covered entity must 'tak[e] into account any rebate or discount'" (quoting 42 U.S.C. § 256b(a)(1)); *see also id.* at *11 (denying Intervenors' cross-motion for summary judgment to the extent it sought "a declaration that rebates are categorically prohibited under the 340B statute").

Properly read as an integrated whole, the best reading of the statutory language at issue in this case—"(taking into account any rebate or discount, as provided by the Secretary)"—is that the HHS Secretary, at most, may provide in Pharmaceutical Pricing Agreements ("PPAs") *how* a manufacturer should "tak[e] into account" the manufacturer's chosen pricing mechanism to ensure that the "amount required to be paid" by the covered entity does not exceed the ceiling price. 42 U.S.C. § 256b(a)(1). The Secretary has not exercised any such authority in the PPA, which does

not contain a pricing mechanism.  Accordingly, manufacturers have discretion to adopt the pricing mechanism of their choice, subject to the statutory "must offer" requirement.

Moreover, Intervenors' brief, including their extra-record declarations (which the Court should strike), fails to grapple with a critical issue in this case: whether the PPA is the exclusive mechanism through which the Health Resources and Services Administration ("HRSA") can exercise any statutory authority it has (J&J maintains that it has none) to mandate or prohibit a pricing mechanism.  The answer to this question is a definitive yes.  As this Court has recognized, "[w]here Congress prescribes the form in which an agency may exercise its authority ... [the court] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form." *PhRMA v. HHS* (*Orphan Drug I*), 43 F. Supp. 3d 28, 38 (D.D.C. 2014) (quoting *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990)).  Congress placed the statutory language supposedly granting HRSA discretion over the 340B pricing mechanism in a provision titled "agreement with [the] Secretary," which solely discusses the contents of the PPA. 42 U.S.C. § 256b(a)(1).  Congress thereby prescribed that the only form through which HRSA may regulate pricing mechanisms, if at all, is the PPA.  This Court's case law, core principles of statutory interpretation, and the available legislative history all corroborate that conclusion.

The decision in the *Lilly* case reached a different and erroneous result on that issue and others, as made clear by the portions of the Administrative Record ("AR") that concern J&J's Rebate Model and its discussions and correspondence with HRSA, which even more strongly demonstrate the program abuse necessitating the Rebate Model and the unlawfulness of HRSA's actions than record materials relating to other manufacturers that the *Lilly* court incorrectly disregarded.  Further, the AR reflects that J&J's Rebate Model will not impose significant administrative or financial burdens on covered entities who already submit the commercially-

standard data required by the model and will receive rebate payments (including on partial package sizes) before outlaying funds on the original drug purchase. The Court in this case therefore should reject Intervenors' arguments; strike extra-record material on which Intervenors rely; depart from the erroneous conclusions of the *Lilly* decision; grant J&J's motion for summary judgment; and hold that J&J may implement its limited-scope Rebate Model as proposed. J&J also respectfully requests oral argument on the parties' pending cross-motions for summary judgment.

## ARGUMENT

## I.    HRSA ACTED UNLAWFULLY IN REJECTING J&J'S REBATE MODEL

As J&J has detailed, the 340B statute allows manufacturers to use rebate models without HRSA pre-approval, but to the extent HRSA has any authority to direct a pricing mechanism, it may do so exclusively through the PPA. Mem. in Supp. of Pl.'s Mot. for Summ. J., ECF No. 18-1 ("J&J Br.") at 26-36; Pl.'s Br. in Opp. to Defs.' Cross-Mot. for Summ. J. & Reply in Supp. of Summ. J, ECF No. 45 ("J&J Reply") at 9-32. Intervenors' contrary claim that the statute prohibits *all* rebate models was resoundingly rejected by the *Lilly* court. *Lilly*, 2025 WL 1423630, at *9 n.11. This Court should similarly dispatch with Intervenors' misreading of the plain statutory text, which "explicitly contemplates a rebate mechanism." *Id.* But the Court should otherwise depart from the *Lilly* decision and decline to embrace other arguments by Intervenors that are likewise unsupported by the 340B statute's text, structure, purpose, and history. The Court should instead apply its own key precedents addressing the structure and features of the 340B statute, which the *Lilly* court did not consult, and grant summary judgment for J&J.

### A.    Manufacturers May Use Rebate Models Without HRSA Pre-Approval

At the outset, the Court should reject Intervenors' starkly atextual claim that the 340B statute *requires* upfront discounts and categorically prohibits rebate models. Intervenor Br. 14-20, 31. As J&J has explained, J&J Reply 14-17, Intervenors' theory (at 16-17) that Congress mandated

3

upfront discounts when it added the "must-offer" sentence to the 340B statute in 2010 finds no support in the statute's text, structure, or history, and contravenes basic statutory interpretation principles. Most glaringly, Intervenors effectively excise the word "rebate" from the statute, which provides that the "amount required to be paid (taking into account *any rebate* or discount, as provided by the Secretary)" shall not exceed the ceiling price. 42 U.S.C. § 256b(a)(1) (emphasis added). Notably, Intervenors themselves highlight that the Supreme Court is "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." Intervenor Br. 18 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011)). Yet that is precisely what Intervenors ask the Court to do here by asserting that the must-offer provision silently struck the word "rebate" from the statutory text. The Court should join the *Lilly* court on this issue and dismiss Intervenors' untenable interpretation of the statute on its face. *Lilly*, 2025 WL 1423630, at *9 n.11; *see also* J&J Reply 15 (noting that Intervenors' interpretation would also render unlawful the 340B rebate program used for decades by state AIDS Drug Assistance Programs, a patently absurd result).

Intervenors' reading of the "taking into account" parenthetical in 42 U.S.C. § 256b(a)(1) is also plainly erroneous—as is the analysis in the *Lilly* decision, which relied on the same inaccurate premise: that the parenthetical provides HRSA with authority to adjust ceiling prices. Not so. The final rule promulgating regulations permitting HRSA to adjust ceiling prices in two narrow circumstances (for new drugs requiring "provisional prices" and for drugs where the 340B price calculates to a negative number) did *not* cite the "taking into account" parenthetical as providing the agency with authority to act. Nor could it have done so, because the "taking into account" provision refers to requirements for the PPA and is not a grant of rulemaking authority. Instead, HRSA expressly relied on a separate statutory provision, 42 U.S.C. § 256b(d)(1)(B)(i)(I), as

authority for its "provisional pricing" and "penny pricing" regulations. *See* 82 Fed. Reg. 1,210, 1,210-11 (Jan. 5, 2017) (announcing final provisional and penny pricing rules and citing 42 U.S.C. § 256b(d)(1)(B)(i)(I) as the authorizing statute); 42 C.F.R. § 10.10(b)-(c) (the enacted regulations addressing provisional pricing and penny pricing). That provision was enacted in the 2010 amendments to the 340B statute and authorized HRSA to "[d]evelop[] and publish[] through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices." *See Orphan Drug I*, 43 F. Supp. 3d at 43-44 (discussing the scope of 42 U.S.C. § 256b(d)(1)(B)(i)(I)). Intervenors simply misstate the statutory and regulatory history to support their erroneous reading of the text.

The *Lilly* decision made the same mistake. 2025 WL 1423630 at *10. Discussing the "taking into account" parenthetical, the *Lilly* court asserted that HRSA "has previously exercised that authority [purportedly conferred by the parenthetical in 42 U.S.C. § 256b(a)(1)] to adjust manufacturers' price reduction obligations in the face of operational challenges"; the court then cited the provisional and penny pricing rules as "further evidence that the agency has the authority to condition how 340B price reductions are implemented." 2025 WL 1423630 at *10 (citing 42 C.F.R. § 10.10(b)-(c)). But, as noted, HRSA did not rely on § 256b(a)(1) and the "taking into account" parenthetical to adopt provisional and penny pricing. The *Lilly* court's mistaken analysis on this issue is a plain error of law. And rectifying that error removes a central premise of the *Lilly* court's reading of the statute.

Contrary to *Lilly*'s interpretation, "the best reading of the statute," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), is that the phrase "as provided by the Secretary" modifies the *entire* preceding phrase "taking into account any rebate or discount," and not merely "any rebate or discount." 42 U.S.C. § 256b(a)(1); *see* J&J Br. 28-29; J&J Reply 10 (citing *Cyan, Inc.*

*v. Beaver Cnty. Emps.' Ret. Fund*, 583 U.S. 416, 440 (2018)).   Properly read, the parenthetical authorizes the Secretary, at most, to provide in the PPA *how* a manufacturer should "tak[e] into account" a pricing mechanism to ensure that the "amount required to be paid" by the covered entity does not exceed the ceiling price.   42 U.S.C. § 256b(a)(1).   Such direction might include "provid[ing]" in the PPA that manufacturers must account for rebates by sending reconciliation forms with each rebate payment to identify the drug purchases to which the rebate payment applies. *See* J&J Br. 29 (describing other potential examples); J&J Reply 13 n.2 (elaborating on the same). That reading of the text also accords with the structure of the 340B statute far better than a reading that assumes the parenthetical allows HRSA to modify the ceiling price, given that the 340B ceiling price is *fixed* by a statutory formula.   *See* 42 U.S.C. § 256b(a)(1); *contra Lilly*, 2025 WL 1423630, at *9 (reasoning that the parenthetical authorizes HRSA to stipulate "how any rebate or discount is accounted for *in the price ultimately paid* by covered entities" (emphasis added)).

In addition to their misattribution of HRSA's authority for its penny and provisional pricing regulations, Intervenors press a series of other erroneous textual and structural claims that J&J has already refuted at length.   *See* J&J Reply 16-23.   In the interest of efficiency for the Court, J&J will simply reiterate that Intervenors' interpretation of the 340B statute relies on various further misunderstandings of the plain text, including the perplexing assertion (at 20) that the "rebate" mentioned in the "taking into account" parenthetical is a *Medicaid* rebate, and baseless claims that J&J's interpretation would render both the statute's "must-offer" provision and the audit provisions redundant or superfluous.   Intervenors' interpretation of the "must-offer" provision assumes its conclusion that the function of the provision is to require upfront discounts, when in fact its purpose is to establish certain "manufacturer integrity provisions" to be included in the PPA.   *See* J&J Reply 16.   Importantly, the must-offer provision also requires manufacturers to

make "a bona fide offer" to covered entities, a limiting condition on rebate models—which Intervenors ignore—that sets an obligation for manufacturers using rebates to pay them on a timely basis.  J&J Reply 16-17 (quoting *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 462 (D.C. Cir. 2024)).

As for the audit provisions, Intervenors' claim (at 20-22) that J&J's Rebate Model is an "end-run" around audits misunderstands the Rebate Model, the statute, and substantial evidence in the AR.  As J&J has explained, using a rebate model is neither an audit nor an appropriate substitute for one.  Audits, by definition, are backward-looking, address a very narrow subset of historical claims—often only a small sampling of units of the manufacturer's drugs that had been previously purchased by the covered entity—and take months or years to complete.  *See, e.g.*, Compl. Ex. 2, *Or. Health & Sci. Univ. v. Johnson*, No. 1:24-cv-02184-RC (D.D.C. July 24, 2024), ECF No. 1-2 (letter to covered entity concerning HRSA-approved J&J audit plan); *see also* AR210; AR217.  The Rebate Model uses a smaller set of data elements, applies prospectively to all purchases of two J&J products by Disproportionate Share Hospitals, and employs real-time data validation to confirm merely that the units of drug were purchased and dispensed by a 340B-eligible entity.  *See* J&J Reply 18-19; *see also* AR76-AR77, AR242-AR243 (identifying required data elements for J&J's Rebate Model); AR174-AR175 (HRSA analysis of availability of this data).  Plainly, audits serve a different purpose than and are not comparable to rebate models, as detailed in section II.B, *infra*.  Intervenors' conflation of rebate models with audits and their claim that audits are a manufacturer's exclusive remedy for compliance concerns are especially striking in light of the half-dozen cases before this Court in which hospitals are suing HRSA to block its approvals of J&J audits.  *See* section II.B, *infra*; *see also* J&J Reply 19 (listing cases).

**B.    Any Authority HRSA Has to Direct a Pricing Mechanism May Be Exercised Exclusively Through the PPA**

As noted, Intervenors conspicuously make no mention of a critical issue in this case—whether the PPA is the exclusive regulatory vehicle through which HRSA can exercise any statutory authority it has to mandate or prohibit a pricing mechanism.  The statutory text makes clear that it is.  Under this Court's careful analysis in the *Orphan Drug I* case, if HRSA has any authority at all to require upfront discounts or proscribe post-purchase rebates (which it does not), HRSA must exercise that authority solely through the PPA.  *See* J&J Br. 33-36 (citing *Orphan Drug I*, 43 F. Supp. 3d at 38); J&J Reply 26-29.  HRSA's attempts to prohibit J&J's rebate model through letters and the announcement posted on the agency's website are therefore unlawful.  *See* J&J Reply 29.  Critically, this Court and the D.C. Circuit have made clear that "[w]here Congress prescribes the form in which an agency may exercise its authority ... [the court] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form."  *Orphan Drug I*, 43 F. Supp. 3d at 38 (quoting *Amalgamated Transit Union*, 894 F.2d at 1364).  Here, by placing the "taking into account" parenthetical in a provision titled "agreement with [the] Secretary," which solely discusses the contents of the PPA, Congress has prescribed that the only form through which HRSA may regulate pricing mechanisms, if at all, is the PPA.  42 U.S.C. § 256b(a).

That conclusion flows from both general principles of statutory interpretation and this Court's analysis in *Orphan Drug I*.  As J&J has detailed, Congress would not plausibly have hidden language establishing a source of agency authority to act *outside* the PPA in a paragraph that otherwise addresses the agency's authority to act *within* the PPA.  *See Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 643 (D.C. Cir. 2021) (explaining that Congress "does not … hide elephants in mouseholes" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 467-68 (2001))).  Stated another way, "[j]ust as Congress' choice of words is presumed to be deliberate, so too are its

structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013); *see* J&J Reply 27.  Congress's choice to place the "taking into account" parenthetical within a paragraph titled "Requirements for agreement with Secretary" must be respected.  42 U.S.C. § 256b(a); *see United States v. Bronstein*, 849 F.3d 1101, 1109 (D.C. Cir. 2017) (finding a statutory section's "scope is apparent from its title").

Moreover, although courts need not "resort to legislative history" to interpret "statutory text that is clear," *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 335 (D.C. Cir. 2020) (citation omitted), the key 1992 House Committee report on the 340B bill provides that "[t]he Committee expects that the Secretary of HHS, *in developing these agreements*, will use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'"  H.R. Rep. No. 102-384, pt. 2, at 16 (1992) (emphasis added).[1]  To the extent relevant, then, "[w]hat legislative history there is reinforces the text."  *Fed. Educ. Ass'n Stateside Region v. FLRA*, 104 F.4th 275, 284 (D.C. Cir. 2024).

This Court's analysis in *Orphan Drug I* strongly supports the same result.  There, the Court held that nothing in the 340B statute authorized HHS and HRSA to promulgate "regulations" mandating 340B pricing for purchases by certain covered entities of so-called orphan designated drugs.  43 F. Supp. 3d at 39-40 (citing 42 U.S.C § 256b).  Carefully parsing the 340B statute, this Court found that Congress authorized HRSA to implement the 340B statute through "regulations"—or in one case, "regulatory issuance[s]"—in only three places: "(1) the establishment of an administrative dispute resolution process, (2) the 'regulatory issuance' of precisely defined standards of methodology for calculation of ceiling prices, and (3) the imposition

---

[1] As J&J has noted, *see* J&J Br. 35 n.8, although this language in the House committee report should receive no weight to the extent it is inconsistent with the plain and unambiguous text of the statute, it does substantiate the conclusion that Congress expected the agency to exercise any regulatory authority over the 340B pricing mechanism through the PPA.

of monetary civil sanctions." *Id.* at 41. And each of those provisions were "clear that they do not confer orphan drug rulemaking authority upon the agency." *Id.* at 45; *see id.* at 41-45 (closely examining each provision to determine whether it authorized rulemaking on orphan drugs). "In other words," this Court concluded, "the agency did not receive congressional authority 'to determine the particular matter at issue *in the particular manner adopted*.'" *Id.* (quoting *City of Arlington v. FCC*, 569 U.S. 290, 306 (2013) (emphasis added)). That flaw was fatal; none of the "specific grants of authority" to promulgate regulations "authorize[d] the orphan drug rule," so the Court vacated the agency's action. *Id.* at 39; *see id.* at 45.

*Orphan Drug I*'s analysis dictates the result here. In 42 U.S.C. § 256b(a)(1), Congress "prescribed" the "form in which [the] agency may exercise [any] authority" to regulate the 340B pricing mechanism, *i.e.*, the "agreement with [the] Secretary"; Congress did *not* grant HRSA authority to proscribe rebate models through regulations. *Orphan Drug I*, 43 F. Supp. 3d at 38 (quoting *Amalgamated Transit Union*, 894 F.2d at 1364). And "[the court] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form." *Id.* (quoting *Amalgamated Transit Union*, 894 F.2d at 1364); *see also* J&J Reply 28-29 (citing *Med. Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 940 (2025)).

That description of what courts may *not* do highlights the flaw in Intervenors' argument as well as the decision in the *Lilly* case, which made no mention of this Court's on-point analysis in *Orphan Drug I* and dedicated a single paragraph to the argument that "any conditions the agency seeks to impose on rebates must be explicitly set forth in manufacturers' PPAs." *Lilly*, 2025 WL 1423630, at *10. Relying almost exclusively on *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the *Lilly* court found that PPAs "are 'form contract[s] implementing the statute,' which 'simply incorporate statutory obligations and record the manufacturers' agreement to abide by

them.'" *Id.* (quoting *Astra USA, Inc.*, 563 U.S. at 114, 117-18). Per the *Lilly* court, because the statute "plainly authorizes HRSA to 'provide[ ]' for the implementation of any rebate or discount … and that authority is incorporated into the plaintiffs' PPAs," manufacturers "cannot claim that they are immune from the agency's statutory approval authority simply because their PPAs do not specifically address the approval of their present proposals." *Id.*

What *Lilly* meant in concluding that HRSA's purported authority to prohibit rebate models "is incorporated into the plaintiffs' PPAs" is somewhat unclear. *Id.* One reading is that the *Lilly* court believed the statute grants HRSA plenary power to mandate or prohibit a pricing mechanism, and that manufacturers submit to that unbounded authority by entering the PPA, regardless of the agreement's terms. But that interpretation would violate the principle that an agency may not assert "*plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area," as this Court noted in *Orphan Drug I*. 43 F. Supp. 3d at 39 (quoting *Am. Library Ass'n v. FCC*, 406 F.3d 689, 708 (D.C. Cir. 2005)). In other words, merely because Congress *arguendo* granted HRSA *some* authority to mandate pricing mechanisms would not mean that the agency could exercise that authority through whatever form it wants; Congress has prescribed that the form is the PPA. *See* J&J Br. 35; J&J Reply 24-25. By holding otherwise, the *Lilly* court erroneously "elevate[d] the goals of [the] agency's action … over [the] prescribed form" that Congress directed. *Id.* at 38 (quoting *Amalgamated Transit Union*, 894 F.2d at 1364).

Nor is there a viable argument that the PPA could not contain a term addressing the pricing mechanism for manufacturers to use. As J&J has explained and Intervenors have not contested, the existing PPA contains numerous substantive terms that do not implement requirements of the 340B statute's text, including among other things provisions relating to manufacturer recordkeeping and maintaining confidentiality of manufacturer and covered entity information.

*See* J&J Reply 28 (citing AR39-AR40, AR42). HRSA imposed these requirements in the PPA, even though they are not set out in the 340B statute, and could do the same to implement any authority the agency has to direct a pricing mechanism.

Further, although the PPA is a form contract through which manufacturers "opt into the 340B Program," *Astra USA, Inc.*, 563 U.S. at 113, HRSA has proposed and implemented amendments to the PPA in the past. Indeed, when Congress amended § 256b(a)(1) in 2010 to add the "must-offer" provision, HRSA proposed an addendum to the PPA to incorporate the "must-offer" language, recognizing that the sole regulatory means to implement Congress's changes to the statutory section titled "Requirements for agreement with Secretary" was changing *the PPA—* not sending letters or issuing a website post announcing the agency's new statutory interpretation. *See* 80 Fed. Reg. 63,560 (Oct. 20, 2015) (HRSA notice announcing PPA addendum "to incorporate the administrative requirement for manufacturer integrity provisions directly addressed in the Affordable Care Act"); 81 Fed. Reg. 20,649 (Apr. 8, 2016) (final notice on PPA addendum). By its terms, the PPA remains subject to further modification by written agreement of the parties. AR44 (amendment provision). Nothing in the *Astra* decision abrogates or undermines the PPA's amendment history, which post-dates *Astra*, nor the agreement's plain text. *See* J&J Reply 28.

Finally, as J&J has also noted, any PPA amendment to direct a pricing mechanism would also constitute a legislative rule that may be promulgated only through notice-and-comment procedures. J&J Br. 39-42; J&J Reply 28-32. Intervenors offer a brief footnote challenging that conclusion on the ground that HRSA could not take any steps to direct a pricing mechanism because the statute requires upfront discounts. Intervenor Br. 31 n.33. Intervenors' position in this regard is completely derivative of their erroneous statutory interpretation and should be rejected for the same reasons. Nor is it any answer that the PPA is a contractual agreement rather

than a promulgated regulation. When an agency's contract with a private party operates like a regulation, courts treat the contract as such and apply principles and requirements of administrative law accordingly. *See Commonwealth Edison Co v. U.S. Dep't of Energy*, 877 F.2d 1042, 1045-46 (D.C. Cir. 1989) (determining that a "Standard Contract" that utilities enter with the Department of Energy to pay for nuclear waste disposal "should be viewed as a regulation" and thus should be interpreted using principles of regulatory rather than contract interpretation).

## II. EXTENSIVE EVIDENCE IN THE ADMINISTRATIVE RECORD SUPPORTS J&J'S MOTION FOR SUMMARY JUDGMENT

J&J has comprehensively detailed its Rebate Model proposal and its commitment to ensuring that the model does not create administrative or financial burdens for covered entities, consistent with J&J's "must-offer" obligation under the statute. *See* J&J Reply 2-8 (responding to government and Intervenor assertions concerning the AR and J&J's Rebate Model); *see also* J&J Br. 16-17. J&J now offers the following four key points, focusing on important facts that render the record as to J&J even stronger than those of the plaintiffs in the parallel rebate model cases that Intervenors and the *Lilly* court overlooked.

### A. HRSA Rejected J&J's Rebate Model Without Considering Key Aspects of the Problems that J&J Raised

The AR makes clear that HRSA definitively and finally rejected J&J's Rebate Model, and that it did so without considering or responding to key aspects of the proposal made by J&J.

*First,* in rejecting J&J's Rebate Model, HRSA rendered a final decision with "direct and appreciable legal consequences" for J&J. *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). The AR demonstrates that:

- In its September 17, 2024 letter to J&J, HRSA expressly declared its view that J&J's Rebate Model is unlawful, making a concrete determination that J&J's "unapproved rebate proposal violates J&J's obligations under the 340B statute." AR202.

- In that letter, HRSA further declared that the "rebate proposal, if implemented, violates J&J's obligations under the 340B statute, [and] subjects J&J to potential consequences," including "termination of J&J's Pharmaceutical Pricing Agreement (PPA)" and "civil monetary penalties." AR203.

- HRSA also found that J&J's Rebate Model "violates Section 340B(a)(1)" because it "would require disproportionate share hospitals to purchase Stelara and Xarelto [the J&J drugs subject to the Rebate Model] at prices that exceed 'the maximum price[s] that covered entities may permissibly be required to pay' for those drugs." AR203 (quoting 42 U.S.C. § 256b(a)(1)).

- HRSA warned that J&J must "cease implementation of its rebate proposal immediately." AR204.

- J&J asked HRSA to reconsider, AR207-AR213, but HRSA stood firm, and threatened J&J with termination from the 340B program and referral to the HHS Office of Inspector General for civil monetary penalties if J&J proceeded with its Rebate Model, AR214.

In addition to confirming HRSA's definitive position that J&J's Rebate Model is unlawful, the AR also reflects that J&J is differently situated from four plaintiffs in the *Lilly* case, whom that court found could not challenge HRSA's decisionmaking because HRSA had not conclusively rejected their rebate models. *See Lilly*, 2025 WL 1423630, at *12-13 (holding that "the agency's ongoing review" rendered "premature" judicial review of "whether HRSA has considered all relevant factors with respect to" those plaintiffs' rebate models).

Instead, J&J is most similarly situated to the remaining plaintiff in the *Lilly* case, Sanofi-Aventis U.S. LLC ("Sanofi"), whom the *Lilly* court found had received a "determinative legal finding and final rejection" from HRSA as to the permissibility of its credit model. *Id.* at *13 (quoting AR425). The *Lilly* court based that determination on a letter HRSA sent to Sanofi on December 13, 2024 that rejected Sanofi's credit model in nearly identical language to the letter HRSA sent to J&J on September 17, 2024. *Compare* AR424-AR425 *with* AR202-AR203. HRSA's decision rejecting J&J's Rebate Model was at least as conclusive as its decision on Sanofi's model. Moreover, even after its final letter, J&J worked to engage with HRSA through

14

September and October 2024 by requesting follow-up meetings, presenting additional evidence, and expressly seeking HRSA's view as to the conditions under which HRSA would approve a rebate model—a request that HRSA still has not answered, seven months later. For example, the AR as to J&J shows that:

- After HRSA first threatened to terminate J&J from the program, J&J asked to meet again with HRSA on September 19, 2024. AR207.

- J&J made an additional presentation to HRSA on October 21, 2024 regarding the need for and benefits of the Rebate Model. AR234-AR246. J&J presented more details about the implementation of the Inflation Reduction Act ("IRA"), Pub. L. No. 117-169, 136 Stat. 181 (2022), the mechanics of the Rebate Model, and the refusal of covered entities to cooperate with audits by J&J's independent auditor, notwithstanding HRSA's approval of those audits. AR225; AR234-AR246.

- Following the meeting, J&J reiterated its request that HRSA approve the Rebate Model, and while reserving its legal rights, sought clarification from HRSA as to what set of facts HRSA would need to find to approve a rebate model. AR232.

- After HRSA provided no answer to that question by the date J&J requested, J&J informed HRSA that J&J would proceed on the understanding that HRSA's position remained unchanged. AR248. HRSA responded on October 30, 2024 that it was still reviewing the information J&J had submitted. AR252. Yet two weeks later, HRSA had not provided any response. *See* AR251.

- With no response from HRSA and given the urgency of the IRA deadlines, J&J had no choice but to file this lawsuit, as it informed HRSA on November 12, 2024. AR251. To this day, HRSA has not articulated the conditions under which it would approve a rebate model.

The AR reflects that J&J consistently sought to work with HRSA to address HRSA's concerns about J&J's Rebate Model, and that HRSA nonetheless refused to offer J&J any path to obtain approval of the rebate mechanism, compelling J&J to turn to litigation. AR251; *cf.* AR426 (Sanofi letter to HRSA announcing filing of suit December 16, 2024).

*Second*, the AR makes clear that, in rejecting J&J's Rebate Model, HRSA disregarded key aspects of the problem that J&J had raised, including extensive evidence of widespread noncompliance with 340B program integrity requirements. The AR is replete with examples of

efforts by J&J to raise program integrity issues with HRSA and to describe the opportunity the

Rebate Model presents to address those compliance concerns:

- J&J repeatedly described to HRSA its serious concerns about diversion of 340B drugs to non-patients and the significant potential for the Rebate Model to address those issues. *See*, *e.g.*, AR56; AR59; AR192; AR197; AR210; AR217.

- J&J presented extensive evidence of unlawful duplicate discounting. For example, J&J identified thousands of actual transactions in which Disproportionate Share Hospital ("DSH") covered entities received a 340B discount and then submitted or caused to be submitted claims for a Medicaid rebate in violation of the 340B statute. AR241; *see also* AR53-AR54; AR192; AR197. J&J repeatedly highlighted the benefits of the Rebate Model for minimizing these issues with no harm to covered entities or narrowing of the universe of 340B-eligible claims. *See* AR58-AR59; AR78-79; AR192; AR198-AR199; AR207-AR208; AR210; AR217.

- J&J highlighted concerning utilization trends with respect to specific J&J products that also pointed to program integrity concerns. AR62; AR73; AR161.

In its summary rejection of J&J's Rebate Model, HRSA neither mentioned nor addressed these

issues. HRSA's own explanation for denying J&J's Rebate Model did not include any discussion

of program integrity, *see* AR202-AR203, and, as the *Lilly* court found in examining the AR, there

is a "dearth of record evidence" indicating that HRSA considered these issues in making its

decision as to any of the manufacturers. *See Lilly*, 2025 WL 1423630, at *14 (granting Sanofi's

summary judgment motion on this ground).

HRSA also did not address the challenges confronting J&J in adhering to its dueling

obligations under the 340B program and the prescription drug provisions of the Inflation Reduction

Act. J&J raised repeatedly with HRSA that the Rebate Model is the only mechanism that J&J is

confident will permit compliance with both J&J's 340B obligations and the "maximum fair price"

("MFP") component of the IRA's drug price negotiation program. *See* AR59; AR167; AR198;

AR207; AR239. Under the IRA, J&J explained, covered entities are entitled to purchase drugs

selected for "negotiation" at the lesser of the 340B price or the MFP. AR59; *see also* 42 U.S.C. §

1320f-2(d).    J&J noted that the IRA includes a non-duplication provision that exempts manufacturers from providing both the 340B ceiling price and the MFP on the same drug unit. AR59; 42 U.S.C. § 1320f-2(d).  Effectuating the MFP thus requires identifying when 340B-priced drugs are dispensed to Medicare beneficiaries, but as J&J explained, the Centers for Medicare and Medicaid Services ("CMS"), the HHS component that administers the program, had not yet developed a mechanism enabling manufacturers to identify those claims as of fall 2024, AR59, and still has not.

J&J further explained that the two products covered by its Rebate Model have been selected for the "negotiation" program for 2026.  AR54; *see* AR73.  As J&J has also described to this Court in its motion for expedited consideration of this case, ECF No. 19 ("Expedite Mot."), J&J must submit to CMS a plan for effectuating the MFP and de-duplicating discounts on these two products by September 1, 2025.  *See* CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027*, § 90.2.1 (Oct. 2, 2024), http://bit.ly/3Y719J0.  With these deadlines looming, J&J explained to HRSA that it can meet its statutory and regulatory obligations to provide MFP rebates and avoid duplication only if it is able to rapidly scrutinize 340B drug dispensing data to which it currently lacks access. *See* AR238-AR239; J&J Br. 15; Expedite Mot. 3-6.  As J&J made clear to HRSA, the Rebate Model is the only existing mechanism that J&J is aware of that can fill the gap left by CMS, enabling J&J to identify Medicare claims in real time and implement all of its competing statutory obligations.  AR 54; AR167-AR168; AR238-239.  Nonetheless, HRSA's letters rejecting J&J's Rebate Model did not address the pressing and serious issue of IRA compliance and the solution the Rebate Model presents.

Additionally, for the Court's benefit as it considers these issues, J&J also notes that in addressing similar arguments relating to the IRA, the *Lilly* decision erroneously characterized certain key provisions of the IRA statute. In *Lilly*, the court stated that the IRA created an "inflation rebate program" under which "manufacturers must pay rebates to the Medicare program for drugs whose prices rise faster than inflation." *Lilly*, 2025 WL 1423630, at *4. The court continued that the IRA "directs CMS to identify specific drugs to be covered under the inflation-rebate program," and negotiate with manufacturers to establish the "maximum fair price" at which such drugs will be available to beneficiaries and covered entities. *Id.* at *4 n.4. However, although the *Lilly* court is correct that the IRA requires manufacturers to pay inflationary rebates if certain prices increase faster than the rate of inflation, 42 U.S.C. §§ 1395w-3a(i), 1395w-114b, those rebates are part of a separate component of the IRA that is not tied to the IRA's drug price negotiation program. Additionally, the inflationary rebates are not paid to covered entities, as the *Lilly* court implied, *see* 2025 WL 1423630 at *12, but instead will be paid to the government on a quarterly basis, 42 U.S.C. §§ 1395w-3a(i)(1)(B), 1395w-114b(a)(2). Accordingly, the *Lilly* court's analysis of the IRA should not bear on this Court's consideration of the issues J&J faces in complying with both the IRA's MFP requirements and 340B.

This Court should similarly disregard Intervenors' argument that there could be other ways to implement the IRA's de-duplication requirements besides the Rebate Model, including voluntary cooperation by covered entities with manufacturers. Intervenor Br. 30-31. As J&J has explained, that vague proposal rings hollow in the face of covered entities' ongoing resistance to J&J's duly authorized audits, as discussed in more detail immediately below. J&J Reply 21 n.3.

### B.    Audits Are Not Comparable to or a Substitute for Rebate Models

The Court should also reject Intervenors' suggestion that rebate models are unnecessary because the statutory audit process is a sufficient mechanism for J&J to address diversion and

duplicate discounting.  Intervenor Br. 1, 4, 13 & n.23.  Setting aside the significant difference in scope and purpose between audits and rebate models as noted above, Intervenors' claim is at odds with both the AR and this Court's docket, which includes no less than six cases by covered entities suing HRSA to block its approvals of J&J audits and thereby to obstruct J&J's exercise of its narrow statutory audit rights.  J&J Br. 13-14; J&J Reply 7-8.  The AR shows that J&J actively invoked the audit process to address its concerns about 340B program integrity, but has been met with staunch opposition by covered entities, rendering J&J's audit rights ineffective, inefficient, and essentially futile.  AR56; AR59; AR192; AR210; AR217.

Indeed, although Intervenors maintain that "[m]anufacturers must meet a fairly low bar in order to audit 340B providers," Intervenor Br. 13 n.23, Intervenors ignore that numerous covered entities have argued the opposite, insisting that J&J must meet an artificially high threshold to initiate an audit, as the AR reflects:

- In presentations to HRSA, J&J recounted concerning trends in purchases of J&J drugs by several covered entities that J&J identified, including an over 200% increase in 340B-priced purchases of STELARA at one covered entity.  AR161.

- J&J also identified thousands of transactions in which DSH covered entities received a 340B discount and then submitted or caused to be submitted a claim for a Medicaid rebate in violation of the 340B statute.  AR241; *see also* AR53.

- To get to the bottom of this issue, J&J made good-faith inquiries with approximately a dozen covered entities, which provided little substantive response.  AR162-AR163. Some covered entities refused even to provide any information without J&J first producing evidence of specific noncompliance, even though the 340B statute grants manufacturers audit rights precisely so that they can obtain such evidence.  AR163.

- Covered entities' stonewalling continued even after HRSA approved J&J's audit requests, preventing J&J from beginning the majority of the audits HRSA permitted. AR164.  Multiple covered entities hired outside counsel and refused to provide documents or information requested by J&J's third-party auditor.  AR164.  Some lobbied HRSA to rescind the audit approvals.  AR164.  Counsel for these covered entities also demanded that J&J produce all correspondence with HRSA that led to HRSA's approval of the audit requests, yet refused to agree to keep that information confidential.  AR164.

- Six of these entities eventually filed suits against HRSA seeking to halt the audits. *See* J&J Reply 7-8 (citing cases pending before this Court).

The AR demonstrates that, despite J&J's extensive good-faith efforts to use the available statutory audit procedures to address substantiated program integrity concerns, covered entities have deprived even those procedures of the value Congress intended for them. Intervenors' empty appeals to a process covered entities have rendered toothless should be no impediment to granting relief for J&J.

### C.    J&J's Rebate Model Would Impose Little to No Additional Costs or Burdens for Covered Entities

The AR extensively demonstrates that J&J's Rebate Model would impose minimal upfront costs or administrative burdens, if any, on covered entities. AR75. Intervenors' arguments to the contrary (at 12-13) misunderstand the facts of J&J's model, and rely on broad statements about hypothetical *other* models and extra-record purported information that was not before HRSA when it made its decision rejecting J&J's Rebate Model.

The AR, which provides the *exclusive* body of facts for the Court to evaluate in adjudicating the parties' summary judgment motions, reflects the following:

- In the course of discussing its Rebate Model with HRSA, J&J explained that the Rebate Model would impose minimal administrative burdens because the claims data required to validate a rebate payment are commercially standard data that covered entities *already collect and provide* as part of the normal course of business, including in reports to other 340B stakeholders. *See* AR56; AR61; AR207; AR242-AR243; *see also* J&J Reply 4.

- J&J represented that inclusion of these data elements in the Rebate Model would be consistent with HRSA's own guidance, which advises that manufacturers may "request standard information" and utilize "customary business practice[s]" in transacting with covered entities. 59 Fed. Reg. 25,110, 21,113-14 (May 13, 1994); *see* AR199.

- The Rebate Model would also impose minimal upfront costs, if any, on covered entities. AR75. Rebate payments would be disbursed when the number of validated dispensed units equals the number of units in the purchased package size. AR75;

AR82; AR179.  For STELARA, the unit of dispense is the same as the number of units in the package, meaning that covered entities could seek a rebate immediately upon dispense of any product.  For XARELTO, almost all 340B utilization is in unit-of-use bottles, so covered entities could also seek a rebate immediately upon dispensing the product.  AR75; AR82; AR93-AR94; AR179; AR185-AR186.

- J&J committed to paying rebates within seven to ten days of the covered entity's submission of the required data elements.  AR244; *see also* AR59; AR61; AR75; AR192; AR207.

- Most DSH hospitals have 15- to 30-day payment terms with wholesalers.  AR244; *see also* AR61-AR62.  As a result, covered entities that submit claims upon product dispense would receive a rebate *before* they would normally pay the wholesaler under standard payment terms.  AR192; AR198-AR199; AR208-AR209.

In granting the motion to intervene, the Court found that this evidence was insufficient to rebut Intervenors' claims of injury because J&J's argument assumed that drugs are dispensed quickly enough after purchase that a rebate claim could be paid faster than wholesaler invoices are due.  Any such time lag between a product purchase and a product dispense would be a function of covered entity inventory management practices, which are within their discretion to manage.  Further, there is also evidence in the AR that mitigates any potential harm.  As J&J informed HRSA, J&J "anticipates functionality" for the Rebate Model "that will permit payment of rebates based on *purchase data only*, up to a certain cap," without requiring the purchased drugs to be dispensed to eligible patients before the covered entity may submit a rebate claim for payment.  AR 244 (emphasis added).  This functionality, which is included in the Beacon platform on which the Rebate Model will operate, would mean that a covered entity that purchased a drug at the commercial price but did not dispense it immediately could still receive a rebate before payment was due to the wholesaler, provided that the covered entity timely submits claims data when the drug is later dispensed.  *See* AR411 (noting that Sanofi's "credit" mechanism, which uses the same platform as J&J's Rebate Model, will allow certain covered entities to receive a "presumptiv[e]" rebate based solely on "validation of only the Purchase Data Elements," and then submit "all

remaining applicable data elements within 30 days of the drug's dispense").  Concerns about delays in rebate payments are well taken but should not be a bar to adoption of J&J's Rebate Model.  Indeed, the D.C. Circuit has held that the must-offer provision *requires* manufacturers to make "a bona fide offer," meaning that "some conditions" on 340B sales "may be onerous enough to effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling." *Novartis*, 102 F.4th at 462.  J&J duly appreciates its binding statutory obligation to ensure that its rebate model provides for a bona fide offer at or below the ceiling price.  J&J Reply 16-17, 22-23.

### D.    J&J's Rebate Model Is Materially Similar to Covered Entities' Unilaterally Adopted Replenishment Models

The AR and other judicially noticeable evidence confirm that, despite Intervenors' claims, the replenishment models that covered entities voluntarily utilize are similar in key respects to J&J's Rebate Model.  *Contra* Intervenor Br. 10.  As J&J repeatedly articulated to HRSA, replenishment models are, in essence, a form of rebate model: covered entities make an initial drug purchase at a commercial price, with a subsequent chargeback to effectuate the 340B price.  *See, e.g.*, AR196; AR209; *see also* J&J Reply 32-33 (responding to the government's arguments on this issue).  And as just noted, covered entities that promptly submit rebate claims should receive the rebate payment *before* their wholesaler invoice is due under standard payment terms.  AR192; AR198-AR199; AR208-AR209.  As a result, under either model, covered entities on net pay only the 340B price, not the full wholesale cost.  *See* J&J Reply 32-33.

Intervenors' primary evidence that rebate models differ from replenishment models is a declaration by Intervenor 340B Health's CEO, Maureen Testoni.  Intervenor Br. 8, 26, 29 (citing ECF No. 43-2).  But the Testoni Declaration is an impermissible attempt to "supplement the administrative record" that should be "stricken" by the Court.  *Orphan Drug I*, 43 F. Supp. 3d at 34 n.6.  "[I]t is black-letter administrative law that in an APA case, a reviewing court 'should have

before it neither more nor less information than did the agency when it made its decision.'" *Id.* (quoting *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013)); *see also Am. Bottling Co. v. NLRB*, 992 F.3d 1129, 1140 (D.C. Cir. 2021) (judicial review of agency action is "confined to the full administrative record before the agency at the time the decision was made" (quoting *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981)). Courts strike extra-record affidavits submitted on summary judgment in APA cases. *See, e.g.*, *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623-24 (D.C. Cir. 1997) (affirming grant of motion to strike). The Court should do so here, or at the very least, disregard the Testoni Declaration in considering the pending motions. The Court also should decline to follow the lead of the *Lilly* decision, which improperly relied on extra-record assertions of alleged fact from a version of the Testoni Declaration filed in those cases. *Lilly*, 2025 WL 1423630, at *2-3, *12.

At this stage of the litigation, this Court should also disregard the various other declarations that Intervenors submitted in support of their motion to intervene, yet draw on now for their arguments on the merits. *See, e.g.*, Intervenor Br. 7, 8, 11, 12, 13. Extra-record declarations may be considered to evaluate a party's standing in an APA case, but nothing more; parties may not use declarations or affidavits filed to support standing to "smuggle in extra-record evidence relevant to the merits of [an] APA action." *Hisp. Affs. Project v. Acosta*, 263 F. Supp. 3d 160, 175 (D.D.C. 2017), *aff'd in part, rev'd in part on other grounds*, 901 F.3d 378 (D.C. Cir. 2018); *see also, e.g.*, *Int'l Ctr. for Tech. Assessment v. Johanns*, 473 F. Supp. 2d 9, 14 n.5 (D.D.C. 2007) ("The evidence submitted by the parties for purposes of summary judgment is relevant only to standing. The court's review of the agency's decisions on the merits is limited to the administrative record."); *Orphan Drug I*, 43 F. Supp. 3d at 34 n.6 (stating that extra-record materials submitted

23

by covered entity associations "would be stricken" as an improper attempt to "supplement the administrative record" if they had been relevant to the issues in dispute).

Setting aside their impermissible extra-record affidavit, Intervenors offer no answer to evidence that is *properly* before the Court that shows there is no material distinction between replenishment models and J&J's Rebate Model.  *See* Intervenor Br. 26-27.  In part due to its own improper reliance on extra-record materials on these issues, the *Lilly* court similarly erred in failing to find that the AR, which is common to all the rebate model cases in this District, disproves any supposed differences between rebate models and replenishment models.  *See Lilly*, 2025 WL 1423630, at \*12.  Intervenors' misapprehensions are further refuted by a brief filed this month by the same federal defendants from this case in another 340B litigation in this District, *Premier, Inc. v. HRSA*, No. 1:24-cv-03116 (D.D.C.).  In *Premier*, the government explained that, under replenishment models, each covered entity "must make their initial purchase of drugs that it intends to dispense to 340B-eligible patients at the wholesale acquisition cost," and that the 340B price is not realized until the drug is subsequently "'replenished' at the 340B price."  Mem. of P. & A. in Supp. of Defs.' Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. Summ. J. 8, *Premier, Inc.*, No. 1:24-cv-03116 (D.D.C. May 9, 2025), ECF No. 16 ("Premier Gov't Br.");[2] *see also id.* at 16 (describing "the product replenishment model" as a mechanism under which each covered entity "needs to make some purchases without the 340B discount").  That is a materially identical structure to J&J's Rebate Model, under which drug units are purchased at commercial prices and the 340B price is realized after the initial sale.  *See* J&J Reply 33.

---

[2] The Court may take judicial notice of this brief under Federal Rule of Evidence 201(b).  *See Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 72 (D.D.C. 2023), *aff'd sub nom. Ateba v. Leavitt*, 133 F.4th 114 (D.C. Cir. 2025) (taking judicial notice of brief); *Mdewakanton Sioux Indians of Minn. v. Zinke*, 264 F. Supp. 3d 116, 123 (D.D.C. 2017) (Contreras, J.) (noting that "a publicly available court filing meets [the] criteria" for taking judicial notice under Federal Rule of Evidence 201(b)).

The government's *Premier* brief also confirms that covered entities unilaterally introduced the product replenishment model without manufacturer consent or approval, and that HRSA has never asserted that the replenishment model required agency sign-off.  Per the government, "covered entities began using the product replenishment model of their own volition," Premier Gov't Br. 16, and HRSA "bec[a]me aware" of it only later "through its program integrity initiatives," *id.* at 10; *see also id.* ("[T]he agency never mandated that covered entities accept 340B price reductions through the product replenishment model …."); *id.* (discussing the "product replenishment model that the covered entities have voluntarily opted into").  These statements further demonstrate the irrationality of HRSA's invented pre-approval requirement for rebate models.  HRSA cannot reasonably permit covered entities unilaterally to reform the basic structure of the 340B Program without so much as a courtesy notice to the agency or manufacturers, while threatening severe sanctions against manufacturers for proposing to adopt rebate models through processes of good-faith engagement.  *See* J&J Br. 11, 42-44; J&J Reply 34-35.

## CONCLUSION

For the foregoing reasons, J&J respectfully requests that the Court grant its Motion for Summary Judgment, declare that J&J may utilize its Rebate Model for the 340B program and that HRSA's rejection of the Rebate Model was unlawful, and vacate and set aside HRSA's letters announcing that rejection decision and its website policy pronouncement requiring agency pre-approval for implementation of 340B rebate models.

DATED:  May 29, 2025

Respectfully submitted,

*/s/* Jeffrey L. Handwerker
Jeffrey L. Handwerker (D.C. Bar No. 451913)
jeffrey.handwerker@arnoldporter.com
Samuel I. Ferenc (D.C. Bar No. 1616595)
sam.ferenc@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000

Paula R. Ramer (*admitted pro hac vice*)
paula.ramer@arnoldporter.com
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000

*Counsel for Plaintiff Johnson & Johnson Health
Care Systems Inc.*

**CERTIFICATE OF SERVICE**

I certify that on May 29, 2025, I filed the foregoing with the Clerk of the Court using the

ECF System, which will send notification of such filing to the registered participants identified

on the Notice of Electronic Filing.

/s/ Jeffrey L. Handwerker
Jeffrey L. Handwerker